# 13-3605-cv(L), 13-3620-cv(CON), 13-3635-cv(CON), 13-4650-cv(CON), 13-4652-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

JOSEPH JESNER, *et. al*., VIKTORIA AGURENKO, *et al*., YAFFA LEV, *et al*., JOSEPH ZUR, *et al*., ODED AVRLINGI, *et al*.,

*Plaintiffs-Appellants,*

– v. –

ARAB BANK, PLC,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## REDACTED BRIEF AND SPECIAL APPENDIX FOR PLAINTIFFS-APPELLANTS

MICHAEL E. ELSNER
JOHN M. EUBANKS
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
(843) 216-9000

MARK WERBNER
JOEL ISRAEL
SAYLES WERBNER, PC
1201 Elm Street, 44th Floor
Dallas, Texas 75270
(214) 939-8700

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS ................................................................ i

TABLE OF AUTHORITIES ........................................................ iii

JURISDICTIONAL STATEMENT ................................................ 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ....................... 2

STATEMENT OF THE CASE ....................................................... 3

STATEMENT OF FACTS ........................................................... 5

SUMMARY OF THE ARGUMENT ................................................ 16

STANDARD OF REVIEW ......................................................... 17

ARGUMENT ....................................................................... 18

I.    CORPORATIONS MAY BE HELD LIABLE UNDER THE ATS BECAUSE *KIOBEL II* OVERRULED *KIOBEL I*. .................................. 18

    A.    By requiring more than "mere corporate presence" in the United States to displace the presumption against extraterritoriality, the Supreme Court determined that corporations may be held liable under the ATS. ........................... 20

    B.    By Addressing the Merits Issue of the Presumption Against Extraterritoriality, the Supreme Court Implicitly Overruled *Kiobel I*. ....................................................................... 23

    C.    Following *Kiobel II*, Cases in this Circuit Question the Precedential Authority of *Kiobel I*. .................................... 25

III.    WITHOUT THE CONSTRAINTS OF *KIOBEL I*, CORPORATE LIABILITY IS AVAILABLE UNDER THE ATS. ................................. 29

    A.    Every Other Circuit Court to Address Corporate Liability Under the ATS Has Rejected the *Kiobel I* Holding. ................. 29

    B.    Whether Corporations are Liable Under the ATS is an Issue Decided Under Federal Common Law, Which Permits Such Liability. ....................................................................... 30

        1.    Corporate Liability Has Long Been Recognized Under the Common Law. ..................................... 32

2.    The Text of the ATS Does Not Bar Corporate Liability. ..................................................................35

C.    Even Without Regard to Federal Common Law, Corporations May Violate the Law of Nations. ............................36

D.    General Principles of Law Support Corporate Liability for Violations of the Law of Nations. ......................................42

IV.    EVEN WERE *KIOBEL I* TO REMAIN THE LAW OF THIS CIRCUIT, THE SPECIFIC CLAIMS AT ISSUE HERE PERMIT CORPORATE LIABILITY..................................................43

A.    Congress Has Legislated that the Provision of Material Support or Resources to Foreign Terrorist Organizations Constitutes a Violation of the Law of Nations Permitting Corporate Liability. ..........................................................43

B.    Specialized Treaties Also Support Corporate Liability for the Acts at Issue in These Consolidated Cases. ............................48

V.    PLAINTIFFS REQUEST REINSTATEMENT OF THEIR GENERAL COMMON-LAW TORT CLAIMS. .....................................53

CONCLUSION................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Abdullahi v. Pfizer*, 562 F.3d 163 (2d Cir. 2009) ...................................................54

*Arab Bank, PLC v. Linde*, 134 S. Ct. 500 (2013) ...................................................15

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) 18, 35

*Balintulo v. Daimler AG*, 727 F.3d 174 (2d Cir. 2013)........................... 26, 27, 28

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964)................................34

*Bell v. Hood*, 327 U.S. 678 (1946) ........................................................................25

*Binder & Binder PC v. Barnhart*, 399 F.3d 128 (2d Cir. 2005) ...........................22

*Chowdhury v. WorldTel Bangladesh Holding, Ltd.*, No. 09-4483-cv, 2014
U.S. App. LEXIS 2507 (2d Cir. Feb. 10, 2014)........................................ 22, 28

*City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384 (2d Cir. 2008).............17

*Commerce and Indus. Ins. Co. v. U.S. Bank Nat'l Ass'n*, 2008 WL
4178474 (S.D.N.Y. Sept. 3, 2008) ...............................................................55

*Doe v. Nestle USA, Inc.*, 738 F.3d 1048 (9th Cir. 2013)................................. 20, 30

*Doe VIII v. Exxon Mobil Corp.*, 654 F.3d 11 (D.C. Cir. 2011), *vacated on
other grounds*, 527 F. App'x 7 (D.C. Cir. 2013)........................................passim

*EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991) ..................................23

*Erie R.R. Co. v. Tomkins*, 304 US 64 (1938) ................................................. 53, 55

*Ex parte McCardle*, 74 U.S. 506 (1869) ..............................................................24

*Farricielli v. Holbrook*, 215 F.3d 241 (2d Cir. 2000)...........................................14

*Flomo v. Firestone Nat. Rubber Co., LLC*, 643 F.3d 1013 (7th Cir. 2011).passim

*Flores v. Southern Peru Copper Corp.*, 414 F.3d 233 (2d Cir. 2003)..... 49, 50, 51

*Hilao v. Estate of Marcos*, 103 F.3d 789 (9th Cir. 1996)......................................54

*Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010) ...................... 45, 46

*In re Extradition of Garcia*, 615 F. Supp. 2d 162 (S.D.N.Y. 2009) .....................21

*In re Jesup & Lamont, Inc.*, 2014 WL 1245003 (Bank. S.D.N.Y. Mar. 26,
2014) ...............................................................................................................55

iii

*In re South African Apartheid Litig.*, 2013 U.S. Dist. LEXIS 181647 (S.D.N.Y. Dec. 26, 2013) ...................................................................28

*In re XE Servs. Alien Tort Litig.*, 665 F. Supp. 2d 569 (E.D. Va. 2009) .............19

*In re Zarnel*, 619 F.3d 156 (2d Cir. 2010)........................................ 22, 26

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) ...........................................41

*Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) ....................passim

*Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010), *aff'd on other grounds*, 133 S. Ct. 1659 (2013)....................................................passim

*Licci v. Lebanese Canadian Bank*, 732 F.3d 161 (2d Cir. 2013) ............ 23, 26, 28

*Linde v. Arab Bank, PLC*, 706 F.3d 92 (2d Cir. 2013) .........................................15

*Magee v. Nassau Cnty. Med. Ctr.*, 27 F. Supp. 2d 154 (E.D.N.Y. 1998) .............56

*Mansfield, C. & L. M. R. Co.* v. *Swan*, 111 U.S. 379 (1884)..................................24

*Marbury Mgmt. v. Kohn*, 629 F.2d 705 (2d Cir. 1980)..........................................56

*Martinez v. City of LA*, 141 F.3d 1373 (9th Cir. 1998)..........................................54

*Mastercard Int'l, Inc. v. Visa Int'l Serv. Ass'n*, 471 F.3d 377 (2d Cir. 2006) ................................................................................24

*Merchants Ins. Grp. v. Mitsubishi Motor Credit Ass'n*, 356 Fed. App'x 548 (2d Cir. 2009) ................................................................................14

*Morrison v. Nat'l Australian Bank*, 130 S. Ct. 2869 (2010).................... 23, 24, 25

*N.Y. Cent. & Hudson River R.R. Co. v. United States*, 212 U.S. 481 (1909) .......32

*Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123 (2d Cir. 2001) ................................................................................18

*Peterson v. Martinez*, 707 F.3d 1197 (10th Cir. 2013)..........................................22

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009) ................................................................................4

*Sarei v. Rio Tinto, PLC*, 671 F.3d 736 (9th Cir. 2011), *vacated on other grounds*, 133 S. Ct. 1995 (2013)........................................................30

*Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252 (11th Cir. 2009)............................30

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) .............................................passim

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998) .............. 24, 25

*Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984).....................41

*The Malek Adhel*, 43 U.S. (2 How.) 210 (1844) ....................................35

*The Nurnberg Trial*, 6 F.R.D. 69 (Int'l Military Trib. At Nuremberg 1946) ..........................................................................................41

*Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819) ..........................................................................................33

*United States v. Bell*, 524 F.2d 202 (2d Cir. 1975).............................21

*United States v. Holy Land Foundation for Relief and Development*, No. 3:04-CR-240-G (N.D. Tex.) ......................................................47

*United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989)...................22

*United States v. Plugh*, 648 F.3d 118 (2d Cir. 2011) ..................... 22, 26

*Wojchowski v. Daines*, 498 F.3d 99 (2d Cir. 2007)........................ 22, 25

## Statutes

18 U.S.C. § 2339B ..............................................................................45

28 U.S.C. § 1291...................................................................................2

Alien Tort Statute, 28 U.S.C. § 1350 ..........................................passim

Anti-Terrorism Act, 18 U.S.C. §§ 2331 *et seq.* ...................................1

Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (1996)..................................... 44, 45

International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.* ...............................................................................................46

U.S. Const., art. 1, § 8 ........................................................................43

## Other Authorities

1 Blackstone, *Commentaries on the Laws of England* (1765) .............32

1 James Kent, *Commentaries on American Law*, "Of Offences Against the Law of Nations" (1st ed. 1826) ...............................................31

1 Stewart Kyd, *Treatise on The Law of Corporations* (1793)...............32

26 Op. Att'y Gen. 250 (1907)..............................................................36

8 *Trials of War Criminals Before the Nurenberg Military Tribunals* (U.S. G.P.O. 1952)........................................................................ 38, 39

*9 Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10* (U.S. G.P.O. 1952) ...............................................39

Agreement Between Gov'ts of the United Kingdom, United States of America, and Union of Soviet Socialist Republics, and the Provisional Gov't of the French Republic on Certain Add'l Requirements to Be Imposed on Germany, 40 Am. J. Int'l. L. 1, 29 (1946) ...............................................................................................36

Anita Ramasastry, *Corporate Complicity: From Nuremberg to Rangoon – An Examination of Forced Labor Cases and Their Impact on the Liability of Multinational Corporations*, 20 Berkeley J. Int'l L. 91 (2002) ...............................................................................................40

Arab Bank Ltd., The Indomitable Arab: The Life and Times of Abdulhameed Shoman (1890-1974) Founder of the Arab Bank (1st ed. 1984) ................................................................................... 11, 12

Brief for the United States as Amicus Curiae Supporting Petitioners, *Kiobel v. Royal Dutch Petroleum*, No. 10-1491 (S. Ct. Dec. 2011)19, 31, 33, 41

Charter of the Int'l Court of Justice, Art. 38 .......................................................49

Charter of the Int'l Military Tribunal – Annex to the Agreement for the prosecution and punishment of the major war criminals of the European Axis, 59 Stat. 1544, 82 U.N.T.S. 279 (Aug. 8, 1945) ....................36

Exec. Order No 13,224, 66 Fed. Reg. 49,079 (Sept. 25, 2001) ................... 46, 47

Int'l Convention for the Suppression of the Financing of Terrorism, Dec. 9, 1999, 2178 U.N.T.S. 229 ........................................... 3, 46, 50

John Ruggie, Report of the Special Representative of the Secretary-General on the issue of human rights and transnational corporations and other business enterprises, *Protect, Respect and Remedy: a Framework for Business and Human Rights*, U.N. Doc. A/HRC/8/5 (7 April 2008) .............................................................................................43

Joseph K. Angell & Samuel Ames, *Treatise on the Law of Private Corporations Aggregate* (7th ed. 1861)............................................................33

Louis Henkin, *Foreign Affairs and the United States Constitution* (2d ed., 1996) ...............................................................................................31

Paul Hoffman & Beth Stephens, *International Human Rights Cases Under State Law and in State Courts*, 3 U.C. IRVINE L. REV. 9 (2013)..........54

S.C. Res. 1267, U.N. Doc. S/RES/1267 (Oct. 15, 1999) ................................ 51, 52

**S.C. Res. 1373, U.N. Doc. S/RES/1373 (Sept. 28, 2001)** .......................52

**S.C. Res. 1390, U.N. Doc. S/RES/1390 (Jan. 16, 2002)** .......................52

**S.C. Res. 1455, U.N. Doc. S/RES/1455 (Jan. 17, 2003)** .......................52

**S.C. Res. 1526, U.N. Doc. S/RES/1526 (Jan. 30, 2004)** .......................52

**U.N. Charter, Art. 103** ............................................................................51

## **Rules**

**Fed. R. Civ. P. 12(b)(1)** .........................................................................4

**Fed. R. Civ. P. 12(b)(6)** .........................................................................4

**Fed. R. Civ. P. 12(c)** ................................................................... 1, 5, 17

**Fed. R. Civ. P. 15(a)** ............................................................................56

**Fed. R. Civ. P. 54(b)** ..............................................................................1

**Local Civ. R. 56.1** ..................................................................................5

# JURISDICTIONAL STATEMENT

In the district court, Plaintiffs-Appellants ("Plaintiffs") brought claims against Defendant-Appellee Arab Bank plc ("Defendant", "Arab Bank", or "the Bank") alleging that it violated the law of nations giving rise to claims under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"). At issue is whether ATS claims for financing terrorism, crimes against humanity, and genocide may proceed against a corporation.[1]

On August 23, 2013, District Judge Cogan issued an Order granting Arab Bank's motion for judgment on the pleadings under Fed. R. Civ. P. 12(c). *See* SPA-1-8.[2] Final judgment issued in the *Jesner* (13-3605), *Lev* (13-3635), and *Agurenko* (13-3620) cases on August 27, 2013. *See* SPA-9-10. Timely notices of appeal were filed in those three cases on September 20, 2013. *See* A-1058-1059.[3] Partial final judgment under Fed. R. Civ. P. 54(b) was entered in the *Almog* (13-4650) and *Afriat-Kurtzer* (13-4652) cases as to all ATS claims on October 16,

---

[1] In the district court, these cases were consolidated for consideration with claims on behalf of American-citizen victims under the Anti-Terrorism Act, 18 U.S.C. §§ 2331 *et seq.* ("ATA"), and the first trial in the ATA cases is currently scheduled to commence on August 11, 2014 based on the same nucleus of material facts.

[2] Citations to "SPA-__" refer to inclusion of these documents in the Special Appendix that has been filed with this brief.

[3] Citations to "A-__" refer to inclusion of these documents in the Joint Appendix that has been filed with this brief.

2013.  *See* SPA-11-12.  Timely notices of appeal were filed in those two cases on November 7, 2013.  *See* A-1060-1163.  On Plaintiffs' motion, these cases were consolidated for consideration by order dated January 6, 2014.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 over the final decision of Judge Cogan of the U.S. District Court for the Eastern District of New York.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Plaintiffs' ATS claims against Arab Bank were dismissed by the district court based solely on this Court's decision in *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 149 (2d Cir. 2010) ("*Kiobel I*"), *aff'd on other grounds*, 133 S. Ct. 1659 (2013), which held that the ATS "does not provide subject matter jurisdiction over claims against corporations."  That dismissal was erroneous in light of the Supreme Court's narrow affirmance of *Kiobel I*.  Plaintiffs therefore raise the following issues in this appeal:

A. Whether the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) ("*Kiobel II*")—which narrowly held that "mere corporate presence" in the United States by itself is insufficient to overcome the presumption against extraterritoriality under the ATS—*de facto* abrogated *Kiobel I*'s holding that ATS claims cannot proceed against corporations.

2

B. Whether the District Court erred in determining that Plaintiffs cannot sue Arab Bank, notwithstanding international conventions and domestic law that specifically provide corporate/entity liability for the Financing of Terrorism. *See, e.g.,* Int'l Convention for the Suppression of the Financing of Terrorism, Dec. 9, 1999, 2178 U.N.T.S. 229 ("Financing Convention").

C. Whether, in the alternative, the District Court erred in determining that Plaintiffs may not reinstate common-law causes of action that were dismissed as redundant of their ATS claims in 2007.

## STATEMENT OF THE CASE

This appeal arises out of five separate lawsuits filed between 2004 and 2010 in the U.S. District Court for the Eastern District of New York asserting claims on behalf of Plaintiffs—including family members and estate representatives—who are victims of terrorist attacks that took place in Israel, the West Bank, and the Gaza Strip between January 1995 and July 2005.

Plaintiffs allege that the Bank purposefully financed terrorism by providing financial services to Foreign Terrorist Organizations ("FTOs") that committed the suicide bombings and other terrorist attacks that caused Plaintiffs' injuries. The Bank also knowingly and purposefully distributed millions of dollars to terrorists and the families of terrorists on behalf of the Saudi Committee in Support of the

Al-Quds Intifada ("Saudi Committee").[4]   As the bank of choice for these enterprises, Plaintiffs claim that Arab Bank financed terrorism in violation of the law of nations and that it aided and abetted crimes against humanity and genocide.

On January 29, 2007, the District Court denied the Bank's initial motion to dismiss Plaintiffs' ATS claims under Fed. R. Civ. P. 12(b)(1), 12(b)(6), and the doctrine of *forum non conveniens* in the *Almog* and *Afriat-Kurtzer* cases.  The court concluded that Plaintiffs sufficiently pled ATS claims in accord with the Supreme Court's decision in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).  *See* A-533-577.

On January 29, 2010, the District Court—faced with a second motion to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) following this Court's decision in *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009) (holding that "the *mens rea* standard for aiding and abetting liability in ATS actions is purpose rather than knowledge alone")—held that Plaintiffs' claims met the *mens rea* threshold set forth in *Talisman Energy*.  *See* A-774-784.

---

[4]     As alleged in the *Almog* First Amended Complaint, "[a]ccording to official Saudi sources, the purpose of the [Saudi Committee] was to support financially, among others, the families and dependents of Palestinian 'martyrs.'" A-235; *see also* A-235-244 (providing further description of how the Saudi Committee provided these funds to terrorists and their families that Plaintiffs alleged in their pleadings).

Neither of these prior decisions is a proper subject of this appeal. The parties commenced merits discovery in early-2005, and that discovery continued in these cases until the district court's dismissal in August 2013.

Following this Court's decision in *Kiobel I*, and the Supreme Court's decision in *Kiobel II*, Arab Bank filed a third motion to dismiss Plaintiffs' ATS claims—this time under Fed. R. Civ. P. 12(c), or, in the alternative, Local Civ. R. 56.1. On August 23, 2013, Judge Cogan issued a narrow order concluding that the law in the Second Circuit precludes ATS claims against corporations. *See* SPA-1-8. The Court also rejected Plaintiffs' alternate request to reinstate their common law claims in the event the Court chose to dismiss Plaintiffs' ATS claims. *See id.*

## STATEMENT OF FACTS

**1.     Parties and Claims.**     Plaintiffs are foreign-national victims—including heirs and survivors—of terrorist attacks that took place in Israel, the West Bank, and the Gaza Strip between January 1995 and July 2005. Plaintiffs assert tort claims under the ATS against Arab Bank for providing financial services for, and distributing funds to, the terrorist organizations (and their proxies) that engaged in the acts in which Plaintiffs were injured. These terrorist organizations include the Islamic Resistance Movement, or Hamas; the Palestinian Islamic Jihad ("PIJ"); the Al-Aqsa Martyrs' Brigades ("AAMB"); the Popular Front for the Liberation of Palestine ("PFLP"); and others.

Since 1983, Arab Bank operated a federally-chartered branch in New York that provided "clearing and correspondent bank services to its foreign bank branch offices and to affiliated banking institutions also owned and/or controlled by the Arab Bank Group as well as other foreign banks." A-197-198; A-201. Arab Bank's presence in New York was used to clear dollar transactions for transfer to a variety of Hamas and other Palestinian terrorist groups that were perpetrating terrorist acts in an attempt to eradicate the Israeli presence in the Middle East. *See, e.g.,* A-209.

**2. Transactions for Individual Terrorists and Terrorist Front Organizations.** Arab Bank processed wire transfers through its New York branch to designated terrorists and terrorist entities including Hamas founders and leaders of the military wing of Hamas and numerous entities designated as Specially Designated Global Terrorists ("SDGT") by the United States Government for their role within Hamas' fundraising infrastructure. Based on the discovery record in these cases, Arab Bank processed ███████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████.[5] This list includes ███████████████████████

---

[5] Citations to "CA-__" refer to inclusion of these documents in the Confidential Joint Appendix that has been filed with this brief under seal.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████.[8]

In addition to ████████████, Arab Bank ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[6]   *See id.*

[7]   *See* CA-98 ████████████████████████████████
████████████.

[8]   *See* CA-99-101 ███████████████████████████
████████████.

[9]   *See, e.g.,* CA-102-104.

[10]  *See* CA-96.

[11]  *See* CA-105-107.



Discovery has also highlighted that Arab Bank ████████████████████████████████

████████████████████████████████████████████████

████████████ *See* CA-115. The Bank ████████████████████████

████████████████████████████████████████████████

████████████████████████ *See* R. 905, Ex. 10.[13]

**3.    Transactions For the Benefit of the Saudi Committee.**  Similarly,

Arab Bank utilized its New York branch to convert Saudi Riyals into U.S. dollars

for the Saudi Committee, which in December 2000 began to send tens of thousands

of transfers and over $90 million to, *inter alia*, Hamas social service organizations

in Palestine and families of Palestinians "martyred" during the "Second Intifada."

The Second Intifada was a Palestinian armed uprising that commenced in October

---

[12]    *See* CA-108-110.

[13]    Citations to "R. __" refer to the document number in the District Court
record in *Almog, et al. v. Arab Bank, PLC*, No. CV 04-5564 (BMC)(VVP).

2000 and was "characterized by systematic and widespread terror campaigns designed not only to kill Jews and Israelis, but to intimidate and coerce the civilian population of Israel, to cause Israel to cede territory to the Palestinians and ultimately, to destroy the Jewish state." *See* A-221. The 1988 Hamas Charter states that "Israel will exist and will continue to exist until Islam will obliterate it, just as it obliterated others before it." A-223; *see also* A-223-232 (describing similar goals to destroy the State of Israel by PIJ, AAMB, and PFLP).

Documentation produced in discovery by the Bank



9





At trial, Plaintiffs would connect these and other transfers that Arab Bank processed through its New York branch to the terrorist attacks that gave rise to Plaintiffs' claims.

**4.     For Decades, Arab Bank's Financial Support for Defeating and Destroying the "Zionist Entity" Has Been Well-Documented.**   The Bank's conduct in support of FTOs and their leaders is grounded in the Bank's historical foundation supporting armed resistance against the "enemy."  The founder of Arab Bank, Abdulhameed Shoman, "[b]eing now fully aware of the Zionist threat … thought it useful to link the idea of establishing a bank to the urgent need of protecting their Arab homeland, of reinforcing their powers of resistance to colonialism and Zionism, and of assuring the Arabs of ultimate victory over those enemies…."[14]  For decades, Arab Bank has routinely described the State of Israel as its enemy.  *See, e.g.,* R. 905, Ex. 121 at 13 (decrying the danger posed by the "Zionists" and urging the Arabs "to concert their efforts throughout the area

---

[14]     Arab Bank Ltd., The Indomitable Arab: The Life and Times of Abdulhameed Shoman (1890-1974) Founder of the Arab Bank 118 (1st ed. 1984).

11

extending from the Atlantic Ocean to the west to the Arabia Gulf in the east, and to sacrifice their lives and offer the money needed for their self-defence and for the liberation of their sacred places and all their occupied territories"); R. 981, Ex. E-31 at 57:1-58:10 (referring to Israel as the "Zionist enemy"); R. 910-2, Ex. 17 (referring to Israel as the "occupying enemy").

With regard to the Bank's founder's views regarding revolutionary movements within the Palestinian sphere, "[i]mpelled by his enthusiasm for the cause, [Abdulhameed Shoman] insisted on confirming his support with substantial financial contributions, saying: 'In the past, I fought with word and deed, and now I fight with my money.'"[15]  The Bank's promotional materials further solidified this adversarial relationship between the Bank and the State of Israel.  For example,

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

---

[15]     The Indomitable Arab at 328.

██████████████████████████████

██████████████████████████████

██████████████████████████████

████████████████ R. 905, Ex. 122.

5.    **The Bank's U.S. Regulators Penalize It.**  In 2004, the Office of the Comptroller of the Currency ("OCC") and the Financial Crimes Enforcement Network ("FinCEN"), two of the Bank's U.S. regulators, commenced investigations of the Bank's compliance with Anti-Money Laundering and Bank Secrecy Act regulations.  These investigations yielded the imposition of significant financial sanctions on the Bank.  The OCC found the wire-transfer services offered by the Bank's New York branch sufficiently alarming to merit an order that its New York branch cease those transfers and other traditional banking activities.[16]  FinCEN, the Treasury Department's enforcement arm, fined Arab Bank $24 million for failing to "identify and report suspicious transactions in a timely manner."[17]  FinCEN concluded that Arab Bank's New York branch was the Bank's mechanism through which "funds transfers occurred on a global basis."  A-1013.  FinCEN determined that the Bank's "customer base and geographic locations of the Arab Bank Group and correspondent institutions, and the volume of funds

---

[16]    A-982 at 2.

[17]    A-1013.

13

transfers that Arab Bank-New York cleared, posed heightened risks of money laundering and terrorist financing." A-1014. It found that Arab Bank failed to recognize that "names similar to those of originators and beneficiaries in funds transfers cleared by Arab Bank-New York appeared in credible and publicly available sources of information, including Congressional testimony, indictments in the United States, and well-publicized research and media reports, linking the originators and beneficiaries to illicit activity." A-1018. Consequently, the New York branch was found to have "failed to apply an adequate system of internal controls to the clearing of funds transfers" that led to "a failure on the part of Arab Bank - New York to identify and report suspicious transactions in a timely manner." A-1014.[18] Although the regulators' focus was on the Bank's New York branch, their findings and observations speak to the Bank's global conduct.

---

[18] This Statement of Facts demonstrates that Arab Bank engaged in substantial activity within the United States that played a significant role in facilitating the relevant terrorist attacks that form the basis for Plaintiffs' claims. Without the Bank's domestic actions, it could not have made the substantial monetary transfers to terrorists and their sympathizers that Plaintiffs have specifically identified. This Court's post-*Kiobel II* precedent regarding the "touch and concern" test therefore strongly supports the conclusion that the extraterritorial aspects of the Bank's misconduct do not preclude Plaintiffs' claims. Because the district court did not address this issue below, remand is necessary to permit the district court to determine whether Plaintiffs have successfully displaced the presumption against extraterritoriality because the Bank's relevant conduct touched and concerned the United States with sufficient force. *See Merchants Ins. Grp. v. Mitsubishi Motor Credit Ass'n*, 356 Fed. App'x 548, 552 (2d Cir. 2009), *quoting Farricielli v. Holbrook*, 215 F.3d 241, 246 (2d Cir. 2000) ("[i]t is our settled practice to allow the district court to address arguments in the first instance").

14

6.     **The Bank's Obstructive Discovery Conduct.**   In the face of these allegations, the Bank chose to defy court orders and withhold production of nearly all of the account records and internal documents concerning the accounts it maintained for designated terrorists and their front groups and the families of the suicide bombers who maintained accounts and received wire transfers from the Bank.

Notwithstanding the Bank's steadfast refusal to turn over the account records of its designated terrorist account holders and suicide bombers' families—which became the subject of a sanctions order that has been reviewed by this Court previously on a *mandamus* petition (*see Linde v. Arab Bank, PLC*, 706 F.3d 92 (2d Cir. 2013))[19]—Plaintiffs have obtained thousands of pages of evidence as part of their own investigation, including some of the Bank's own documents produced to

---

While the district court did not decide this issue on Defendant's motion, earlier in the litigation, the district court found that "a significant number of transactions at issue [in these cases] took place in New York."  R. 958 at 2.  The district court also noted that "counsel for the Bank has suggested that [the Saudi Committee transfers] . . . 'didn't touch New York'—even though the so-called 'cover transactions' for which no documents were produced did in fact go through New York."  Further, "it is simply not acceptable … for Arab Bank to withhold the *documents showing the funds transfers through New York which plaintiffs seek to make their case*."  R. 251 at 5-6.

[19]     Following this Court's 2013 decision, Arab Bank filed a petition for a writ of *certiorari* with the Supreme Court.  On October 21, 2013, the Supreme Court invited the Office of the Solicitor General to express its views on the case.  *See Arab Bank, PLC v. Linde*, 134 S. Ct. 500 (2013).  The Office of the Solicitor General has not yet issued its brief in response to the Supreme Court's invitation.

the U.S. Government, which confirmed the allegations asserted in the Complaints. The full scope of Arab Bank's complicity and purposeful conduct may never be known, however, as the Bank continues to refuse to produce account records and internal correspondence concerning accounts of designated terrorists.

## SUMMARY OF THE ARGUMENT

The Supreme Court's decision in *Kiobel II* explicitly and implicitly abrogated this Court's holding in *Kiobel I* on multiple grounds including by: (a) not affirming *Kiobel I*'s bright-line holding seemingly barring all ATS claims against corporations and instead crafting a test for extraterritorial application of the ATS that requires more than "mere corporate presence" in the U.S. to establish ATS claims; and (b) addressing the merits and thus assuming subject matter jurisdiction in the case. These issues have manifested themselves in a lack of clarity in this Court's post-*Kiobel II* ATS decisions thus raising questions regarding the continued precedential value of *Kiobel I*.

Because *Kiobel I* no longer represents good law, the proper basis for addressing corporate liability under the ATS is to look to federal common law rather than customary international law. Regardless of the sources of law consulted, however, corporate liability is available.

To the extent this Court determines that *Kiobel I* remains precedential, the ATS claims at issue in these cases—all related to terrorist financing—have been

16

designated as violations of the law of nations under congressional constitutional authority to "define and punish … offences against the law of nations" in addition to specialized treaties and other binding international instruments related to terrorism and terrorist financing. Therefore, this Court should find in Plaintiffs' favor notwithstanding *Kiobel I* and remand these cases for further consideration in the district court on the applicability of *Kiobel II*'s presumption against extraterritoriality.

Alternatively, should this Court determine that Plaintiffs' ATS claims were appropriately dismissed under *Kiobel I*, Plaintiffs' state and foreign common-law claims that were previously dismissed as redundant should be reinstated under this Court's logic in *Kiobel I* that "nothing in this opinion limits or forecloses corporate liability under any body of law other than the ATS." 621 F.3d at 149.

## STANDARD OF REVIEW

This Court applies a *de novo* standard of review to the district court's grant of a motion to dismiss under Fed. R. Civ. P. 12(c). *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 392 (2d Cir. 2008). "[T]he district court must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor. The court will not dismiss the case unless it is satisfied that the complaint cannot state any set of facts that would entitle him to relief." *Patel v.*

17

*Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001) (citations omitted).

## ARGUMENT

## I. CORPORATIONS MAY BE HELD LIABLE UNDER THE ATS BECAUSE *KIOBEL II* OVERRULED *KIOBEL I*.

The ATS "by its terms does not distinguish among classes of defendants." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 438 (1989), and expressly includes jurisdiction in the federal courts for "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. In determining that corporations were not among the class of defendants that may be held liable under the ATS, the *Kiobel I* court relied heavily upon footnote 20 in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), which states, "[a] related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual." 542 U.S. at 732, n.20 (discussed as "the question before us" in *Kiobel I*, 621 F.3d at 120 to conclude that under *Sosa*, ATS suits against corporations cannot proceed).

That reliance was misplaced. Footnote 20 makes clear that the phrase "private actor" encompassed *both* corporations and individuals, and the Supreme Court made no effort to distinguish those types of "private actor[s]." Subsequent

18

to *Kiobel I*, the D.C. Circuit concluded that "[f]ootnote 20 appears to reference this dichotomy [between private and state actors in international law], which was briefed before the Supreme Court, as opposed to an argument about corporate liability, which was not."  *Doe VIII v. Exxon Mobil Corp.*, 654 F.3d 11, 50-51 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013); *see also In re XE Servs. Alien Tort Litig.*, 665 F. Supp. 2d 569, 588 (E.D. Va. 2009) ("Nothing in the ATS or *Sosa* may plausibly be read to distinguish between private individuals and corporations").

Likewise, the United States government, in its brief to the Supreme Court as *amicus curiae* urging reversal of *Kiobel I* on the issue of corporate liability, unequivocally stated that *Kiobel I* "misread the distinction between state actors and non-state actors—a distinction well recognized in international law—as a basis for drawing a distinction between natural and juridical persons—one that finds no basis in the relevant norms of international law."  *See* Brief for the United States as Amicus Curiae Supporting Petitioners at 18, *Kiobel v. Royal Dutch Petroleum*, No. 10-1491 (S. Ct. Dec. 2011) ("2011 U.S. Amicus Brief").

The precise question before the Supreme Court in *Kiobel II* was whether to affirm *Kiobel I*'s bright-line holding; however, *Kiobel II* did not affirm this holding.  Instead, *Kiobel II* affirmed the judgment below on different grounds— because plaintiffs failed to show a sufficient nexus between their claims and the

19

United States to displace the presumption against extraterritoriality that the Court applied to the ATS. Finding that "mere corporate presence" of a defendant in the United States alone was insufficient to extend the ATS's reach to include plaintiffs' claims, the Court imposed an entirely different basis of dismissal to resolve the case. In doing so, the Supreme Court effectively abrogated *Kiobel I*'s holding.

> **A.** **By requiring more than "mere corporate presence" in the United States to displace the presumption against extraterritoriality, the Supreme Court determined that corporations may be held liable under the ATS.**

*Kiobel II* expressly undermines *Kiobel I*. The Ninth Circuit's December 2013 opinion in *Doe v. Nestle USA, Inc.*, cites *Kiobel II* for the proposition that "corporations can face liability for claims brought under the [ATS]." 738 F.3d 1048, 1049 (9th Cir. 2013). Writing for a unanimous Court, Chief Justice Roberts plainly acknowledges that corporations may, in appropriate circumstances, be sued under the ATS. This conclusion follows the Court's discussion of "corporate presence" as a factor affecting extraterritorial application of the ATS: "Corporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices." 133 S. Ct. at 1669. Under the specific facts in *Kiobel*, "all the relevant conduct took place outside the United States." *Id.*

Nevertheless, the Court held that <u>corporate presence plus relevant conduct that sufficiently touched and concerned the United States *does* provide a basis for</u>

20

<u>corporate liability under the ATS</u>.  Chief Justice Roberts wrote "where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." *Id.*  "Mere corporate presence" would not suffice to displace the presumption.  Justice Breyer's concurrence—joined by three Justices—describes this "corporate presence" statement as one of *Kiobel II*'s "four key propositions of law" and explicitly agrees with it.  *Id*. at 1670, 1678.

Thus, in a case where corporate liability under the ATS was squarely presented, all nine Justices agreed that <u>mere</u> corporate presence in the United States is insufficient to rebut a presumption against extraterritorial application of the ATS.  That discussion would have been superfluous unless viable corporate defendants may exist.  Given the majority's observations regarding displacing the presumption against extraterritoriality and Justice Breyer's characterization of that analysis as "key" to the Court's ruling, this point is controlling.

Furthermore, this language addresses one of the questions presented to the Supreme Court upon which the petition for a writ of *certiorari* was granted.  Even if it were to constitute dicta, which the Bank argued below, "dictum [that] constitutes the Supreme Court's only pronouncement on the topic ... is entitled to 'considerable weight.'"  *In re Extradition of Garcia,* 615 F. Supp. 2d 162, 169 (S.D.N.Y. 2009), citing *United States v. Bell*, 524 F.2d 202, 206 (2d Cir. 1975).

21

Lower courts "are bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements." *Peterson v. Martinez*, 707 F.3d 1197, 1210 (10th Cir. 2013); *see also United States v. Indelicato*, 865 F.2d 1370, 1281 (2d Cir. 1989).

> And as this Court has stated, where:

> reconsideration of our prior decision requires revisiting and reversing existing Circuit law, we do so only under limited circumstances, among them, where "there has been an intervening Supreme Court decision that casts doubt on our controlling precedent." *Wojchowski v. Daines*, 498 F.3d 99, 106 (2d Cir. 2007) (internal quotation marks omitted). "The intervening decision need not discuss the precise issue decided by the panel for this exception to apply." *In re Zarnel*, 619 F.3d 156, 168 (2d Cir. 2010).

*United States v. Plugh*, 648 F.3d 118, 124 (2d Cir. 2011). The circumstances justifying reexamination of Circuit precedent applies even where the Supreme Court decision only "subtly disturbed the law of [the] Circuit." *Wojchowski*, 498 F.3d at 108 (quoting *Binder & Binder PC v. Barnhart*, 399 F.3d 128, 134 (2d Cir. 2005)).

This point appears to have weighed on Judge Pooler in her concurrence in *Chowdhury v. WorldTel Bangladesh Holding, Ltd.*, No. 09-4483-cv, 2014 U.S. App. LEXIS 2507, at *37, n.2 (2d Cir. Feb. 10, 2014) (Pooler, J., concurring) (questioning reference in a majority footnote to *Kiobel I* remaining the law of the Circuit in light of *Kiobel II* and referring to such reference as dicta that she did not join). In addition, the panel in *Licci v. Lebanese Canadian Bank*, 732 F.3d 161,

22

174 (2d Cir. 2013), could not definitively say whether *Kiobel I* remained the law of the Circuit regarding corporate liability under the ATS and remanded claims to the district court to address that issue.

In short, *Kiobel II* specifically recognized that, under appropriate circumstances, a corporation may be held liable under the ATS. By deciding this issue, the Supreme Court abrogated the bright-line holding in *Kiobel I*.

**B.** **By Addressing the Merits Issue of the Presumption Against Extraterritoriality, the Supreme Court Implicitly Overruled *Kiobel I*.**

As a threshold matter, the Supreme Court in *Kiobel II* necessarily determined that it possessed subject matter jurisdiction over an ATS claim against a corporate defendant by proceeding to the merits issue of the presumption against extraterritoriality. *See Morrison v. Nat'l Australian Bank*, 130 S. Ct. 2869, 2877 (2010) (holding that consideration of the extraterritorial reach of § 10(b) of the Securities and Exchange Act of 1934 "is a merits question"); *see also Kiobel II*, 133 S. Ct. at 1664. The unique, fact-specific balancing test created in *Kiobel II* to determine whether the claims touch and concern the United States with sufficient force to displace the presumption against extraterritoriality is a stronger case than *Morrison* where the Supreme Court clearly decided that Section 10(b) does not apply extraterritorially. *See also EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991).

23

In *Kiobel I*, this Court held that the absence of corporate liability under the ATS is a subject matter jurisdiction question. 621 F.3d at 149. But *Kiobel II* never could have reached a merits issue—the presumption against extraterritoriality— without first finding that subject matter jurisdiction existed. In *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), the Supreme Court held:

> "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle,* 74 U.S. 506, 7 Wall. 506, 514, 19 L. Ed. 264 (1869)…. The requirement that jurisdiction be established as a threshold matter "springs from the nature and limits of the judicial power of the United States" and is "inflexible and without exception." *Mansfield, C. & L. M. R. Co.* v. *Swan,* 111 U.S. 379, 382, 28 L. Ed. 462, 4 S. Ct. 510 (1884).

523 U.S. at 94-95; *see also Mastercard Int'l, Inc. v. Visa Int'l Serv. Ass'n*, 471 F.3d 377, 383 (2d Cir. 2006) ("[b]efore we can discuss the merits of [an] appeal, we must first establish that we have jurisdiction to do so.").

In *Morrison*, the Supreme Court held that "to ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits, which is a merits question." 130 S. Ct. at 2877. In other words, looking to the conduct of a party—including extraterritorial conduct—is a merits issue that could not be addressed without the Supreme Court determining that it possessed subject matter jurisdiction. *Kiobel II* states that "[t]he question here is not whether petitioners have stated a proper claim under the ATS, but whether a claim may reach conduct occurring in the territory of

a foreign sovereign." 133 S. Ct. at 1664. Borrowing from *Morrison*, *Kiobel II* asks what conduct ATS claims reach which is the same as asking what conduct ATS claims prohibit, and this "is a merits question." In *Steel Co.*, subject matter jurisdiction "is not defeated … by the possibility that the averments might fail to state a cause of action on which petitions could actually recover." 523 U.S. at 89 (quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946)). Addressing the extraterritorial reach of the ATS, however, attempts to determine if there is a valid cause of action, which "does not implicate subject-matter jurisdiction." *Id.*

By reaching the merits issue that a presumption against extraterritoriality applies to the ATS, the Supreme Court necessarily determined that it possessed subject matter jurisdiction thereby rendering *Kiobel I* infirm and stripping *Kiobel I* of any precedential effect.

### C. Following *Kiobel II*, Cases in this Circuit Question the Precedential Authority of *Kiobel I*.

Even if the Supreme Court had not explicitly overruled *Kiobel I*, recent decisions in this Court and in other jurisdictions have questioned the authority and legitimacy of *Kiobel I*'s precedential authority. Those questions are well-founded and require that *Kiobel I*'s bright-line holding be expressly reversed in light of *Kiobel II*. *See Wojchowski*, 498 F.3d at 106 (reversing is appropriate where "there has been an intervening Supreme Court decision that casts doubt on our controlling

precedent"); *see also In re Zarnel*, 619 F.3d at 168; *United States v. Plugh*, 648 F.3d at 124.

In *Licci*, this Court stated that the corporate liability question remains open following *Kiobel II*. *See* 732 F.3d at 174. *Licci* held that "a foreign bank's use of a New York correspondent account to execute dozens of wire transfers is sufficiently purposeful conduct to constitute a 'transaction of business' within the meaning of [New York's long-arm statute]" and that such "nexus" comports with due process protections provided by the United States Constitution. 732 F.3d at 165. *Licci* found unresolved the question of subject matter jurisdiction with respect to the plaintiffs' ATS claims and remanded for resolution notwithstanding the defendant's corporate status. *Id.* at 174. "Because the question of subject-matter jurisdiction was not briefed on appeal, because the Supreme Court's opinion did not directly address the question of corporate liability under the ATS, and in light of the other claims brought by the plaintiffs, we now think it best for the district court to address this issue in the first instance." *Id.* (emphasis added). Had the *Licci* panel believed *Kiobel I* remained the clear law of this Circuit, it would have dismissed the ATS claims *sua sponte* for lack of subject matter jurisdiction.

In *Balintulo v. Daimler AG*, 727 F.3d 174 (2d Cir. 2013), the panel expressed in a footnote its belief that *Kiobel I*'s holding remains; however, the Court nonetheless opted against dismissing the corporate ATS defendants and

26

remanded the case.  In *Balintulo*, the panel heard a petition for mandamus and a collateral order appeal in a putative class action lawsuit against various U.S.-based corporations for their complicity with the South African government during the Apartheid era.  *Id.* at 179.  The panel held "the opinion of the Supreme Court in [*Kiobel II*] plainly bars common-law suits…alleging violations of customary international law based solely on conduct occurring abroad."  *Id.* at 182.  It denied mandamus in light of that "unambiguous holding" because "the defendants will be able to obtain their desired relief (dismissal of all claims) in the District Court through a motion for judgment on the pleadings…."  *Id.*  The observation in a subsequent footnote is superfluous and internally contradicts *Balintulo*'s result.  The footnote states:

> The [Supreme Court] did not attempt to answer other questions involved in defining causes of action, including 'who may be liable,' relevant exhaustion rules, and applicable limitations periods.  *See* [*Kiobel II*].  The law of this Circuit already provides answers to some of those questions, including the principle that corporations are not proper defendants under the ATS in light of prevailing customary international law, *see* [*Kiobel I*]….

*Id.* at 191, n.26.  This language adds nothing to the panel's remand of the case to the district court and illuminates the panel's understandable level of uncertainty regarding *Kiobel I*'s relevance.  Furthermore, this language attempts to re-write *Kiobel I* which said nothing about whether corporations were "proper defendants" but instead held that subject matter jurisdiction was lacking over cases against

27

corporations.  Respectfully, had the *Balintulo* panel been confident in *Kiobel I*'s continued precedential effect, it would require dismissal of *Balintulo* on subject matter jurisdiction grounds.

This confusion has prompted inconsistency in the district courts within this Circuit.  The consolidated cases presently before the Court were dismissed based solely on *Kiobel I*.  Nevertheless, Judge Scheindlin recently permitted briefing on "the issue of whether a corporation may be liable for a violation of the ATS."  *In re South African Apartheid Litig.*, 2013 U.S. Dist. LEXIS 181647, at *5 (S.D.N.Y. Dec. 26, 2013).  This decision was "based on the Second Circuit's recent decision in *Licci* to refer the issue of corporate liability under the ATS to the district court, despite the Second Circuit's 2010 decision in *Kiobel*" and her determination that *Balintulo* "did not substa[n]tively discuss corporate liability under the ATS."  *Id.*

Judge Pooler in *Chowdhury* likewise questioned if *Kiobel I* remains the law of the Circuit in light of *Kiobel II*.  *See Chowdhury*, 2014 U.S. App. LEXIS 2507, at *37, n.2 (Pooler, J., concurring).

Plaintiffs respectfully submit that *Kiobel II* abrogated *Kiobel I*, and until this Court determines ATS corporate liability post-*Kiobel II*, the state of the law will continue to confound district courts below.  This Court should therefore rule that *Kiobel I* is no longer viable or controlling precedent in light of *Kiobel II*.

## III. WITHOUT THE CONSTRAINTS OF *KIOBEL I*, CORPORATE LIABILITY IS AVAILABLE UNDER THE ATS.

As *Kiobel I* has no continuing precedential value in *Kiobel II*'s wake, the Court is free to address the issue of corporate liability under the ATS. Among other factors, the conclusion that Arab Bank may be found liable under the ATS is supported by: (a) the decisions of every other Circuit to address this issue that corporations may be liable under the ATS; (b) uniform federal common law providing for corporate liability for torts; and (c) relevant sources of international law.

### A. Every Other Circuit Court to Address Corporate Liability Under the ATS Has Rejected the *Kiobel I* Holding.

When *Kiobel I* was decided, only one other Circuit had expressly addressed the issue of whether corporations could be held liable under the ATS. However, since that time, *Kiobel I* has become "[t]he outlier" among ATS cases. *Flomo v. Firestone Nat. Rubber Co., LLC,* 643 F.3d 1013, 1025 (7th Cir. 2011). Judge Posner declared that "[t]he factual premise of the majority opinion in the *Kiobel* case is incorrect." *Flomo*, 643 F.3d at 1017; *see also Doe VIII v. Exxon Mobil Corp*, 654 F.3d at 51 ("the analysis of the majority in *Kiobel [I]* … overlooks a source of international law that would tend to confirm that liability under the ATS is properly extended to corporate defendants").

29

The two-member *Kiobel I* majority enunciated a "principle [that] has never been addressed with favor in any opinion on behalf of any court and has many times been rejected."  *Kiobel I,* 621 F.3d at 163 (Leval, J., concurring only in the judgment).  *Every* other Court of Appeals to address this question has concluded that corporations *can* be held liable under the ATS.[20]

### B.    Whether Corporations are Liable Under the ATS is an Issue Decided Under Federal Common Law, Which Permits Such Liability.

In *Doe VIII v. Exxon Mobil Corp.*, the D.C. Circuit held "the technical accoutrements to the ATS cause of action, such as corporate liability and agency law, are to be drawn from federal common law, mindful that 'in most cases where a court is asked to state or formulate a common law principle in a new context, there is a general understanding that the law is not so much found or discovered as

---

[20]    *See, e.g., Doe v. Nestle USA, Inc.*, 738 F.3d 1048, 1049 (9th Cir. 2013) ("we conclude that corporations can face liability for claims brought under the Alien Tort Statute") (citing *Sarei v. Rio Tinto, PLC,* 671 F.3d 736, 761 (9th Cir. 2011), *vacated on other grounds*, 133 S. Ct. 1995 (2013)); *Flomo*, 643 F.3d at 1021 (holding that the court was "satisfied … that corporate liability is possible under the Alien Tort Statute"); *Doe VIII v. Exxon Mobil Corp.,* 654 F.3d 11, 57 (D.C. Cir. 2011) ("Given that the law of every jurisdiction in the United States and of every civilized nation, and the law of numerous international treaties, provide that corporations are responsible for their torts, it would create a bizarre anomaly to immunize corporations from liability for the conduct of their agents in lawsuits brought for 'shockingly egregious violations of universally recognized principles of international law'"), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013); *Sinaltrainal v. Coca-Cola Co.,* 578 F.3d 1252, 1263 (11th Cir. 2009) ("we have also recognized corporate defendants are subject to liability under the ATS and may be liable for violations of the law of nations").

it is either made or created." 654 F.3d at 51. The United States agreed, arguing that the *Kiobel I* majority looked at the wrong question when addressing corporate liability under the ATS. According to the Government, "courts are not required to determine whether 'corporate liability for a 'violation of the law of nations' is a norm 'accepted by the civilized world and defined with a specificity' sufficient to provide a basis for jurisdiction under the ATS" as the *Kiobel I* majority held. 2011 U.S. Amicus Brief at 16. Rather, "[o]nce it is established that the international norm applies to conduct by an actor, it is largely up to each state to determine for itself whether and how that norm should be enforced in its domestic law." *Id.* at 19.

Echoing these points, the Seventh Circuit held that corporate civil liability under the ATS "would be [a] remedial question[] for the tribunal, in this case our federal judiciary, to answer in light of its experience with particular remedies and its immersion in the nation's legal culture, rather than questions the answers to which could be found in customary international law." *Flomo*, 643 F.3d at 1020; *accord, e.g.,* 1 James Kent, *Commentaries on American Law*, "Of Offences Against the Law of Nations," at 170 (1st ed. 1826); Louis Henkin*, Foreign Affairs and the United States Constitution* 245-46 (2d ed., 1996) ("International law itself … does not require any particular reaction to violations of law…. Whether and how the United States should react to such violations are domestic, political

31

questions: the court will not assume any particular reaction, remedy, or consequence").[21]

### 1. Corporate Liability Has Long Been Recognized Under the Common Law.

The *Kiobel I* majority specifically recognized and accepted that corporate liability for criminal and civil offenses had a long history in U.S. jurisprudence. 621 F.3d at 117, 117, n.11 ("corporations are generally liable in tort under our domestic law" and "[t]he idea that corporations are 'persons' with duties, liabilities, and rights has a long history in American domestic law" (citing *N.Y. Cent. & Hudson River R.R. Co. v. United States*, 212 U.S. 481, 492 (1909))). In 1789, Congress surely would have recognized common-law tort liability of corporations. *See* 1 Blackstone, *Commentaries on the Laws of England* 463 (1765) (a corporation may "sue and be sued … and do all other acts as natural persons may").[22] Moreover, in 1819, the Supreme Court explicitly held that a "corporation

---

[21]    The Supreme Court in *Sosa* looked to federal common law for addressing the relief that might be sought by Plaintiffs under the ATS. "Whatever the ultimate criteria for accepting a cause of action subject to jurisdiction under § 1350, we are persuaded that federal courts should not recognize private claims *under federal common law* for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted." 542 U.S. at 732.

[22]    *See also* 1 Stewart Kyd, *Treatise on The Law of Corporations* 13 (1793) ("A corporation then … is a collection of many individuals, united into one body, under a *special denomination*, having perpetual succession under an *artificial form*, and vested, by the policy of the law, with the capacity of acting, in several respects, as

at common law" possesses the ability "of suing and being sued." *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 667 (1819). Immunizing corporations from liability for the acts of their agents "would be unjust to society, as well as unreasonable in itself." Joseph K. Angell & Samuel Ames, *Treatise on the Law of Private Corporations Aggregate* 390 (7th ed. 1861).

 *Kiobel I*, however, mistakenly conflated the norms of conduct analysis in *Sosa* with the rules for any remedies found in federal common law. Customary international law merely provides rules or a framework for determining whether condemnation of egregious conduct such as genocide or crimes against humanity has reached the point of a consensus among civilized nations to qualify as a norm of customary international law. *See Doe VIII*, 654 F.3d at 90 ("Although customary international law provides rules for determining whether international disapprobation attaches to certain type of conduct, … one could not expect … the widespread practice of states out of 'a sense of legal obligation' to produce detailed rules of procedure and evidence"); *Flomo*, 643 F.3d at 1020 ("International law imposes substantive obligations and the individual nations decide how to enforce them"); 2011 U.S. Amicus Brief at 18 (*Kiobel I* "reflects a misunderstanding of

---

an *individual*, particularly … of suing and being sued…"); *accord Doe VIII*, 654 F.3d at 106 ("The notion that corporations could be held liable for their torts, therefore, would not have been surprising to the First Congress that enacted the ATS").

international law which establishes the substantive standards of conduct and generally leaves the means of enforcing those substantive standards to each state"). The law of nations does not provide anyone the specific right to bring a lawsuit whether against individuals, corporations, or even states. Judge Leval, in his concurrence in *Kiobel I*, stated "international law … leaves the manner of enforcement [of international law norms] … almost entirely to individual nations." 621 F.3d at 152 (Leval, J., concurring). To suggest otherwise might interfere with each state's sovereign rights. As the Supreme Court has stated, the "law of nations can hardly dictate to a country which is in theory wronged how to treat that wrong within its domestic borders." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964).

The *Kiobel I* majority's concern that recognizing corporate liability under the ATS "would potentially create friction in our relations with foreign nations and, therefore, would contravene the international comity the [ATS] was enacted to promote" (621 F.3d at 141) rings hollow in light of the fact that claims—like those asserted here—are subject to a presumption against extraterritoriality that can only be displaced where the relevant conduct touches and concerns the United States with sufficient force. *See Kiobel II*, 133 S. Ct. at 1669. Sufficient threshold protections thus already exist to ensure that only a narrowly-defined class of claims warrant adjudication under ATS jurisdiction.

34

## 2. The Text of the ATS Does Not Bar Corporate Liability.

Furthermore, Congress did not limit who could be held liable under the ATS. In fact, as previously noted, the Supreme Court has explicitly held that the ATS "by its terms does not distinguish among classes of defendants." *Amerada Hess*, 488 U.S. at 438. The ATS requires that the plaintiff be "an alien" and that the cause of action be a "tort committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. If Congress wished to preclude suit against corporations, it could have expressly limited the statute in the same manner in which Congress limited who could sue; however, it did not.

Moreover, legal actions for violations of the law of nations have historically been brought against non-natural entities, including ships. *See The Malek Adhel*, 43 U.S. (2 How.) 210, 233 (1844) (holding "[i]t is not an uncommon course in the admiralty, acting under the law of nations, to treat the vessel in which or by which, or by the master or crew thereof, a wrong or offense has been done as the offender, without any regard whatsoever to the personal misconduct or responsibility of the owner thereof"). If a ship—which has no heart, mind, soul, or legal rights—is a proper subject of an action for violation of the law of nations, then a corporation imbued with "personhood" and the legal right to sue and be sued must be capable of ATS liability. To hold otherwise would be inconsistent with both case law and fundamental logic. *See also Flomo*, 643 F.3d at 1021 ("if precedent for imposing

35

liability for a violation of customary international law by an entity that does not breathe is wanted, we point to *in rem* judgments against pirate ships"). Furthermore, in 1907, the U.S. Attorney General concluded that an American corporation could be sued in tort under the ATS. *See* 26 Op. Att'y Gen. 250 (1907). This precedent leaves no doubt that federal common law dictates that corporations can be held liable under the ATS for torts assuming such torts were committed in violation of the law of nations.

### C. Even Without Regard to Federal Common Law, Corporations May Violate the Law of Nations.

Following World War II, on September 20, 1945, the Nazi Party was disbanded through international treaty. *See* Agreement Between Gov'ts of the United Kingdom, United States of America, and Union of Soviet Socialist Republics, and the Provisional Gov't of the French Republic on Certain Add'l Requirements to Be Imposed on Germany, Article 38, 40 Am. J. Int'l. L. 1, 29 (1946). The International Military Tribunal indicted six Nazi organizations: the Reich Cabinet, the SA, the German High Command, the Leadership Corps of the Nazi Party, the SS with the SD as its integral part, and the SS. *See* Charter of the Int'l Military Tribunal – Annex to the Agreement for the prosecution and punishment of the major war criminals of the European Axis, art. 9, 59 Stat. 1544, 82 U.N.T.S. 279 (Aug. 8, 1945).

36

In addition, the Allies separately "dismantled Nazi Germany's industrial assets, public and private, and created a system of reparations for injured individuals and states." *Doe VIII,* 654 F.3d at 52. *See generally* A-871-907. In a series of Control Council Directives, orders were issued for the "seizure of the assets of a wide range of German corporations, notably those producing arms, coal, steel and chemicals, and the banks and insurance companies that the Allies, after detailed investigations, found to be involved in the war of aggression." A-893-894.

Perhaps the most well-known example of a "corporate death penalty" issued by the Control Council was the action taken against I.G. Farben, which had supplied Zyklon B poison gas to the Nazis for use in concentration camp gas chambers. Farben had also profited from the vast system of Nazi slave labor. A-895-896. Control Council Law No. 9 seized "[a]ll plants, properties and assets of any nature situated in Germany which were, on or after 8 May, 1945, owned or controlled by I.G. Farbenindustrie A.G." "to insure that Germany will never again threaten her neighbors or the peace of the world, and taking into consideration that I.G. Farbenindustrie knowingly and prominently engaged in building up and maintaining the German war potential." A-896-897.

37

Distinct from this "corporate death penalty," the tribunal decisions expressly found the conduct of corporations like Farben and Krupp was "in violation of international law":

> Where private individuals, <u>including juristic persons</u>, proceed to exploit the military occupancy by acquiring private property against the will and consent of the former owner, such action, not being expressly justified . . ., is in violation of international law. . . . Similarly where a private individual <u>or a juristic person</u> becomes a party to unlawful confiscation of public or private property by planning and executing a well-defined design to acquire such property permanently, acquisition under such circumstances subsequent to the confiscation constitutes conduct in violation of [international law].

> <u>[W]e find that the proof establishes beyond a reasonable doubt that offenses against property as defined in Control Council Law No. 10 were committed by [I.G.] Farben</u>, and that these offenses were connected with, and an inextricable part of the German policy for occupied countries as above described. . .. The action of [I.G.] Farben and its representatives, under these circumstances, cannot be differentiated from acts of plunder or pillage committed by officers, soldiers, or public officials of the German Reich.

*The Farben Case,* 8 *Trials of War Criminals Before the Nurenberg Military Tribunals* 1132–33, 1140 (U.S. G.P.O. 1952) (emphasis added). *See also* A-899-900. The Tribunal in other instances referred to the violations committed not by the individual defendants in that case but rather by I.G. Farben itself. *Id.* at 1144 ("the permanent acquisition by Farben of productive facilities or interest therein, and the dismantling of plant equipment, was exploitation of territories under belligerent occupation in violation of the Hague Regulations"); 1147 ("The violation of the Hague Regulations is clear and Farben's participation therein

38

amply proven"). The Tribunal emphasized: "One cannot condone the activities of Farben in the field of spoliation. If not actually marching with the Wehrmacht, Farben at least was not far behind. But translating the *criminal responsibility* to personal and individual criminal acts is another matter." *Id.* at 1153 (emphasis added). The Tribunal recognized that Farben as a corporation was capable of violating and indeed had violated international law; however, the Tribunal's mandate extended only to *individual criminal responsibility*.

The Tribunal also recognized the potential liability of corporations in at least two other cases—the Krupp and Flick cases. In the former, the Tribunal held, "Under the facts of this case it is obvious from what has been said as to the law that the employment of these concentration camp inmates was also a violation of international law in several different particulars." *9 Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10* at 1434 (U.S. G.P.O. 1952). The corporate "Krupp firm" employed concentration camp workers, and while the knowledge and active participation of the *individuals* made them criminally liable, the Tribunal found that the acts of the *corporation qua corporation* violated international law. The Krupp firm was also liquidated and reorganized by Allied High Commission Law No. 27 because the excessive concentration of economic power in the firm constituted "a threat to international

peace." A-901. Banks and insurance companies were also subject to punitive action pursuant to the Allies' post-war efforts in Germany. *See* A-902-905.[23]

The conduct of nations is primary evidence of customary international law. *Doe VIII*, 654 F.3d at 412, n.42. Irrespective of whether a tribunal, even the International Military Tribunal in Nuremberg, accorded prosecutorial authority over juridical entities, the actions of various States to ban, dismantle and liquidate juridical entities because they engaged in conduct that violated the law of nations is far stronger evidence than an inference to be drawn from a political decision only to prosecute individuals.

At Nuremberg, States recognized that some acts so violate the universal conscience of civilized nations that they rise to the level of a violation of customary international law even when committed by non-State actors. *Kiobel I* incorrectly extrapolates from the U.S. Military Tribunal on personal responsibility to conclude that a corporation could not violate international law because "[c]rimes against international law are committed by men, not abstract entities." 621 F.3d at

---

[23]  While not as publicized, the United Kingdom convened a war crimes tribunal in Hong Kong that prosecuted Japanese war criminals. Among those prosecuted were nine civilian employees of the Nippon Mining Company with regard to the company's Kinkaseki mine that utilized POW labor. These individuals were found guilty "more upon their responsibility as members of the mining company than as private individuals." Anita Ramasastry, *Corporate Complicity: From Nuremberg to Rangoon – An Examination of Forced Labor Cases and Their Impact on the Liability of Multinational Corporations*, 20 Berkeley J. Int'l L. 91, 114-18 (2002).

119 (quoting *The Nurnberg Trial*, 6 F.R.D. 69, 110 (Int'l Military Trib. At Nuremberg 1946)).  As noted by the U.S. government, "[t]he Tribunal clearly was rejecting the defendant's argument that only a State could be held liable for violations of international law; it was not making any distinction between actors other than the State."  2011 U.S. Amicus Brief at 30.  A similar extrapolation was undertaken in *Kiobel I*'s interpretation of footnote 20 in *Sosa* where the Supreme Court was reinforcing that, depending on the type of conduct, State action may be required.   In footnote 20, the Supreme Court distinguished an "insufficient consensus in 1984 that torture by private actors violates international law" with a "sufficient consensus in 1995 that genocide by private actors violates international law."  542 U.S. at 732, n.20 (citing *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984), and *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995)).   In making this comparison, no distinction was made between individuals as "private actors" and corporations as "private actors."

In recognizing that some egregious conduct is inherently of universal concern, the international community hardly sought to draw the distinction between a madman who may have acted entirely on his own and a madman who sought to band together with other people to form an association, corporation, charity or gang.  There is no iron curtain drawn between individuals and the

entities that individuals might form thereby depriving civilized nations of the world from shutting down, liquidating or seizing the profits of such entities.

**D.    General Principles of Law Support Corporate Liability for Violations of the Law of Nations.**

In addition to federal common law and post-World War II precedent, international law—through general principles of law—permits corporate liability. The *Kiobel I* majority overlooked sources of international law establishing that "corporate liability is a universal feature of the world's legal systems and that no domestic jurisdiction exempts legal persons from liability."  *Doe VIII,* 654 F.3d at 53-54 (gathering authorities).  *See also* A-827-830; *Flomo,* 643 F.3d at 1019.  The D.C. Circuit also held that "[l]egal systems throughout the world recognize that corporate legal responsibility is part and parcel of the privilege of corporate personhood" and "a general principle becomes international law by its widespread application domestically by civilized nations."  *Doe VIII*, 654 F.3d at 53-54; *see also* A-839-841 ("The civil liability of corporations is so well-established among domestic legal systems around the world that it qualifies as a 'general principle of law,' which qualifies as a source of international law no less than treaties or custom" that "establish at a minimum that customary international law does not recognize, preserve, or allow an international law-free zone for corporations").  Thus, *Kiobel I* "ignor[ed] a source of international law providing for corporate liability in all legal systems" pursuant to general principles of law.  654 F.3d at 55;

*accord, e.g.*, A-834 ("corporate responsibility to respect human rights includes avoiding complicity, which has been most clearly elucidated 'in the area of aiding and abetting international crimes….'") (citing John Ruggie, Report of the Special Representative of the Secretary-General on the issue of human rights and transnational corporations and other business enterprises, *Protect, Respect and Remedy: a Framework for Business and Human Rights*, U.N. Doc. A/HRC/8/5 (7 April 2008), at ¶ 74).

## IV. EVEN WERE *KIOBEL I* TO REMAIN THE LAW OF THIS CIRCUIT, THE SPECIFIC CLAIMS AT ISSUE HERE PERMIT CORPORATE LIABILITY.

Should this Court determine that *Kiobel I* remains the law of this Circuit, Plaintiffs' claims nevertheless survive because (a) Congress has spoken on the specific conduct at issue in this case which has been confirmed by the Supreme Court, and (b) the majority opinion speaks of "specialized treaties … that impose obligations on corporations in the context of the treaties' particular subject matter." 621 F.3d at 138.

### A. Congress Has Legislated that the Provision of Material Support or Resources to Foreign Terrorist Organizations Constitutes a Violation of the Law of Nations Permitting Corporate Liability.

*Kiobel I* states "nothing in this opinion limits or forecloses legislative action by Congress." 621 F.3d at 122. The Constitution explicitly empowers Congress to "define and punish…offences against the law of nations." U.S. Const., art. 1, § 8.

43

Whereas Congress possesses the unique power to define violations of the law of nations, the ATS provides civil liability to aliens for such violations. 28 U.S.C. § 1350. The interplay of the congressional power to define law-of-nations violations with the ATS is evident in legislation enacted in 1996 determining that the provision of "material support or resources" to a FTO constitutes a violation of the law of nations. *See* Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, § 301(a)(2), 110 Stat. 1214, 1247 (1996) ("the Constitution confers upon Congress the power to punish crimes against the law of nations and to carry out the treaty obligations of the United States, and therefore Congress may by law impose penalties relating to the provision of material support to foreign organizations engaged in terrorist activity"). When Congress declared that the provision of "material support or resources" to FTOs constitutes a crime in violation of the law of nations, regardless of the status of the perpetrator, it made such a violation an actionable norm upon which ATS liability may be premised.[24] This addresses a concern raised in *Sosa* that federal courts "have no congressional mandate to seek out and define new and debatable violations of the law of nations." 542 U.S. at 728. Here, Congress has spoken pursuant to its Constitutional powers and does not require this Court to "define new and debatable

---

[24] In *Flomo*, the Seventh Circuit held "[t]he United States has enacted legislation making violations of customary international law actionable in U.S. courts: it is the Alien Tort Statute." 643 F.3d at 1022.

44

violations of the law of nations" or to exercise any "judicial creativity" or second guessing. *Id.*

The AEDPA forbids providing material support or resources to FTOs and requires all financial institutions that gain possession or control of the funds of an FTO to retain the funds and report their existence to the Secretary of the Treasury. *See* 18 U.S.C. § 2339B. The scope of the AEDPA is extraordinarily broad, authorizing "extra-territorial jurisdiction" and covering conduct "outside the United States" so long as the offender is later found in the United States or assists a covered person. *See* 18 U.S.C. § 2339B(d).

The Supreme Court in *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010), deemed constitutional the imposition of liability on juridical entities, such as charities, that provide material support or resources to designated FTOs. The Court held that "[p]roviding foreign terrorist groups with material support in any form also furthers terrorism by *straining the United States' relationships with its allies and undermining cooperative efforts between nations* to prevent terrorist attacks." 130 S. Ct. at 2726 (emphasis added). "We see no reason to question Congress's finding that 'international cooperation is required for an effective response to terrorism, as demonstrated by the numerous multilateral conventions in force providing universal prosecutive jurisdiction over persons involved in a variety of terrorist acts....'" *Id.* Moreover, the Supreme Court explicitly

45

recognized that "terrorist groups systematically conceal their activities behind charitable, social, and political fronts" while using "social and political components to recruit personnel to carry out terrorist operations, and to provide support to criminal terrorists and their families in aid of such operations." *Id.* at 2725.

Aware "the financing of terrorism is a matter of grave concern to the international community as a whole" (*see* Financing Convention, preamble), President George W. Bush issued Executive Order 13224 ("E.O. 13224") on September 23, 2001 to block the sources of terrorist financing—acting under the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.* E.O. 13224 found "that because of the pervasiveness and expansiveness of the financial foundation of foreign terrorists, financial sanctions may be appropriate for those foreign persons that support or otherwise associate with these foreign terrorists." *See* Exec. Order No 13,224, 66 Fed. Reg. 49,079 (Sept. 25, 2001). E.O. 13224 blocked access to "all property and interests in property" of designated persons who support international terrorism—including individuals, partnerships, associations, corporations, and other organizations, groups, and subgroups—and commanded the appropriate federal agencies to "make all relevant efforts to cooperate and coordinate with other countries, including through technical assistance, as well as bilateral and multilateral agreements and arrangements, to

46

achieve the objectives of this order, including the prevention and suppression of acts of terrorism, the denial of financing and financial services to terrorists and terrorist organizations, and the sharing of intelligence about funding activities in support of terrorism." *Id.*

As a critical element in its fight against international terrorism, the Executive Branch has designated numerous corporations and charities as global terrorists for either carrying out terrorist attacks or engaging in financing terrorism worldwide in violation of the law of nations.[25]  In addition, corporations have been criminally indicted and charged with provision of material support or resources.[26] With the two coordinate branches of government having spoken unequivocally, there should be no question that corporate liability under the ATS is available—at the very least—for the financing (or provision of material support or resources for) terrorism.

---

[25]    *See*  http://www.treasury.gov/ofac/downloads/sdnlist.txt  (last visited April 6, 2014), the "Specially Designated National List" maintained by the Office of Foreign Assets Control of the United States Department of the Treasury designating individuals, criminal organizations, and corporations (including, but not limited to, the following corporations: Al Haramain Foundation, Inc., Al Taqwa Bank, Al-Aqsa Foundation, Interpal (UK), Association de Secours Palestiniens (Switzerland), Iran Overseas Investment Bank PLC, Benevolence International Foundation, Comite de Bienfaisance et de Secours aux Palestiniens (France), Global Relief Foundation, Inc., and the Holy Land Foundation for Relief and Development).

[26]    *See, e.g., United States v. Holy Land Foundation for Relief and Development*, No. 3:04-CR-240-G (N.D. Tex.).

**B.    Specialized Treaties Also Support Corporate Liability for the Acts at Issue in These Consolidated Cases.**

*Kiobel I* noted that there are "specialized treaties … that impose obligations on corporations in the context of the treaties' particular subject matter."  621 F.3d at 138; *see also Doe VIII*, 654 F.3d at 108.  *Kiobel I* held that such specialized treaties could not be used to create a blanket rule of corporate liability under the ATS; however, the Court declined to address the situation where the subject matter of the specialized treaties at issue is germane to the claims before the Court. Furthermore, on eleven separate occasions, the *Kiobel I* majority stated that "the customary international law of human rights" did not permit corporate liability. 621 F. 3d at 119, 121, 121 n.22, 125, 126 n.28, 127, 128, 128, 129 n.31, 141, 147. While terrorism may be subsumed within the definition of crimes against humanity,[27] terrorist attacks—including the financing of terrorist attacks—are not generally viewed as part of the "customary international law *of human rights*" and

---

[27]    Defined as "widespread or systematic attack[s] directed against any civilian population" through such acts as murder, extermination, enslavement, "deportation or forcible transfer of population," "imprisonment or other severe deprivation of physical liberty in violation of fundamental rules of international law," torture, "rape, sexual slavery, enforced prostitution, forced pregnancy, enforced sterilization, or any other form of sexual violence of comparable gravity," "persecution against any identifiable group or collectivity on political, racial, national, ethnic, cultural, religious, gender … or other grounds that are universally recognized as impermissible under international law," "enforced disappearance of persons, "the crime of apartheid," or "other inhumane acts of a similar character intentionally causing great suffering, or serious injury to body or to mental or physical health."  *See* Rome Statute of the International Criminal Court, 37 I.L.M. 999, 1004-05 (1998).

48

clearly fit within the *specialized treaties* governing terrorism.  Under those treaties

and the unique facts in these cases, corporate liability is available.   While

recognizing that there may be margins of "terrorism" that are undefined, the

District Court denied Arab Bank's initial motion to dismiss explaining that "there

is no need to resolve any definitional disputes as to the scope of the word

'terrorism'" because "authoritative sources establish that the specific conduct

alleged—organized, systematic suicide bombings and other murderous attacks on

innocent civilians intended to intimidate or coerce a civilian population—are

universally condemned." A-563.

In *Flores v. Southern Peru Copper Corp.*, 414 F.3d 233 (2d Cir. 2003), this

Court delineated the relevant sources of international law:

> the proper *primary* evidence consists only of those "conventions"
> (that is, treaties) that set forth "*rules* expressly recognized by the
> contesting states," … "international custom" insofar as it provides
> "evidence of a general practice *accepted as law,*" … and "the general
> principles of *law* recognized by civilized nations" ….

414 F.3d at 251 (*citing* Art. 38 of the Charter of the Int'l Court of Justice).

Covenants "are proper evidence of customary international law to the extent

that they create legal obligations among the States parties to them." *Flores*, 414

F.3d at 256. The number and identity of the State parties also support the

covenant's evidentiary value, and "the evidentiary weight of a treaty increases if

49

States parties have taken official action to enforce the principles set forth in the treaty either internationally or within their own borders." *Id.* at 257.

The Financing Convention—an international covenant with 182 state parties—prohibits the premeditated and purposeful funding of terrorist attacks on civilian sites, whether by natural persons or an entity in corporate form. *See* Financing Convention, art. 2, Dec. 9, 1999, 2178 U.N.T.S. 229.[28]   This key provision is specifically applicable to "entities" under the Convention. *See id.* art. 5(1) ("[e]ach State Party, in accordance with its domestic legal principles, shall take the necessary measures to enable a *legal entity* located in its territory or organized under its laws *to be held liable* when a person responsible for the management or control of that *legal entity* has, in that capacity, committed an offence set forth in article 2. Such liability may be criminal, *civil* or administrative") (emphasis added).

Furthermore, the U.N. Security Council has issued binding resolutions mandating that member states must investigate and freeze the assets of financial

---

[28]    "Any person commits an offence within the meaning of this Convention if that person…provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out: (a) An act which constitutes an offence within the scope of and as defined in one of the treaties listed in the annex; or (b) Any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act."

entities and individuals that are engaged or have been engaged in terrorist financing. Moreover, these resolutions were issued under Chapter VII authority of the UN Charter related to issues of war and the maintenance of peace, which make them legally binding on all U.N. member states. *See Flores v. So. Peru Copper Corp.*, 414 F.3d 233, 261 (2d Cir. 2003) ("Under the Charter of the United Nations, the Security Council was afforded the power (in circumstances where no veto is exercised by a 'permanent member') to issue binding resolutions, United Nations Charter, ch. VII"). Furthermore, under Article 103, obligations imposed by the U.N. Charter are deemed superior to any other treaty or source of international law. *See* U.N. Charter, Art. 103.

U.N. Security Council Resolution 1267—addressing specifically the provision of shelter, training, safe haven, and territory by the Taliban to Al-Qaeda—instructed all States to "[f]reeze funds and other financial resources, including funds derived or generated from property owned or controlled directly or indirectly by the Taliban, or by any undertaking owned or controlled by the Taliban, as designated by the Committee established in paragraph 6." S.C. Res. 1267 at ¶ 4(b), U.N. Doc. S/RES/1267 (Oct. 15, 1999).

Following the terrorist attacks of September 11, 2001, the Security Council approved a new resolution, adopted under Chapter VII, directing all States to "[p]revent and suppress the financing of terrorist acts." *See* S.C. Res. 1373, ¶ 1(a),

51

U.N. Doc. S/RES/1373 (Sept. 28, 2001). Resolution 1373 further directed all States to "[e]nsure that any person [including entities] who participates in the financing, planning, preparation or perpetration of terrorist acts or in supporting terrorist acts is brought to justice…." *Id.* at ¶ 2(e). Finally, the Security Council declared "acts, methods, and practices of terrorism are contrary to the purposes and principles of the United Nations and that knowingly financing, planning and inciting terrorist acts are also contrary to the purposes and principles of the United Nations." *Id.* at ¶ 5.

In multiple resolutions, the Security Council has requested U.N. member states to investigate and report any individuals or entities engaged in or financing terrorist activities. *See, e.g.*, S.C. Res. 1390, ¶ 8, U.N. Doc. S/RES/1390 (Jan. 16, 2002); S.C. Res. 1455, ¶ 7, U.N. Doc. S/RES/1455 (Jan. 17, 2003); S.C. Res. 1526, U.N. Doc. S/RES/1526 (Jan. 30, 2004). Under the legally-binding decisions of the Security Council, member states are required to freeze the financial assets of these proscribed individuals and entities, and prohibit any financial transactions with them. Finally, the UN has designated numerous entities for either carrying out terrorist attacks or engaging in financing terrorism worldwide in violation of the law of nations.[29]

---

[29]     *See* http://www.un.org/sc/committees/1267/AQList.htm (last visited April 6, 2014), "The List established and maintained by the Al-Qaida Sanctions Committee with respect to individuals, groups, undertakings and other entities associated with

"Specialized treaties," UN Conventions, UN Security Council Resolutions, U.S. congressional legislation, and U.S. Executive Orders all recognize that corporations may be held responsible for the financing of terrorism, which is a specific and universal norm of customary international law.[30]

## V. PLAINTIFFS REQUEST REINSTATEMENT OF THEIR GENERAL COMMON-LAW TORT CLAIMS.

In 2007, the district court dismissed Plaintiffs' state and foreign common-law causes of action as "redundant" of the ATS claims and barred by *Erie R.R. Co. v. Tomkins*, 304 US 64 (1938). *See* A-576. Plaintiffs sought the reinstatement of those claims in the event the district court granted the Bank's motion for judgment on the pleadings. The district court, however, determined that these claims "were dismissed not only as redundant, but also because Plaintiffs offered 'no sound basis' for them." SPA-1. Plaintiffs respectfully submit that the district court erred, and this Court should reinstate Plaintiffs' state and foreign common-law claims.

---

Al-Qaida" maintained by the UN's Security Council Committee established pursuant to Resolution 1267 including over 60 **"Entities and other groups and undertakings associated with Al-Qaida."**

[30] All of these considerations informed the District Court's 2007 conclusion that Plaintiffs had adequately pled their ATS claims against Arab Bank. *See* A-570-571.

Plaintiffs' general common law tort claims and ATS counts are distinct causes of action.[31]   Courts have consistently entertained both general tort claims and ATS claims in a single lawsuit.[32] Because recovery on the ATS claims obviates the need, as a practical matter, to pursue the general tort claims, Plaintiffs acknowledged during oral argument in 2006 on the Bank's initial motion to dismiss that "if the ATS claim is sustained, the other counts may become redundant of that claim."  R. 96 at 40:15-17.  Nevertheless, Plaintiffs argued that their general tort claims "are stated as separate counts and if, for example, the Court were not to find an ATS claim, the Court might find one of those other claims."  *Id.* at 40:23-25. In ruling on that earlier motion to dismiss in 2007, the district court sustained Plaintiffs' ATS claims and dismissed the general tort claims as redundant.  If this Court dismisses Plaintiffs' ATS claims now, there is no longer any redundancy between the ATS claims and the general tort claims.  If

---

[31]   Certain Plaintiffs in these consolidated appeals asserted general tort claims for assisting in the intentional injury of others by a third party, reckless disregard, wrongful death, survival, and negligent and/or intentional infliction of emotional distress.

[32]   *See*, *e.g.*, *Abdullahi v. Pfizer*, 562 F.3d 163, 169-70 (2d Cir. 2009) (vacating dismissal of state-law claims in ATS case); *Martinez v. City of LA*, 141 F.3d 1373 (9th Cir. 1998) (reversing dismissal of certain state-law tort claims in ATS case); *Hilao v. Estate of Marcos*, 103 F.3d 789 (9th Cir. 1996) (non-international-law tort claims should have been submitted to jury in ATS case); *see also, e.g.*, Paul Hoffman & Beth Stephens, *International Human Rights Cases Under State Law and in State Courts*, 3 U.C. IRVINE L. REV. 9, at 15-17 (2013).

54

anything, reinstating Plaintiffs' common law claims harmonizes with *Kiobel I*'s observation that "nothing in this opinion limits or forecloses corporate liability under any body of law other than the ATS." 621 F.3d at 149.

*Erie* does not bar Plaintiffs from prosecuting common law claims. Plaintiffs styled their common law claims as unique and specific counts without reference to which state or country's law may govern, relying instead on future choice-of-law determinations regarding what law would cover these common law claims. Moreover, *Erie* does not preclude assertion of corollary non-federal theories based on the same facts. Given the large number of claims and differing domiciles of the various Plaintiffs, it is possible that different states' or countries' liability or damages laws may apply. Therefore, Plaintiffs did not specify the exact law to be applied. Instead, Plaintiffs gave the Bank notice of the tort claims asserted and the facts supporting those claims notwithstanding what law would ultimately apply. *See Commerce and Indus. Ins. Co. v. U.S. Bank Nat'l Ass'n*, 2008 WL 4178474, at *7-*8 (S.D.N.Y. Sept. 3, 2008) (denying motion to dismiss complaint when record was unclear how choice of law analysis would be resolved but affording parties opportunity for further briefing on issue for later determination); *In re Jesup & Lamont, Inc.*, 2014 WL 1245003, at *17 (Bank. S.D.N.Y. Mar. 26, 2014) ("Where a choice of law determination cannot be made based on the pleadings, the motion should be denied, without prejudice, leaving the material facts for later

55

determination."). Even if Plaintiffs erred and should have cited the specific tort law of a particular jurisdiction, these cases should not be dismissed. Under Second Circuit precedent, "a complaint that gives full notice of the circumstances giving rise to the plaintiff's claim for relief need not also correctly plead the legal theory or theories . . . supporting the claim." *Marbury Mgmt. v. Kohn*, 629 F.2d 705 (2d Cir. 1980). Accordingly, "[a] complaint will not be dismissed merely because a plaintiff's allegations do not support the particular legal theory advanced in the complaint." *Magee v. Nassau Cnty. Med. Ctr.*, 27 F. Supp. 2d 154, 160 (E.D.N.Y. 1998). Instead, "[a] court presented with a motion to dismiss must examine the complaint to determine whether the allegations provide a basis for relief under any possible theory." *Id.*

The district court, therefore, erred in denying Plaintiffs' request for reinstatement of their common law claims or, in the alternative, for leave to amend to assert common law claims that relate back to filing. *See* Fed. R. Civ. P. 15(a).

## CONCLUSION

For the foregoing reasons, this Court should reverse the order of the district court and remand this case for further deliberations.

Dated:      April 7, 2014           Respectfully submitted,

/S/_ Michael E. Elsner_____
MOTLEY RICE LLC
Michael E. Elsner, Esq.
John M. Eubanks, Esq.
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Phone: (843) 216-9000
Fax: (843) 216-9450

Mark Werbner, Esq.
Joel Israel, Esq.
SAYLES WERBNER, PC
1201 Elm Street
44th Floor
Dallas, TX 75270
Phone: (214) 939-8700

*Attorneys for Plaintiffs-Appellants*

Of Counsel:

Allan Gerson, Esq.
AG INTERNATIONAL LAW, PLLC
2131 S Street, NW
Washington, DC 20008
Phone: (202) 234-9717

Gavriel Mairone, Esq.
MM~LAW LLC
980 Michigan Avenue, Suite 1400
Chicago, IL 60611
Phone: (312) 253-7444

57

Jonathan David, Esq.
THE DAVID LAW FIRM, P.C.
2202 Timberloch Place, #200
The Woodlands, TX 77380
Phone: (281) 296-9090

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the foregoing brief is in <u>14-Point Times New Roman</u> proportional font and contains 13,909 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

Dated:  April 7, 2014  Respectfully submitted,

/S/ John M. Eubanks
MOTLEY RICE LLC
Michael E. Elsner, Esq.
John M. Eubanks, Esq.
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Phone: (843) 216-9000
Fax: (843) 216-9450

# Special Appendix

i

# SPECIAL APPENDIX
# TABLE OF CONTENTS

**Page**

Order of District Court Dismissing Plaintiffs'
   Claims Under the Alien Tort Statute, dated
   August 23, 2013, Appealed From .......................... SPA-1

Judgment in *Jesner, et al v. Arab Bank, PLC*; *Lev, et
   al. v. Arab Bank, PLC*; and *Agurenko, et al. v.
   Arab Bank, PLC*, dated August 27, 2013,
   Appealed From ....................................... SPA-9

Partial Judgment under Fed. R. Civ. P. 54(b) in
   *Almog, et al. v. Arab Bank, PLC*, dated October
   16, 2013, Appealed From....................................... SPA-11

Partial Judgment under Fed. R. Civ. P. 54(b) in
   *Afriat-Kurtzer, et al. v. Arab Bank, PLC*, dated
   October 16, 2013, Appealed From......................... SPA-12

SPA-1

**Eubanks, John**

| | |
|---|---|
| **From:** | ecf_bounces@nyed.uscourts.gov |
| **Sent:** | Friday, August 23, 2013 2:46 PM |
| **To:** | nobody@nyed.uscourts.gov |
| **Subject:** | Activity in Case 1:04-cv-02799-BMC-VVP Linde et al v. Arab Bank, PLC Order |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### U.S. District Court

### Eastern District of New York

**Notice of Electronic Filing**

The following transaction was entered on 8/23/2013 at 2:45 PM EDT and filed on 8/23/2013

| | |
|---|---|
| **Case Name:** | Linde et al v. Arab Bank, PLC |
| **Case Number:** | 1:04-cv-02799-BMC-VVP |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
Order granting defendant's motion to dismiss plaintiffs' ATS claims. The law of this Circuit is that plaintiffs cannot bring claims against corporations under the ATS. See Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111 (2d Cir. 2010), aff'd, Kiobel v. Royal Dutch Petroleum Co., 133 S.Ct. 1659 (2013). A decision by a panel of the Second Circuit "is binding unless and until it is overruled by the Court en banc or by the Supreme Court." Baraket v. Holder, 632 F.3d 56, 59 (2d Cir. 2011). Because the Supreme Court affirmed Kiobel I on other grounds, the Second Circuit's holding on corporate liability under the ATS remains intact. Nothing in the Supreme Court's affirmance undercuts the authority of the Second Circuit's decision. Plaintiffs' request to reinstate their federal common law claims or, in the alternative, assert non-federal common law claims is denied. The federal common law claims were dismissed not only as redundant, but also because Plaintiffs offered "no sound basis" for them. Almog v. Arab Bank, PLC, 471 F. Supp. 2d 257 (E.D.N.Y. 2007). Plaintiffs also offer no sound basis for repackaging these claims under unidentified "non-federal common law" theories. The clerk is directed to enter judgment for defendant in Joseph Jesner, et al. v. Arab Bank, PLC, 06-CV-3869; Yaffa Lev, et al. v. Arab Bank, PLC, 08-CV-3251; and Viktoria Agurenko, et al. v. Arab Bank, PLC, 10-CV-626. Associated Cases: 1:04-cv-02799-BMC-VVP et al. Ordered by Judge Brian M. Cogan on 8/23/2013. (Weisberg, Peggy)

| | |
|---|---|
| **Case Name:** | Almog et al v. Arab Bank, PLC |
| **Case Number:** | 1:04-cv-05564-BMC-VVP |

SPA-2

**Filer:**
**Document Number:** No document attached

**Docket Text:**
**Order granting defendant's motion to dismiss plaintiffs' ATS claims. The law of this Circuit is that plaintiffs cannot bring claims against corporations under the ATS. See Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111 (2d Cir. 2010), aff'd, Kiobel v. Royal Dutch Petroleum Co., 133 S.Ct. 1659 (2013). A decision by a panel of the Second Circuit "is binding unless and until it is overruled by the Court en banc or by the Supreme Court." Baraket v. Holder, 632 F.3d 56, 59 (2d Cir. 2011). Because the Supreme Court affirmed Kiobel I on other grounds, the Second Circuit's holding on corporate liability under the ATS remains intact. Nothing in the Supreme Court's affirmance undercuts the authority of the Second Circuit's decision. Plaintiffs' request to reinstate their federal common law claims or, in the alternative, assert non-federal common law claims is denied. The federal common law claims were dismissed not only as redundant, but also because Plaintiffs offered "no sound basis" for them. Almog v. Arab Bank, PLC, 471 F. Supp. 2d 257 (E.D.N.Y. 2007). Plaintiffs also offer no sound basis for repackaging these claims under unidentified "non-federal common law" theories. The clerk is directed to enter judgment for defendant in Joseph Jesner, et al. v. Arab Bank, PLC, 06-CV-3869; Yaffa Lev, et al. v. Arab Bank, PLC, 08-CV-3251; and Viktoria Agurenko, et al. v. Arab Bank, PLC, 10-CV-626. Associated Cases: 1:04-cv-02799-BMC-VVP et al. Ordered by Judge Brian M. Cogan on 8/23/2013. (Weisberg, Peggy)**

**Case Name:**        Afriat-Kurtzer et al
**Case Number:**      1:05-cv-00388-BMC-VVP
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**Order granting defendant's motion to dismiss plaintiffs' ATS claims. The law of this Circuit is that plaintiffs cannot bring claims against corporations under the ATS. See Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111 (2d Cir. 2010), aff'd, Kiobel v. Royal Dutch Petroleum Co., 133 S.Ct. 1659 (2013). A decision by a panel of the Second Circuit "is binding unless and until it is overruled by the Court en banc or by the Supreme Court." Baraket v. Holder, 632 F.3d 56, 59 (2d Cir. 2011). Because the Supreme Court affirmed Kiobel I on other grounds, the Second Circuit's holding on corporate liability under the ATS remains intact. Nothing in the Supreme Court's affirmance undercuts the authority of the Second Circuit's decision. Plaintiffs' request to reinstate their federal common law claims or, in the alternative, assert non-federal common law claims is denied. The federal common law claims were dismissed not only as redundant, but also because Plaintiffs offered "no sound basis" for them. Almog v. Arab Bank, PLC, 471 F. Supp. 2d 257 (E.D.N.Y. 2007). Plaintiffs also offer no sound basis for repackaging these claims under unidentified "non-federal common law" theories. The clerk is directed to enter judgment for defendant in Joseph Jesner, et al. v. Arab Bank, PLC, 06-CV-3869; Yaffa Lev, et al. v. Arab Bank, PLC, 08-CV-3251; and Viktoria Agurenko, et al. v. Arab Bank, PLC, 10-CV-626. Associated Cases: 1:04-cv-02799-BMC-VVP et al. Ordered by Judge Brian M. Cogan on 8/23/2013. (Weisberg, Peggy)**

**Case Name:**        Jesner et al v. Arab Bank, PLC
**Case Number:**      1:06-cv-03869-BMC-VVP
**Filer:**
**Document Number:** No document attached

**Docket Text:**

**Order granting defendant's motion to dismiss plaintiffs' ATS claims. The law of this Circuit is that plaintiffs cannot bring claims against corporations under the ATS. See Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111 (2d Cir. 2010), aff'd, Kiobel v. Royal Dutch Petroleum Co., 133 S.Ct. 1659 (2013). A decision by a panel of the Second Circuit "is binding unless and until it is overruled by the Court en banc or by the Supreme Court." Baraket v. Holder, 632 F.3d 56, 59 (2d Cir. 2011). Because the Supreme Court affirmed Kiobel I on other grounds, the Second Circuit's holding on corporate liability under the ATS remains intact. Nothing in the Supreme Court's affirmance undercuts the authority of the Second Circuit's decision. Plaintiffs' request to reinstate their federal common law claims or, in the alternative, assert non-federal common law claims is denied. The federal common law claims were dismissed not only as redundant, but also because Plaintiffs offered "no sound basis" for them. Almog v. Arab Bank, PLC, 471 F. Supp. 2d 257 (E.D.N.Y. 2007). Plaintiffs also offer no sound basis for repackaging these claims under unidentified "non-federal common law" theories. The clerk is directed to enter judgment for defendant in Joseph Jesner, et al. v. Arab Bank, PLC, 06-CV-3869; Yaffa Lev, et al. v. Arab Bank, PLC, 08-CV-3251; and Viktoria Agurenko, et al. v. Arab Bank, PLC, 10-CV-626. Associated Cases: 1:04-cv-02799-BMC-VVP et al. Ordered by Judge Brian M. Cogan on 8/23/2013. (Weisberg, Peggy)**

**Case Name:**      Lev et al v. Arab Bank, PLC
**Case Number:**   1:08-cv-03251-BMC-VVP
**Filer:**
**Document Number:** No document attached

**Docket Text:**

**Order granting defendant's motion to dismiss plaintiffs' ATS claims. The law of this Circuit is that plaintiffs cannot bring claims against corporations under the ATS. See Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111 (2d Cir. 2010), aff'd, Kiobel v. Royal Dutch Petroleum Co., 133 S.Ct. 1659 (2013). A decision by a panel of the Second Circuit "is binding unless and until it is overruled by the Court en banc or by the Supreme Court." Baraket v. Holder, 632 F.3d 56, 59 (2d Cir. 2011). Because the Supreme Court affirmed Kiobel I on other grounds, the Second Circuit's holding on corporate liability under the ATS remains intact. Nothing in the Supreme Court's affirmance undercuts the authority of the Second Circuit's decision. Plaintiffs' request to reinstate their federal common law claims or, in the alternative, assert non-federal common law claims is denied. The federal common law claims were dismissed not only as redundant, but also because Plaintiffs offered "no sound basis" for them. Almog v. Arab Bank, PLC, 471 F. Supp. 2d 257 (E.D.N.Y. 2007). Plaintiffs also offer no sound basis for repackaging these claims under unidentified "non-federal common law" theories. The clerk is directed to enter judgment for defendant in Joseph Jesner, et al. v. Arab Bank, PLC, 06-CV-3869; Yaffa Lev, et al. v. Arab Bank, PLC, 08-CV-3251; and Viktoria Agurenko, et al. v. Arab Bank, PLC, 10-CV-626. Associated Cases: 1:04-cv-02799-BMC-VVP et al. Ordered by Judge Brian M. Cogan on 8/23/2013. (Weisberg, Peggy)**

**Case Name:**      Agurenko et al v. Arab Bank, PLC
**Case Number:**   1:10-cv-00626-BMC-VVP
**Filer:**
**Document Number:** No document attached

**Docket Text:**

**Order granting defendant's motion to dismiss plaintiffs' ATS claims. The law of this Circuit is that plaintiffs cannot bring claims against corporations under the ATS. See Kiobel v. Royal Dutch Petroleum Co., 621 F.3d 111 (2d Cir. 2010), aff'd, Kiobel v. Royal Dutch Petroleum Co., 133 S.Ct. 1659 (2013). A decision by a panel of the Second Circuit "is binding unless and until it is overruled by the Court en banc or by the Supreme Court." Baraket v. Holder, 632 F.3d 56, 59 (2d Cir. 2011). Because the Supreme Court affirmed Kiobel I on other grounds, the Second Circuit's holding on corporate liability under the ATS remains intact. Nothing in the Supreme Court's affirmance undercuts the authority of the Second Circuit's decision. Plaintiffs' request to reinstate their federal common law claims or, in the alternative, assert non-federal common law claims is denied. The federal common law claims were dismissed not only as redundant, but also because Plaintiffs offered "no sound basis" for them. Almog v. Arab Bank, PLC, 471 F. Supp. 2d 257 (E.D.N.Y. 2007). Plaintiffs also offer no sound basis for repackaging these claims under unidentified "non-federal common law" theories. The clerk is directed to enter judgment for defendant in Joseph Jesner, et al. v. Arab Bank, PLC, 06-CV-3869; Yaffa Lev, et al. v. Arab Bank, PLC, 08-CV-3251; and Viktoria Agurenko, et al. v. Arab Bank, PLC, 10-CV-626. Associated Cases: 1:04-cv-02799-BMC-VVP et al. Ordered by Judge Brian M. Cogan on 8/23/2013. (Weisberg, Peggy)**

**1:04-cv-02799-BMC-VVP Notice has been electronically mailed to:**

Peter Adam Chavkin   pchavkin@mintz.com, docketing@mintz.com

Matthew E. Fishbein   mfishbein@debevoise.com

Stephen H. Schwartz   sschwartz@kohnswift.com

Andrew David Friedman   afriedman@gbgfriedman.com, pdelligatti@gbgfriedman.com

David L. Barres   dbarres@mintz.com, Docketing@mintz.com

James P. Bonner   jbonner@lawssb.com

Jay Cohen   jaycohen@paulweiss.com

David Grant Hille (Terminated)   dhille@whitecase.com, MCO@whitecase.com, jdisanti@whitecase.com

Steven M. Steingard   ssteingard@kohnswift.com

Jennifer R. Cowan   jrcowan@debevoise.com, mao-ecf@debevoise.com

Steven J. Young   Steven.Young@dlapiper.com, DocketingNewYork@dlapiper.com

Anthony Paul Coles   anthony.coles@dlapiper.com

Gary M. Osen   gmo@osen.us

Mark S Werbner   mwerbner@swtriallaw.com, jkennedy@swtriallaw.com

Joshua D. Glatter (Terminated)   jdg@osen.us

SPA-5

Kevin Walsh kevin.walsh@dlapiper.com, DocketingNewYork@dlapiper.com,
matthew.matystik@dlapiper.com

Aaron Schlanger as@osen.us

John M. Eubanks jeubanks@motleyrice.com

Ari Ungar au@osen.us

Aitan David Goelman agoelman@zuckerman.com, shaselberger@zuckerman.com

Peter Raven-Hansen pravenhansen@gmail.com

Gregory Gene Little (Terminated) glittle@whitecase.com, MCO@whitecase.com, jdisanti@whitecase.com

Neal Dublinsky ndublinsky@glancylaw.com

Neil L. Glazer nglazer@kohnswift.com

Narges Maneck Kakalia nmkakalia@mintz.com, docketing@mintz.com

Semra Aylin Mesulam semra.mesulam@gmail.com

Christopher Mark Curran (Terminated) ccurran@whitecase.com, MCO@whitecase.com,
jdisanti@whitecase.com, rsequeira@washdc.whitecase.com

Cindy T. Schlanger cts@osen.us

Naomi B Weinberg nbw@osen.us

Clyde T. Turner tab@tturner.com, tiffany@tturner.com

Brian Thomas Frutig bfrutig@motleyrice.com

Douglas Walter Mateyaschuk douglas.mateyaschuk@dlapiper.com, DocketingNewYork@dlapiper.com

Peter R. Kolker pkolker@zuckerman.com

Nicole Erb (Terminated) nerb@whitecase.com, MCO@whitecase.com, jdisanti@whitecase.com,
mleddicotte@washdc.whitecase.com

Shand Scott Stephens shand.stephens@dlapiper.com, docketingnewyork@dlapiper.com

**1:04-cv-02799-BMC-VVP Notice will not be electronically mailed to:**

Peter A. Binkow
Law Offices of Lionel Z. Glancy
1801 Avenue of the Stars
Suite 308
Los Angeles, CA 90067

SPA-6

**1:04-cv-05564-BMC-VVP Notice has been electronically mailed to:**

Peter Rolf Jerdee Pjerdee@josephnyc.com

Douglas James Pepe dpepe@josephnyc.com

Gavriel Mairone ctlaw@mm-law.com

Elizabeth Smith esmith@motleyrice.com

Ilana K. Waxman ikw@gogaliher.com

Bena N. Ochs bena@mm-law.com, bena.ochs@gmail.com

**1:04-cv-05564-BMC-VVP Notice will not be electronically mailed to:**

Allan Gerson
Attorney at Law
2131 S Street
Washington, DC 20008

Donald Migliori
Motley Rice, LLC
321 South Main Street
2nd Floor
Providence, RI 02903

Jill HaLevi
Motley Rice LLC
28 Bridgeside Blvd
Mount Pleasant, SC 29464

Jodi Westbrook Flowers
Motley Rice, LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465

Justin B. Kaplan
Motley Rice
28 Bridgeside Blvd
Mount Pleasant, SC 29464

Robert T. Haefele
Motley Rice LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465

Ronald L. Motley

SPA-7

Motley Rice, LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465

**1:05-cv-00388-BMC-VVP Notice has been electronically mailed to:**

**1:05-cv-00388-BMC-VVP Notice will not be electronically mailed to:**

Donald Migliori
Motley Rice, LLC
321 South Main Street
2nd Floor
Providence, RI 02903

Jill HaLevi
Motley Rice LLC
28 Bridgeside Blvd
Mount Pleasant, SC 29464

Jodi Westbrook Flowers
Motley Rice, LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465

Justin B. Kaplan
Motley Rice
28 Bridgeside Blvd
Mount Pleasant, SC 29464

Robert T. Haefele
Motley Rice LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465

Ronald L. Motley
Motley Rice, LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465

**1:06-cv-03869-BMC-VVP Notice has been electronically mailed to:**

Joel Lawrence Israel cpoor@swtriallaw.com

**1:06-cv-03869-BMC-VVP Notice will not be electronically mailed to:**

**1:08-cv-03251-BMC-VVP Notice has been electronically mailed to:**

Vincent Ian Parrett vparrett@motleyrice.com

**1:08-cv-03251-BMC-VVP Notice will not be electronically mailed to:**

Donald Migliori
Motley Rice, LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465

Jodi Westbrook Flowers
Motley Rice, LLC
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465

Ronald L. Motley
Motley Rice, LLC
P.O. Box 1792
Mount Pleasant, SC 29465

**1:10-cv-00626-BMC-VVP Notice has been electronically mailed to:**

David S. Stone dstone@stonemagnalaw.com, aalberts@stonemagnalaw.com, jshooman@stonemagnalaw.com, jspiro@stonemagnalaw.com, mhamilton@stonemagnalaw.com

**1:10-cv-00626-BMC-VVP Notice will not be electronically mailed to:**

All Plaintiffs

**SPA-9**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------X
JOSEPH  JESNER,  et al.,                                          JUDGMENT
                                                                                06-CV- 3869 (BMC)
                                    Plaintiffs,

             -against-

ARAB BANK, PLC,

                                    Defendant.
---------------------------------------------------X
YAFFA LEV,  et al.,                                              08-CV- 3251 (BMC)

                                    Plaintiffs,

             -against-

ARAB BANK, PLC,

                                    Defendant.
---------------------------------------------------X
VIKTORIA  AGURENKO, et al.,                            10-CV- 0626 (BMC)

                                    Plaintiffs,

             -against-

ARAB BANK, PLC,

                                    Defendant.
---------------------------------------------------X

            An Order of Honorable Brian M. Cogan, United States District Judge, having

been filed on August 23, 2013, directing the Clerk of Court to enter judgment for Defendant in

Joseph Jesner, et al. v. Arab Bank, PLC, 06-CV-3869; Yaffa Lev, et al. v. Arab Bank, PLC, 08-

CV-3251; and Viktoria Agurenko, et al. v. Arab Bank, PLC, 10-CV- 0626 (BMC); it is

SPA-10

JUDGMENT 06-CV- 3869 (BMC)

      ORDERED and ADJUDGED that judgment is hereby entered in favor of Defendant Arab Bank, PLC and against Plaintiff Joseph Jesner, et al., in 06-CV-3869 (BMC) and that the case is closed; and that it is further,

      ORDERED and ADJUDGED that judgment is hereby entered in favor of Defendant Arab Bank, PLC and against Plaintiff Yaffa Lev, et al., in 08-CV- 3251 (BMC) and that the case is closed; and that it is further,

      ORDERED and ADJUDGED that judgment is hereby entered in favor of Defendant Arab Bank, PLC and against Plaintiff Viktoria Argurenko, et al., in 10-CV- 0626 (BMC) and that the case is closed.

Dated: Brooklyn, New York            Douglas C. Palmer
      August 27, 2013             Clerk of Court

                         by:    */s/ Janet Hamilton*
                               Deputy Clerk

2

SPA-11

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X

ORAN ALMOG, et al.,                                        PARTIAL
                                                           JUDGMENT
                                    Plaintiffs,            04-CV- 5564 (BMC)

            -against-

ARAB BANK, PLC,

                                    Defendant.
--------------------------------------------------X

        An Order of Honorable Brian M. Cogan, United States District Judge, having

been filed on October 15, 2013, directing the Clerk of Court to enter a partial final judgment

under Rule 54(b) of the Federal Rules of Civil Procedure dismissing Plaintiffs' claims under the

Alien Tort Statute; and certifying that its disposition of those claims presents no just reason for

delay; it is

        ORDERED and ADJUDGED that a partial final judgment is hereby entered

dismissing Plaintiffs' claims under the Alien Tort Statute pursuant to Rule 54(b) of the Federal

Rules of Civil Procedure.

Dated: Brooklyn, New York                                  Douglas C. Palmer
       October 16, 2013                                    Clerk of Court

                                        by:    */s/ Janet Hamilton*
                                           Deputy Clerk

SPA-12

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
GILA AFRIAT-KURTZER, et al.,

                              Plaintiffs,

      -against-

ARAB BANK, PLC,

                             Defendant.
-------------------------------------------------X

           PARTIAL
           JUDGMENT
           05-CV- 0388 (BMC)

        An Order of Honorable Brian M. Cogan, United States District Judge, having

been filed on October 15, 2013, directing the Clerk of Court to enter a partial judgment under

Rule 54(b) of the Federal Rules of Civil Procedure dismissing Plaintiff's claims under the Alien

Tort Statute; certifying that its disposition of those claims presents no just reason for delay; it is

        ORDERED and ADJUDGED that a partial final judgment is hereby entered

dismissing Plaintiffs' claims under the Alien Tort Statute pursuant to Rule 54(b) of the Federal

Rules of Civil Procedure.

Dated: Brooklyn, New York
      October 16, 2013

                             Douglas C. Palmer
                             Clerk of Court

                    by:    */s/ Janet Hamilton*
                              Deputy Clerk