# 13-3605-cv(L)

## 13-3620-cv(CON), 13-3635-cv(CON), 13-4650-cv(CON), 13-4652-cv(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

◆

JOSEPH JESNER, *et al.*, VIKTORIA AGURENKO, *et al.*, YAFFA LEV, *et al.*,
JOSEPH ZUR, *et al.*, ODED AVRLINGI, *et al.*,

*Plaintiffs-Appellants,*

—against—

ARAB BANK, PLC,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

KEVIN WALSH
DOUGLAS W. MATEYASCHUK, II
STEVEN J. YOUNG
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500

STEPHEN M. SHAPIRO
TIMOTHY S. BISHOP
CHAD M. CLAMAGE
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600

*Attorneys for Defendant-Appellee*

## CORPORATE DISCLOSURE STATEMENT

Defendant-Appellee Arab Bank plc has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

## STATEMENT AS TO RELATED CASES

These cases previously have been before this Court on a Petition for Mandamus challenging a district court discovery sanctions order not at issue here. *See Linde v. Arab Bank, PLC*, 706 F.3d 92 (2d Cir. 2013), *brief for the United States filed*, No. 12-1485 (U.S. May 23, 2014), *cert. denied* (U.S. June 30, 2014). Related claims under the Anti-Terrorism Act, also not at issue here, have also been the subject of a mandamus petition to this Court. *In re Arab Bank, PLC*, No. 13-3253 (2d Cir. pet. denied Jan. 7, 2014).

The central issue presented by this appeal, whether *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 11 (2d Cir. 2010), remains the binding law of this Circuit, is currently being addressed by this Court in *Balintulo v. Daimler AG*, 727 F.3d 174 (2d Cir. 2013), *request for mandamus renewed*, No. 09-2778 (2d Cir. Apr. 25, 2014).

# **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ......................................i

STATEMENT AS TO RELATED CASES.........................................i

TABLE OF AUTHORITIES ...............................................iv

STATEMENT OF THE ISSUES............................................1

STATEMENT OF FACTS ................................................1

   1. The Bank is a corporation ........................................1

   2. All parties are foreign, as is the place of alleged injury ...........4

   3. The bank accounts at issue are foreign............................4

   4. The financial transactions at issue originated and terminated in foreign locales................................................8

SUMMARY OF ARGUMENT ...........................................12

ARGUMENT ........................................................14

   I.   PLAINTIFFS' ATS CLAIMS WERE PROPERLY DISMISSED UNDER *KIOBEL I*......................................14

      A.  The District Court Correctly Held That Dismissal Is Required By This Court's Binding Decision In *Kiobel I*. .......14

      B.  This Court Correctly Held In *Kiobel I* That Corporations Are Not Proper ATS Defendants ...........................18

         1.  Under *Sosa*, Corporations Like Arab Bank Are Not Proper ATS Defendants................................18

         2.  International Law Does Not Recognize Corporate Liability.......................................................20

         3.  Federal Common Law Does Not Supply A Basis For Holding Corporations Liable Under The ATS .......24

         4.  International Treaties Do Not Supply A Basis For Corporate Liability .......................................26

**TABLE OF CONTENTS**
(continued)

**Page**

II.   DISMISSAL OF PLAINTIFFS' ATS CLAIMS IS ALSO
      REQUIRED BY *KIOBEL II* ............................................................29

      A.    The Case For Dismissal Is More Compelling Here Than
            It Was In *Kiobel II* ...................................................................31

            1.    The Cases Cited in *Kiobel II* Confirm That
                  Dismissal Is Needed Here..............................................35

            2.    Under *Sosa* There Is No Universally Accepted
                  International Norm ........................................................38

            3.    Maintaining This Suit Would Violate Comity
                  Principles ......................................................................42

      B.    This Court Has Held That Dismissal Is Required In
            Indistinguishable Cases...............................................................46

      C.    There Is No Direct Or But-For Causation In This Case ..........49

      D.    Dismissal Should Be Affirmed Without A Pointless
            Remand ........................................................................................51

III.  DISMISSAL OF PLAINTIFFS' "GENERAL FEDERAL
      COMMON LAW" CLAIMS WAS REQUIRED BY WELL-
      SETTLED SUPREME COURT PRECEDENT ...............................54

CONCLUSION ......................................................................................55

iii

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACLU v. Mukasey*,
534 F.3d 181 (3d Cir. 2008) ...............................................................15

*Al Shimari v. CACI Premier Technology, Inc.*,
2014 WL 2922840 (4th Cir. June 30, 2014).....................................48

*Aldana v. Del Monte Fresh Produce N.A., Inc.*,
741 F.3d 1349 (11th Cir. 2014) .........................................................48

*Arab Bank, PLC v. Linde*, 706 F.3d 92 (2d Cir. 2013),
*cert. denied*, No. 12-1485 (U.S. June 30, 2014)..........................*passim*

*Balintulo v. Daimler AG*,
727 F.3d 174 (2d Cir. 2013) ...................................... 14, 46-48, 51, 52

*Ben-Haim v. Neeman*,
543 F. App'x 152 (3d Cir. 2013) ...................................................48, 53

*Bernstein v. Kerry*,
962 F. Supp. 2d 122 (D.D.C. 2013).............................................43, 50

*Burrage v. United States*,
134 S. Ct. 881 (2014).........................................................................50

*California v. FERC*,
495 U.S. 490 (1990)...........................................................................15

*Carey v. Nevada Gaming Control Bd.*,
279 F.3d 873 (9th Cir. 2002) .............................................................15

*Cedeno v. Castillo*,
457 F. App'x 35 (2d Cir. 2012) .........................................................53

*In re Chiquita Brands Int'l, Inc. Alien Tort Statute & Shareholder
Derivative Litig.*, 792 F. Supp. 2d 1301 (S.D. Fla. 2011) ....................27, 28, 39

*Chowdhury v. Wordtel Bangladesh Holding, Ltd.*,
746 F.3d 42 (2d Cir. 2014) ...................................................14, 15, 47

*Corrie v. Caterpillar Inc.*,
503 F.3d 974 (9th Cir. 2007) ..............................................................43

*Cuban Am. Bar Ass'n, Inc. v. Christopher*,
43 F.3d 1412 (11th Cir. 1995) ...........................................................15

*Daimler AG v. Bauman*,
134 S. Ct. 746 (2014).........................................................................37

*Doe I v. Israel*,
400 F. Supp. 2d 86 (D.D.C. 2005).....................................................43

*Erie R. Co. v. Tompkins*,
304 U.S. 64 (1938)........................................................................26, 54

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
542 U.S. 155 (2004)...........................................................................36

*Gill v. Arab Bank, PLC*,
893 F. Supp. 2d 542 (E.D.N.Y. 2012) ...............................3, 5, 6, 9, 11

*Halliburton Co. v. Erica P. John Fund, Inc.*,
2014 WL 2807181 (U.S. June 23, 2014) ...........................................15

*IIT v. Vencap, Ltd.*,
519 F.2d 1001 (2d Cir. 1975) ............................................................22

*Jones v. Coughlin*,
45 F.3d 677 (2d Cir. 1995) ................................................................16

*Kaplan v. Cent. Bank*,
961 F. Supp. 2d 185 (D.D.C. 2013)...................................................53

*Khulumani v. Barclay National Bank*,
504 F.3d 254 (2d Cir. 2007) .............................................................20

*Kiobel v. Royal Dutch Petroleum Co.*,
621 F.3d 11 (2d Cir. 2010) ("*Kiobel I*").....................................*passim*

*Kiobel v. Royal Dutch Petroleum Co.*,
133 S. Ct. 1659 (2013) ("*Kiobel II*").........................................*passim*

v

*Mashreqbank PSC v. Ahmed Hamad Al Gosaibi Co.*,
   2014 WL 1356220, 2014 N.Y. Slip Op. 2381 (2014) ........................................34

*Matar v. Dichter*,
   500 F. Supp. 2d 284 (S.D.N.Y. 2007), *aff'd*, 563 F.3d 9 (2d Cir. 2009) ...........43

*Medellin v. Texas*,
   552 U.S. 491 (2008)......................................................................................29

*Michigan v. Bay Mills Indian Community*,
   134 S. Ct. 2024 (2014)..................................................................................15

*Mohamad v. Palestinian Auth.*,
   132 S. Ct. 1702 (2012)..................................................................................23

*Morrison v. National Australia Bank*,
   561 U.S. 247 (2010)...................................................................18, 35, 36, 53

*Muntslag v. Beerens*,
   2013 WL 4519669 (S.D.N.Y. Aug. 26, 2013)...................................................53

*Nortex Petroleum v. Access Indus., Inc.*,
   631 F.3d 29 (2d Cir. 2010) ...........................................................................53

*In re Oswego Barge Corp.*,
   664 F.2d 327 (2d Cir. 1981) .........................................................................41

*Presbyterian Church v. Talisman Energy*,
   582 F.3d 244 (2d Cir. 2009) .........................................................................20

*Robinson v. Gov't of Malaysia*,
   269 F.3d 133 (2d Cir. 2001) .........................................................................54

*Rothstein v. UBS*,
   708 F.3d 82 (2d Cir. 2013) .....................................................................49, 50

*Sarei v. Rio Tinto, PLC*,
   671 F.3d 736 (9th Cir. 2011) (*en banc*), *vacated and remanded*,
   133 S. Ct. 1995 (2013), *on remand*, 722 F.3d 1109 (9th Cir. 2013)
   (*en banc*) .....................................................................................................47

*Scott v. Fischer*,
   616 F.3d 100 (2d Cir. 2010) .........................................................................53

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004)......................................................................*passim*

*In re Terrorist Attacks on Sept. 11, 2001*,
    714 F.3d 109 (2d Cir. 2013) .......................................................53, 54

*In re Terrorist Attacks on Sept. 11, 2001*,
    714 F.3d 118 (2d Cir. 2013) ........................................ 31, 38-40, 50, 51

*Tymoshenko v. Firtash*,
    2013 WL 4564646 (S.D.N.Y. Aug. 28, 2013)....................................49

*United States v. Goering*,
    6 F.R.D. 69 (Int'l Mil. Trib. 1946) ...................................................21

*United States v. Krauch*,
    7 Nuremberg Trials 50, 8 Nuremberg Trials 1081 (Int'l Mil. Trib. 1952)........22

*United States v. Yousef*,
    327 F.3d 56 (2d Cir. 2003) ........................................................39, 52

*Univ. of Texas v. Nassar*,
    133 S. Ct. 2517 (2013).............................................................49, 51

*Wiwa v. Royal Dutch Petroleum Co.*,
    226 F.3d 88 (2d Cir. 2000) ..............................................................32

*Yeun Jin v. Mukasey*,
    538 F.3d 143 (2d Cir. 2008) ............................................................41

## STATUTES

18 U.S.C. § 2340A ...............................................................................48

Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.* .........................5, 27, 40, 41

Anti-Terrorism and Effective Death Penalty Act, 18 U.S.C. §§ 2339A-C ............29

Anti-Terrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110
    Stat. 1214 (1996)............................................................................29

Alien Tort Statute, 18 U.S.C. § 1350..............................................*passim*

Libyan Claims Resolution Act, Pub. L. No. 110-301, 122 Stat. 2999 (2008).........41

National Defense Authorization Act, Pub. L. No. 113-66, 127 Stat. 672 (2013) .................................................................................................41

Torture Victims Protection Act, 18 U.S.C. § 1350 note ..............................23, 26, 48

**OTHER AUTHORITIES**

*Arab Bank Awarded Title of Best Cash Manager in the Middle East 2013*, Daily Pak Banker, 2013 WLNR 31500645, Dec. 17, 2013 ................3

Arab Bank, Group Directory, http://arabbank.com/en/globalgroupdir.aspx? CSRT=17519517872182649435 ........................................................2

*Arab Bank Named Best Bank in Jordan by Euromoney for Sixth Consecutive Year*, MENA Report, 2013 WLNR 13727086, June 4, 2013 ..............3

*Arab Bank Named Best Trade Finance Provider in the Middle East for 2014*, Islamic Finance News, 2014 WLNR 3566502, Feb. 7, 2014 ..............3

Brief of the Gov'ts of the United Kingdom of Great Britain, *et al.*, as *Amici Curiae*, *Kiobel v. Royal Dutch Petroleum Co.*, No. 10-1491 (U.S. Feb. 3, 2012) ....................................................................................28

Brief for the United States as *Amicus Curiae*, *Arab Bank, PLC v. Linde*, No. 12-1485 (U.S. May 23, 2014), http://www.justice.gov/ osg/briefs/2013/2pet/6invit/2012-1485.pet.ami.inv.pdf ...........2, 44, 45

Brief for the United States as *Amicus Curiae*, *Kiobel v. Royal Dutch Petroleum Co.*, No. 10-1491 (U.S. Dec. 21, 2011), http://www.justice.gov/osg/briefs/2011/3mer/1ami/2010-1491.mer.ami.pdf ..............................................................................21

Brief for the United States as *Amicus Curiae*, *O'Neill v. Al-Rajhi Bank*, No. 13-318 (U.S. May 27, 2014), http://www.justice.gov/osg/briefs/ 2013/2pet/6invit/2013-0318.pet.ami.inv.pdf ......................................5

Clearing House Interbank Payments System, *About Us*, https://www.chips.org/about/pages/033738.php .................................8

Convention Against Torture, 1465 U.N.T.S. 85 (1984) .........................................26

Convention on the Prevention and Punishment of the Crime of Genocide, 78 U.N.T.S. 277 (Dec. 9, 1948) ........................................................26

viii

Morton J. Horwitz, THE TRANSFORMATION OF AMERICAN LAW 1780-1860 (1977) ................................................................................................25

H.R. Rep. No. 102-367 (1991)................................................................23

International Convention for the Suppression of the Financing of Terrorism, 2178 U.N.T.S. 197 (Dec. 9, 1999) ....................................................27

International Federation of Red Cross and Red Crescent Societies, *Who We Are*, https://www.ifrc.org/en/who-we-are/...........................................9

Report on Implementation of Gen. Assembly Res. 60/251, U.N. Doc. A/HRC/4/35 (Feb. 19, 2007) ............................................................27

S. Amdt. 2523 to S. 1197, 113th Cong., 159 Cong. Rec. S8516-20 (Daily ed. Nov. 21, 2013) .....................................................................................41

Supplemental Brief for the United States as *Amicus Curiae*, *Kiobel v. Royal Dutch Petroleum Co.*, No. 10-1491 (U.S. June 13, 2012), http://www.justice.gov/osg/briefs/2011/3mer/1ami/2010-1491.mer.supp.ami.pdf ...........................................................23, 24

U.S. Dep't of the Treasury, *Who must comply with OFAC regulations?*, http://www.treasury.gov/resource-center/faqs/Sanctions/Pages/answer.aspx .........................................................................................6

26 U.S. Op. Atty. Gen. 250 (1907) .......................................................25

The White House, *Statement by the President on the Death of Crown Prince Nayif bin Abd al-Aziz Al Saud of Saudi Arabia*, http://www.whitehouse.gov/the-press-office/2012/06/16/statement-president-death-crown-prince-nayif-bin-abd-al-aziz-al-saud-sau .....................44

## STATEMENT OF THE ISSUES

Plaintiffs-appellants are foreign citizens who seek to hold Arab Bank plc ("Arab Bank" or "the Bank"), a foreign corporation, liable under the Alien Tort Statute, 18 U.S.C. § 1350 (the "ATS"), for injuries sustained by them as a result of alleged violations of international law committed by foreign non-parties on foreign soil. The district court properly dismissed these claims pursuant to *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 11 (2d Cir. 2010) ("*Kiobel I*"), which holds that corporations are not proper ATS defendants. The issues presented are:

1. Whether the district court correctly dismissed plaintiffs' claims pursuant to *Kiobel I*, which was affirmed, on other grounds, by *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) ("*Kiobel II*").

2. Whether, in the alternative, this lawsuit must be dismissed under *Kiobel II* because of its extraterritorial character.

## STATEMENT OF FACTS

**1. The Bank is a corporation.** One undisputed fact is dispositive of this appeal: Arab Bank is a legally incorporated entity. A-197-98(¶¶33-34). As a corporation, it may not be sued under the ATS. The district court's dismissal of the allegations in this case was therefore correct.

Other undisputed facts underscore Arab Bank's importance to the economies of the countries where it operates, its reputation for safe, sound, and transparent

banking, and its commitment to combating the financing of terrorism. The Bank is the largest financial institution in Jordan, where it maintains its global headquarters. A-197(¶33); A-1039; A-1041; A-1054. It operates throughout the Middle East and North Africa, as well as in China, Singapore, South Korea, Kazakhstan, and the United States.[1] The Bank is also the largest financial institution in the Palestinian Territories, where it has been a development partner with "USAID, IFC, OXFAM, ANERA, CARITAS, Save the Children Fund, [and] Catholic Relief Services" and has emerged as "the main vehicle for * * * payments by the international donor community." A-929-30; A-1055. Its Palestinian branches are also used by Israel, which transfers their tax revenues collected for the benefit of the Palestinian Authority to accounts maintained by the Bank. A-930; Brief for U.S. as *Amicus Curiae* at 20, *Arab Bank, PLC v. Linde*, No. 12-1485 (U.S. May 23, 2014) ("U.S. Br.").[2]

The United States has stated that the Bank is "a constructive partner" in "working to prevent terrorist financing" and "a leading participant" in "regional forums on anti-money laundering and combating the financing of terrorism." U.S. Br. at 20. The Hashemite Kingdom of Jordan describes the Bank as a "pivotal

---

[1]    *See* Arab Bank's Corporate web site, Group Directory, *available at* http://arabbank.com/en/globalgroupdir.aspx?CSRT=17519517872182649435.

[2]    For the convenience of the Court, the Solicitor General's brief is appended hereto. It is also available through the Solicitor General's web site: http://www.justice.gov/osg/briefs/2013/2pet/6invit/2012-1485.pet.ami.inv.pdf.

2

force of economic stability and security in the Kingdom and the broader region"
and has told the Supreme Court that its "economic well-being" is "tightly linked to
Arab Bank's well-being." A-1025; A-1054-55. The Kingdom has also emphasized
that the Bank's substantial presence in the Palestinian Territories "provide[s] some
of the only safe, sophisticated, and transparent financial infrastructure available—a
measure of stability in a turbulent region." A-1054.

The Bank is uniformly recognized within its industry as a "best" institution.[3]
It was one of the first financial institutions to implement U.S. counter-terrorism
procedures in the Middle East by voluntarily screening the names of its foreign
account holders, and parties to foreign fund transfers, against the omnibus list of
suspected terrorists and other prohibited bank customers promulgated by the
United States (the "OFAC list"). *See Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542,
565 (E.D.N.Y. 2012) (granting Bank's motion for summary judgment in a related
case that incorporated the discovery record at issue here).

The conduct of the Bank that is at issue in this action involves the provision
of conventional financial services, under the watchful scrutiny of foreign bank

---

[3]     *Arab Bank Named Best Bank in Jordan by Euromoney for Sixth Consecutive
Year*, MENA Report, 2013 WLNR 13727086, June 4, 2013; *Arab Bank Awarded
Title of Best Cash Manager in the Middle East 2013 [by Global Investor ISF
Magazine]*, Daily Pak Banker, 2013 WLNR 31500645, Dec. 17, 2013; *Arab Bank
Named Best Trade Finance Provider in the Middle East for 2014 [by Global
Finance Magazine]*, Islamic Finance News, 2014 WLNR 3566502, Feb. 7, 2014.

regulators, to foreign correspondent banks and customers that plaintiffs claim are affiliated with terror organizations. Substantially all of these services involved automated fund transfers that passed through an international banking network that collectively processes trillions of dollars of transactions a day. The Bank is not alleged to have participated in any fashion in the acts that are alleged to have caused plaintiffs' injuries.

2. **All parties are foreign, as is the place of alleged injury.** Each of the plaintiffs claims foreign citizenship. Pls. Brief 5 (hereafter, "Pls."). These individuals allege that they were injured on foreign soil. The acts giving rise to their injuries were committed by foreign non-parties, for the alleged purpose of targeting the citizens of a foreign country. A-149(¶30).[4]

3. **The bank accounts at issue are foreign.** Plaintiffs' allegations concerning the Bank's provision of financial services focus exclusively on foreign bank accounts maintained by foreign customers. A-204(¶50); A-206-07. Individuals resident in the Middle East, all subject to the scrutiny of foreign

---

[4]     In many, if not most, cases, plaintiffs—including foreign soldiers injured on active duty—have not alleged, and presumably do not know, the identity of their assailants. *E.g.*, A-156(21) ("Palestinian terrorists * * * open fire on IDF soldiers"); A-159(28) ("[A] citizen of Israel * * * is shot and severely wounded in an IDF operation"); A-189(118) ("A drive-by shooter injures 4"). Instead, they claim that foreign militant organizations "claimed responsibility" for these attacks. *E.g.*, A-151(6) ("Hamas and Fatah claim joint responsibility"); A-151(7) ("Hamas and the AAMB claim joint responsibility"); A-156-57(21) ("AAMB, Hamas, and PIJ issue a joint statement of responsibility").

regulators, allegedly received deposits of funds in accounts maintained by them in the Middle East. *Ibid.* Licensed charities operating in the Middle East, which plaintiffs acknowledge "officially h[eld] [themselves] out to the public" as "charitable organization[s] with a purely humanitarian and benign purpose," A-210(¶76), conducted banking business in the Middle East, making deposits and withdrawals there, and writing checks drawn on accounts there.[5] *See also Gill*, 893 F. Supp. 2d at 561 (noting that many of the Palestinian charities at issue received grants from the U.S. government at the time that they received financial services from the Bank).

No customer of the Bank is alleged to have maintained an account in the United States. *Cf.* A-810-16 (foreign regulators' objections to district court order for Bank to disclose foreign account records). And there is no dispute that Arab Bank applied the OFAC list at all times in processing international fund transfers through its New York branch (*see*, *e.g.*, CA-50-52; CA-74-75; A-1018), and that it also undertook efforts to apply U.S. standards globally absent any legal obligation

---

[5]     The United States has taken the position that allegations of this sort are insufficient to support a case for liability against a bank, even where plaintiffs are U.S. citizens pursuing claims under the Anti-Terrorism Act. Br. for the U.S. as *Amicus Curiae* at 11 n.4, *O'Neill v. Al Rajhi Bank*, No. 13-318 (U.S. May 27, 2014) ("Petitioners' allegations that the charities held themselves out as bona fide organizations * * * undercut any inference that the [b]ank was aware of the charities' alleged support for terrorism."), *available at* http://www.justice.gov/osg/briefs/2013/2pet/6invit/2013-0318.pet.ami.inv.pdf.

to do so. *See Gill*, 893 F. Supp. 2d at 565; *see also* U.S. Dep't of the Treasury, *Who must comply with OFAC regulations?*, *available at* http://www.treasury.gov/ resource-center/faqs/Sanctions/Pages/answer.aspx (last accessed July 2, 2014).

Moreover, it is undisputed that substantially all of the foreign accountholders identified by appellants as "senior Hamas leaders" (Pls. 7) have never been designated as such by the U.S. Government and remain unlisted to this day. *See*, *e.g.*, *Gill*, 893 F. Supp. 2d at 563-65. Plaintiffs' statement that "Arab Bank maintained accounts for a minimum of 11 Palestinian entities and individuals designated as terrorists by the U.S. Government" (Pls. 8), which also refers to foreign accounts, fails to note, as the Bank's interrogatory responses made clear, that those 11 foreign accounts were closed as a result of the U.S. designations. *See* CA-115.

In addition to their claims regarding these exclusively foreign accounts, the plaintiffs challenge the Bank's processing of automated fund transfers originated by a Saudi charity that is alleged to have been "the main conduit for Saudi financial and material aid to the Palestinian territories" (the "Saudi Committee"). Plaintiffs acknowledge that the Saudi Committee was established by Royal Decree of the Kingdom of Saudi Arabia in October 2000, was overseen by the Interior Minister of Saudi Arabia, and operated transparently by posting all of its charitable donations—including those challenged by plaintiffs—on the internet. A-235-37.

The Saudi Committee held *no accounts* at Arab Bank and engaged in *no activities* in the United States. It conducted all of its fundraising efforts in Saudi Arabia and distributed all of the funds raised by it in the Palestinian Territories. A-236-37. Saudi Arabian donors to the Committee made deposits into the accounts of Saudi Arabian banks ("Saudi-American Bank, the Saudi-British Bank, the Saudi-Dutch Bank, Saudi-French Bank, National Commercial Bank and Arab National Bank"). A-224(¶198). The Committee then instructed its banks in Saudi Arabia to transfer funds to specific beneficiaries chosen by it, who allegedly collected their electronically transmitted payments at Arab Bank branches in the West Bank and Gaza. A-245-46(¶203).

Plaintiffs do not, and cannot, claim that Saudi Arabia funded acts of terrorism through the foreign bank accounts of the Saudi Committee. Instead, they claim that these foreign funds somehow incentivized the foreign terrorists of the future by providing financial relief to the survivors of those killed or injured during years of conflict in the Palestinian Territories.[6] Any search for a domestic nexus in these claims would be futile.

---

[6] As discussed *infra* Part II.A.3, these allegations conflict with U.S. foreign policy, which endorsed the work of the Saudi Committee and its Chairman, and raise diplomatic and international comity concerns.

**4. The financial transactions at issue originated and terminated in foreign locales.** The banking transactions central to this litigation have both foreign sources and foreign destinations; they were initiated by parties overseas for the benefit of other parties overseas. A-203-07; CA-54-62; CA-98-109; CA-129-67. Where dollar-denominated, these electronic transfers in some cases passed through the automated clearing facilities of the New York branch of Arab Bank. As a matter of course, international financial institutions have historically routed the largest percentage of their cross-border dollar transfers through U.S. banks as a matter of convenience. *1.5 trillion dollars of cross-border and domestic payments* are cleared and settled through the Clearing House Interbank Payments System ("CHIPS") automated funds transfer system *each day.* CHIPS, *About Us*, The Clearing House ("CHIPS is the largest private-sector U.S.-dollar funds-transfer system in the world");[7] A-197(¶33) ("[A]mong the banking and financial services that [Arab Bank] conducts in New York is the provision of clearing and correspondent bank services to its foreign bank branch offices."); *see also infra* Part II.A.

---

[7]   *Available at* https://www.chips.org/about/pages/033738.php (last accessed June 30, 2014); *see also* A-1013 ("[A]s a member of [CHIPS] and other settlement systems in the United States, Arab Bank-New York cleared funds transfers involving major commercial banks in the United States.").

Throughout the relevant time period, the New York branch of Arab Bank annually processed approximately 500,000 automated transfers. *Gill*, 893 F. Supp. 2d at 565; A-1014. Each of these transfers was processed electronically, through automated systems that screened the names of the parties involved in each transaction against the OFAC list. *E.g.*, CA-50-52; CA-74-75.

Plaintiffs attempt to exaggerate the importance of Arab Bank's New York branch to their claims by contending that, over the course of a decade, "Arab Bank processed at least 2,719 transfers totaling $121,991,947 through its New York branch" to "terrorist-affiliated individuals and organizations." Pls. 6.[8] The undisputed facts upon which plaintiffs rely provide no support for these claims, however:

- None of the automated clearing transactions processed by Arab Bank's New York branch involved "designated terrorists and terrorist entities" on the OFAC list, with the exception of four transactions that originated overseas—three of which were for the benefit of overseas recipients—which passed

---

[8]     Plaintiffs rely on an analysis of transactions processed by the New York branch that was conducted by one of their experts. Pls. 6; *see* CA-95-96. This list includes indisputably legitimate organizations like a member of the International Federation of Red Cross and Red Crescent Societies (IFRC). *Compare* CA-95(#19) (New York branch processed transfers from an IFRC member totaling $6,195,433), *with* IFRC, "Who We Are" ("[IFRC] is the world's largest humanitarian network," which acts "before, during and after disasters and health emergencies to meet the needs and improve the lives of vulnerable people"), *available at* https://www.ifrc.org/en/who-we-are/.

through the Bank's electronic funds transfer systems as a result of innocent machine or human error.[9]

- The Bank did not "process[] over 282 transfers for [U.S.-designated] individuals and entities" through its New York branch after their designation. Pls. 8. In support of this false claim, plaintiffs rely upon the Bank's answers to interrogatories that expressly inquire about transactions it processed "*anywhere in the world*, including jurisdictions in which application of U.S. designations is not required by law" through December 2007. *See* Bank's Resps. and Objections, Jan. 12, 2011, at 2-3 (*Linde* ECF No. 892-37). The 282 transfers identified by the Bank in response to this interrogatory were not processed through New York, as plaintiffs were readily able to discern, since they have received all transfer records from the Bank's New York branch that they requested.

- The plaintiffs concede, through the work product of their own expert, that only 73 electronic fund transfer instructions, of the approximately 180,000 originated by the Saudi Committee, were directed through the automated dollar-clearing servers of the Bank's New York branch and processed after passing through the Bank's OFAC filter. *Compare* A-932(¶36), *with* CA-95(#8). And, as records included by plaintiffs in the joint appendix demonstrate, these 73 transfers were denominated in dollars, thus requiring no currency conversion from riyals to dollars. *E.g.*, CA-166.

- Plaintiffs also suggest that the Office of the Comptroller of the Currency ("OCC") penalized the Bank because of its "global conduct" and because of information that originators and beneficiaries in foreign fund transfers cleared by Arab Bank's New York branch were linked to "illicit activity." Pls. 14. In fact, the OCC identified deficiencies "in the Bank's internal controls" with regard to its monitoring of transfers involving parties that did

---

[9]     Two of these transactions were automatically cleared by the OFAC filter because of disparities between the names on the transfer instructions and the names specified on the OFAC list. CA-34-37; CA-49-52; CA-71-75; CA-98. Neither of these transactions received human attention. The remaining two transactions, both involving foreign origins and destinations, were processed as a result of operator error, when an employee confused signatures authorizing currency conversions with a false-positive OFAC override. CA-43-45; CA-58-60. Once these errors were realized, the Bank reported them to OFAC, which took no action. CA-47; CA-34.

not hold accounts at Arab Bank-New York. A-1015. It did not make any finding of any knowing misconduct on the part of the Bank. To the contrary, the OCC found that Arab Bank-New York complied with regulations requiring it to block transactions involving designated terrorists. A-1018.[10]

The routine banking activity at issue here is thus indisputably foreign. And plaintiffs cannot bootstrap their claims regarding these foreign activities into claims having a strong domestic connection merely because some of the automated transfers at issue were cleared, without human intervention, by the Bank's New York branch. Only *four* electronic fund transfers, out of millions processed through the automated clearing systems of the Bank's New York branch on their way to, or from, foreign destinations, involved foreign individuals or entities that had been placed on the OFAC list. Each of these four transfers was processed because of an innocent error that was promptly disclosed and reported to regulators. *Supra* note 9. And a number of the transactions identified by plaintiffs never touched United States shores, even for the routine, ministerial task of dollar clearing. *E.g.*, CA-99-101.

---

[10]     The Bank did not admit to any wrongdoing. A-1012; *see also Gill*, 893 F. Supp. 2d at 566 (these agency findings are not probative of the terrorism financing questions at issue and are otherwise inadmissible). The narrow issue of non-compliance as found by the OCC concerned Arab Bank-New York's failure to utilize an adequate automated system to monitor the names of originators and beneficiaries of non-customers in order to determine whether there was any suspicious activity on the part of those non-customers that should be reported. *See* A-1015.

## SUMMARY OF ARGUMENT

The district court properly held that it had no jurisdiction to hear plaintiffs' claims, because corporations are not proper defendants under the ATS. Alternatively, the claims should be dismissed because *Kiobel II* holds that U.S. courts may not exercise jurisdiction over claims, like these, that are extraterritorial in nature.

**I.** In dismissing these claims, the district court held that "[t]he law of this Circuit is that plaintiffs cannot bring claims against corporations under the ATS." SPA-1. The district court properly concluded that the only analytic exercise to be performed is a determination of whether the defendant is a corporation. Here, there is no question that Arab Bank qualifies for this status.

As a corporation, the Bank is not subject to the norms of customary international law. There is no consensus among nations that recognizes corporate liability for violations of these norms. *Kiobel I*, 621 F.3d at 120, 131-45. In fact, far from corporate liability being the "universal" norm that would be necessary to bring it within the scope of the ATS, "no international tribunal" has "*ever* held a corporation liable for a violation of the law of nations." *Id*. at 132.

The district court correctly concluded that this Court's carefully reasoned holding, which has been endorsed by this Court in three subsequent decisions, "remains intact." SPA-1. The doctrine of *stare decisis* applies and easily resolves

this appeal. And even if this Court wished to reexamine the holding in *Kiobel I*—which it can only do *en banc*—plaintiffs have not met their burden of proving a universal international norm of corporate liability and thus supply no reason to disturb that holding.

**II.** In *Kiobel II*, the Supreme Court held that the presumption against extraterritoriality applies to the ATS. *Kiobel II*, 133 S. Ct. at 1669. Accordingly, the ATS does not permit courts to recognize a cause of action for violations of the law of nations occurring on foreign soil. *See id.* at 1670 (Alito, J., concurring). Here, every element of the claims before this Court is extraterritorial and thus outside the jurisdictional grant of the ATS: foreign plaintiffs are suing a foreign defendant for torts committed by foreign non-parties on foreign soil. *Id.* at 1669.

Plaintiffs seek to bring their claims within the reach of the ATS by arguing that some of the banking services that the Bank provided to customers and account holders whom they allege to be affiliated with terrorists touch and concern the United States. But plaintiffs can identify no domestic conduct enjoined by customary international law. The only banking activity alleged to have occurred in the United States is the automated clearance of electronic fund transfers that were intended for beneficiaries outside of the United States and, in almost all cases, originated by parties outside of the United States. *Supra* at 8-12. The performance of such automated and routine services, when considered in light of the

13

overwhelmingly foreign character of plaintiffs' claims, cannot plausibly be understood to touch and concern the United States with sufficient force to displace the strong presumption against extraterritoriality that applies to the ATS.

## ARGUMENT

## I.   PLAINTIFFS' ATS CLAIMS WERE PROPERLY DISMISSED UNDER *KIOBEL I*.

The district court properly held that *Kiobel I* is binding law in this Circuit. SPA-1. It requires dismissal of plaintiffs' complaints.

### A.   The District Court Correctly Held That Dismissal Is Required By This Court's Binding Decision In *Kiobel I*.

The holding of *Kiobel I* can be simply stated: ATS jurisdiction does not extend to claims against corporations. 621 F.3d at 120. This Court has refused to reconsider its opinion on three separate occasions:

- the denial of rehearing (642 F.3d 268 (2d Cir. 2011));

- the denial of rehearing *en banc* (642 F.3d 379 (2d Cir. 2011)); and

- the denial of rehearing *en banc* a second time without dissent (Order, No. 06-4800, Mar. 1, 2011 (2d Cir.)).

In fact, since *Kiobel II* was decided, this Court has repeatedly *reaffirmed* its holding in *Kiobel I* in multiple panel opinions. *See Balintulo v. Daimler AG*, 727 F.3d 174, 191 n.26 (2d Cir. 2013) (confirming that *Kiobel I* is "[t]he law of this Circuit"); *Chowdhury v. Wordtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 49 n.6

14

(2d Cir. 2014) (calling *Kiobel I* "the precedent of this Circuit" that the Supreme Court "did not disturb"). And it denied these very plaintiffs' petition for an initial hearing of this appeal *en banc*. *See Jesner*, Dkt. No. 75 (Feb. 21, 2014).

Plaintiffs' pursuit of this appeal is thus exactly what the doctrine of *stare decisis* was designed to prevent. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 2014 WL 2807181, at *11 (U.S. June 23, 2014) ("The principle of *stare decisis* has special force in respect to statutory interpretation because Congress remains free to alter what we have done.") (internal quotation marks omitted); *accord Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2036 (2014) (adherence to precedent "is a foundation stone of the rule of law"); *California v. FERC*, 495 U.S. 490, 499 (1990).

The Supreme Court's affirmance of *Kiobel I* on other grounds does not "undercu[t] the authority of [this Court's] decision" (SPA-1), as plaintiffs claim. *See ACLU v. Mukasey*, 534 F.3d 181, 189-90 (3d Cir. 2008) (prior Third Circuit opinion "remain[s] binding on us" because the Supreme Court "left untouched our conclusions"); *Carey v. Nevada Gaming Control Bd.*, 279 F.3d 873, 880 (9th Cir. 2002) (prior Ninth Circuit opinion "remains good law in this circuit" because "the Supreme Court did not reverse" but affirmed on other grounds); *Cuban Am. Bar Ass'n, Inc. v. Christopher*, 43 F.3d 1412, 1428 n.20 (11th Cir. 1995) (prior

Eleventh Circuit opinion "remains viable as the Supreme Court did not vacate the opinion but affirmed and remanded on alternative grounds").

*Kiobel I* remains the law of this Circuit because it has not been "overruled by the Court *en banc* or by the Supreme Court." *Jones v. Coughlin*, 45 F.3d 677, 679 (2d Cir. 1995). In fact, far from overruling *Kiobel I*, *Kiobel II* "affirmed" this Court's judgment. The Supreme Court expressly stated that it was not deciding the issue of "corporate liability." 133 S. Ct. at 1663. While it "granted certiorari to consider that question," the Court ordered supplemental briefing in response to an "additional question" posed by it and affirmed this Court's decision "based on our answer to [this] question." *Ibid.* Thus confronted with the opportunity to repudiate the reasoning of this Court, the Supreme Court refused to do so. Instead, the Court's decision to "answer the second question," not the first, was an explicit declaration that it was *not* answering the first. *Ibid.*

In claiming that *Kiobel II* "abrogated" and "expressly undermines" *Kiobel I*, plaintiffs rely entirely on a single sentence of *dicta* in *Kiobel II*, which they misread. Pls. 20-23. There, the Supreme Court noted that "[c]orporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices [to displace the presumption against extraterritorial application]." 133 S. Ct. at 1669. The conclusion that corporate presence does not displace the presumption against extraterritoriality says nothing about whether corporations are

16

a legitimate class of defendants under international customary law, however. Nor does this sentence even suggest that the Court intended to resolve the separate question initially presented to it in the petition for *certiorari*, or to repudiate the reasoning of this Court.

Plaintiffs' reading of this lone sentence, moreover, cannot be squared with *Kiobel II*'s approving discussion of *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). "*Sosa* repeatedly stressed the need for judicial caution in considering which claims could be brought under the ATS, in light of foreign policy concerns." 133 S. Ct at 1664. In addition, *Sosa* "limited federal courts to recognizing causes of action only for alleged violations of international law norms that are specific, universal, and obligatory." *Id.* at 1665 (internal quotation marks omitted). Such cautionary language is flatly inconsistent with the expansion of liability that plaintiffs purport to discern in *Kiobel II*. ATS claims are reserved for today's pirates and "enemies of all mankind," and "there is no indication that the ATS was passed to make the United States a uniquely hospitable forum for the enforcement of international norms." *Id.* at 1661, 1672-73. These are the very same principles that animate *Kiobel I*. *See infra* Part I.B.

Plaintiffs fare no better in claiming that the Supreme Court, in choosing to decide whether the ATS had extraterritorial application, thereby concluded that it "possessed subject matter jurisdiction over an ATS claim against a corporate

17

defendant." Pls. 23. That is simply incorrect. The ATS "is 'strictly jurisdictional.'"

*Kiobel II*, 133 S. Ct. at 1664; *see also id.* at 1677 ("I agree with the Court that

jurisdiction does not lie.") (Breyer, J., concurring). And it is pure illogic to argue

that a court cannot consider the scope of the ATS's jurisdictional grant without

implicitly acknowledging the existence of jurisdiction. Plaintiffs rely on *Morrison*

*v. National Australia Bank*, 561 U.S. 247, 254 (2010), in support of this bizarre

proposition. But the statute at issue in *Morrison*, Section 10(b) of the Exchange

Act, is not a jurisdictional statute like the ATS. "Asking what conduct the ATS

claims reach" (Pls. 25) thus bears little resemblance to assessing whether Section

10(b) applies to the purchase and sale of securities on foreign exchanges.

### B. This Court Correctly Held In *Kiobel I* That Corporations Are Not Proper ATS Defendants.

#### 1. Under **Sosa**, *Corporations Like Arab Bank Are Not Proper ATS Defendants.*

*Sosa* makes clear that Arab Bank is not a proper ATS defendant. An ATS

claim must be assessed by "look[ing] to the historical antecedents"; a court may

not "recognize private claims under federal common law for violations of any

international law norm with less definite content and acceptance among civilized

nations than the historical paradigms familiar when [the ATS] was enacted." *Sosa*,

542 U.S. at 732, 737 (citing "the certainty afforded by Blackstone's three common

law offenses"). There is no international norm that permits the assertion of claims

18

against corporations, and certainly no norm that recognizes the legitimacy of claims under customary international law against a highly regulated financial institution for processing routine banking transactions.

Plaintiffs contend that *Sosa* is not controlling here because federal common law, not international law, must be consulted to determine the remedies available under the ATS, including the identification of those classes of defendants who may be sued. Pls. 30-34. But *Sosa* directly refutes that argument. The Supreme Court held that the relevant question under the ATS "is whether international law extends the scope of liability for a violation of a given norm *to the perpetrator being sued*." 542 U.S. at 732 n.20 (emphasis added). Justice Breyer in concurrence agreed. *Id.* at 760 (international law norms "must extend liability to the type of perpetrator" plaintiffs seek to sue). "That language," this Court properly held in *Kiobel I*, "requires that we look to *international law* to determine our jurisdiction over ATS claims against a particular class of defendant." 621 F.3d at 127 (emphasis original).

This Court thus followed the precise requirements of *Sosa* when it held that "the substantive law that determines [federal courts'] jurisdiction under the ATS is [not] the domestic law of the United States" or "of any other country"; rather, the central inquiry is "the treatment of corporations as a matter of *customary international law*." 621 F.3d at 117-18 & n.11 (emphasis original); *see also id.* at 120 & n.18.

In so holding, this Court followed circuit precedent as well as the cautionary instruction of *Sosa*. It has refused to look to domestic law to construe the ATS. Thus, in *Presbyterian Church v. Talisman Energy*, 582 F.3d 244 (2d Cir. 2009), where Sudanese plaintiffs alleged that the defendant, a Canadian company, aided and abetted human rights violations by the Sudanese government, this Court was required to resolve a difference of opinion among members of the panel in *Khulumani v. Barclay National Bank*, 504 F.3d 254 (2d Cir. 2007). The Court there had concluded, in a majority opinion authored by Judges Katzmann and Korman, that "the standard for aiding and abetting liability under the ATS must derive from international law." 582 F.3d at 258. Judge Hall, by contrast (in concurrence)—like plaintiffs here—distinguished between "substantive offenses," defined by international law, and "the means of [their] domestic enforcement," governed by U.S. law, and concluded that identifying those who could be held secondarily liable for a tort fell into the "domestic" category. 504 F.3d at 286. *Presbyterian Church* unanimously *rejected* Judge Hall's approach. It held instead that *Sosa* supports "the broa[d] principle that the scope of liability for ATS violations should be derived from international law." 582 F.3d at 258.

## 2. *International Law Does Not Recognize Corporate Liability.*

International law "reject[s] the notion of corporate liability for international crimes," and "no international tribunal has ever held a corporation liable for a

violation of the law of nations." *Kiobel I*, 621 F.3d at 120. Scholars agree that there is no corporate liability under international law. *Id.* at 137-45. Because "corporate liability" in international law "has not attained a discernible, much less universal, acceptance," it cannot "form the basis of a suit under the ATS." *Id.* at 148-49 (following *Sosa*, 542 U.S. at 732).

Plaintiffs have failed to meet their burden of establishing a universal norm of corporate liability in international law. *Kiobel I*, 621 F.3d at 120-21. They and their *amici* rely principally on the Nuremberg proceedings, in which, they claim, tribunal decisions expressly found the conduct of corporations like I.G. Farben to be in violation of international law. But as the United States explained in its *amicus* brief in *Kiobel I*, "no private organization or corporation was criminally charged or convicted" at Nuremberg, even though "corporate liability was 'explored.'" U.S. Am. Br. at 30, No. 10-1491 (U.S. Dec. 21, 2011). To the contrary, the International Military Tribunal "unmistakably" held that "'[c]rimes against international law are committed by men, not by abstract entities, and only by punishing individuals who commit such crimes can the provisions of international law be enforced.'" *Kiobel I*, 621 F.3d at 119 (quoting *United States v. Goering*, 6 F.R.D. 69, 110 (Int'l Mil. Trib. 1946)). Insofar as the Allies, as victors in war, made the political decision to seize the assets of some German corporations, plaintiffs concede (Pls. 38) that this was because the companies' activities were "an inextricable part" of "German

21

policy" and indistinguishable from activities "of the German Reich."[11] Plaintiffs'

citation to the Japanese war crimes tribunal (Pls. 40 n.23) proves the point: though

the liability of employees of the Nippon Mining Company was attributed to "their

responsibility as members of the mining company," only individual employees

were prosecuted. It is thus irrelevant that the ATS on its face "'does not distinguish

among classes of defendants'" (Pls. 35), because the law of nations incorporated in

the ATS does.

Plaintiffs otherwise cite only "general principles" of law within domestic

jurisdictions in support of the proposition that legal systems throughout the world

recognize corporate responsibility. Pls. 42-43. Domestic laws are not, however, a

proper source of information as to what the international community recognizes as

customary international law. Plaintiffs' unsubstantiated assertion that domestic

laws recognizing civil corporate liability may magically transform themselves into

universal principles of international law is thus entirely fanciful. *See IIT v. Vencap,

Ltd.*, 519 F.2d 1001, 1015 (2d Cir. 1975) (Friendly, J.) ("'Thou shalt not steal'"

---

[11]    Twenty-four Farben directors were charged with "acting through the instrumentality of Farben." *United States v. Krauch*, 7 Nuremberg Trials 50, 59 (Int'l Mil. Trib. 1952). But Farben itself, the Tribunal observed, "is not before the bar of this Tribunal and cannot be subjected to criminal penalties[.] * * * [C]orporations act through individuals." *Id.*, 8 Nuremberg Trials 1081, 1152-53 (Int'l Mil. Trib. 1952).

does not become "part of the law of nations" just because "every civilized nation doubtless has this as a part of its legal system.").

The text of the Torture Victims Protection Act, codified as a note to the ATS, confirms that there is no corporate responsibility for torture, the prohibition of which has traditionally been recognized as a customary international norm. When Congress created a private right of action in the TVPA to provide a "modern basis for a cause of action that" had previously been "maintained under [the ATS]," it limited liability to "individuals." H.R. Rep. No. 102-367, at 3-4 (1991). In "authoriz[ing] suit against natural persons alone," and not corporations, Congress was plainly tailoring its legislation to the existing framework of the ATS. *Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1706 (2012). The TVPA thus gives concrete form to an international norm, in conformity with the narrow purpose embodied in the ATS. "[C]ourts engaged in judicial law-making should not recognize a cause of action that is significantly more expansive" than the "express" cause of action "created by Congress." U.S. Supp. *Amicus* Br. at 21, *Kiobel II*, No. 10-1491 (U.S. June 13, 2012) ("*Kiobel II* U.S. Supp. Br.").

Policy arguments, like those made by plaintiffs here, about "precluding organizational liability" and potentially "foreclos[ing] effective remedies for victims and their relatives" did not persuade the Supreme Court to expand TVPA liability to corporations in *Mohamad*. 132 S. Ct. at 1710. Nor are these policy

23

arguments persuasive when "other more appropriate means of redress would often be available in other forums," such as pursuit of claims against the natural persons who committed the offenses against plaintiffs. There are, moreover, venues, unlike this, that offer some connection to the claims alleged, such as Israel, where the torts occurred. *Kiobel II* U.S. Supp. Br. at 20; *see also* A-603-29; A-310. And any consideration of "policy" arguments would, of course, be hopelessly muddled, as it would require consideration of countervailing concerns, such as the likelihood that foreign corporations will avoid American shores for fear of being drawn into protracted and economically debilitating litigation here, or will avoid doing business in less-developed nations out of concern that allegations of complicity with foreign regimes will give rise to claims in an American court.

### 3. *Federal Common Law Does Not Supply A Basis For Holding Corporations Liable Under The ATS.*

Plaintiffs argue that corporate liability has "long been recognized under common law" and speculate that "[i]n 1789, Congress surely would have recognized common-law tort liability of corporations." Pls. 32. But that conclusion is foreclosed by the Supreme Court's instruction in *Sosa* that "federal courts *should not recognize private claims under federal common law* for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when [the ATS] was enacted." 542 U.S. at 732 (emphasis added).

24

*Sosa*'s requirement that courts "look to the historical antecedents" in identifying norms of international law is fatal to plaintiffs' argument. 542 U.S. at 732. As plaintiffs' Professors of Legal History *amici* concede (at "P.L.H. Br." 22), "[b]usiness corporations were rare" in 1789. Eighteenth century corporations were typically "a public body charged with carrying out public functions." *Ibid.* (quoting Horwitz, THE TRANSFORMATION OF AMERICAN LAW 1780-1860, at 112 (1977)). Furthermore, corporations could not, under the law at that time, be found liable in tort. As the Professors of Legal History explain, "a corporation could only authorize that conduct which its charter permitted," and because charters did not "authoriz[e] tortious conduct, torts were frolics, and the remedy lay against the 'tortious employee,'" not the corporation—hence Blackstone's statement that a corporation could not sue or be sued for "'personal injuries.'" *Id.* at 22 n.22. Notably, the cases that plaintiffs and their *amici* cite as recognizing corporate liability were decided decades later. *Id.* at 23-24; Pls. 32-33. It is thus inconceivable that the drafters of the ATS in 1789 could have envisioned that they were affording foreign citizens the opportunity to sue private corporations for torts.[12]

---

[12]    Plaintiffs cite a conclusory Attorney General opinion that assumed an ATS right of action against a corporation, Pls. 36, but Attorney General Bonaparte concededly did not consider the "principles of international law" that define ATS jurisdiction or address any argument against corporate jurisdiction. 26 U.S. Op. Atty. Gen. 250, 253 (1907).

*Sosa* specifically warned courts against using "judicial creativity" to expand the narrow reach of the ATS. 542 U.S. at 728. It explained that in light of the strictures of *Erie R. Co. v. Tompkins*, which have compelled courts to "look for legislative guidance before exercising innovative authority over substantive law," "[i]t would be remarkable to take a more aggressive role in exercising a jurisdiction that has remained largely in shadow" for "two centuries." *Id*. at 726. Here, by comparison, plaintiffs propose a massive expansion of ATS liability to reach the conduct of institutions engaged in routine banking activities, with no historical precedent whatsoever to support that expansion.

### 4. *International Treaties Do Not Supply A Basis For Corporate Liability.*

International treaties that address human rights violations exclude corporations from their scope. The Convention Against Torture, 1465 U.N.T.S. 85 (1984), which contemplates civil as well as criminal liability, was implemented in the United States through the TVPA, which, as described above, applies only to individuals. The three major treaties establishing international criminal tribunals, also discussed above, grant remedies solely against individuals. The genocide convention applies to "rulers, public officials, or private individuals."[13] As a United Nations report concluded after broadly surveying international conventions

---

[13]    Convention on the Prevention and Punishment of the Crime of Genocide, art. IV, 78 U.N.T.S. 277 (Dec. 9, 1948).

and laws, "international human rights instruments" "d[o] not * * * currently impose direct legal responsibilities on corporations." Report on Implementation of Gen. Assembly Res. 60/251, U.N. Doc. A/HRC/4/35 ¶44 (Feb. 19, 2007).

This Court in *Kiobel I* analyzed the few treaties that do apply to corporations and concluded that (1) too few had been ratified by the United States or "other States whose interests would be most profoundly affected" to demonstrate that corporate liability is a universal norm of international law; (2) these treaties were too specialized in subject matter (such as the right to organize and bargain collectively) to indicate that corporate liability is a universal norm; and (3) corporate liability provisions in these specialized treaties were not of a norm-creating character. 621 F.3d at 138-39.

Plaintiffs' reliance on treaties and U.S. laws relating to financial support for terrorism is similarly misplaced. Pls. 43-53. The International Convention for the Suppression of the Financing of Terrorism, 2178 U.N.T.S. 197, 229 (Dec. 9, 1999) (the "Financing Convention"), requires each signatory State "in accordance with its domestic legal principles" to pass laws to enable legal entities to be held responsible criminally, civilly, or administratively for offenses committed by "a person responsible for the management or control of that legal entity." *Id.*, Art. 5(1). That Convention is thus insufficient by its own terms to establish a universal international norm of corporate liability. *Cf. In re Chiquita Brands Int'l, Inc. Alien*

*Tort Statute & Shareholder Derivative Litig.* ("*Chiquita Brands*"), 792 F. Supp. 2d 1301, 1318-22 (S.D. Fla. 2011) ("[T]he Financing Convention neither codifies nor creates an international-law norm against terrorism or financing terrorism."). Critically, the obligations imposed by the Financing Convention are directed to States—they impose no direct duties on corporations. *Id.* Corporations, to the extent they are subject to laws promulgated by States, are thus subject to domestic law rather than universal norms. As Great Britain and the Netherlands noted in their *amicus* brief in *Kiobel II*, "[t]he fact that a treaty requires States to impose particular obligations on corporations cannot convert those entities into legal persons on the international plane. Equally, without an intervening act of domestic law, an obligation owed by the State cannot be converted into one owed by a private party." Br. of the Gov'ts of the United Kingdom of Great Britain, *et al.*, as *Amici Curiae*, at 15, *Kiobel II*, No. 10-1491 (U.S. Feb. 3, 2012). Plaintiffs fail to cite a single international treaty or convention that imposes private civil damages liability on corporations for conduct like that alleged here—or indeed for any conduct. And the *Sosa* Court has made clear that the "decision to create a private right of action" is one that it leaves "to legislative judgment in the great majority of cases." 542 U.S. at 727.

There is a "presumption" that "[e]ven when treaties are self-executing" they do not result in "a private cause of action in domestic courts" absent implementing

legislation. *Medellin v. Texas*, 552 U.S. 491, 506 n.3 (2008) (internal quotation marks omitted). Plaintiffs concede that one example of such implementing legislation, the Anti-Terrorism and Effective Death Penalty Act, 18 U.S.C. § 2339A-C, was passed "to carry out the treaty obligations of the United States." Pls. 44-45. But that statute imposes only *criminal liability* on persons who support terrorism. Pub. L. No. 104-132, § 301, 110 Stat. 1214, 1247 (1996). The *private damages claims* here are brought solely under the ATS, passed 200 years before the Financing Convention, and are not authorized by any statute or treaty.

## II. DISMISSAL OF PLAINTIFFS' ATS CLAIMS IS ALSO REQUIRED BY *KIOBEL II*.

This Court also should affirm dismissal on the alternative legal ground that *Kiobel II* bars the extraterritorial claims at issue here. No remand is required because the dispositive facts are stated in the complaint and plaintiffs' brief in this Court. Application of *Kiobel II* to those facts mandates affirmance:

- Every plaintiff is either a foreign citizen or a foreign soldier. *See* Pls. 5.

- The defendant, Arab Bank, is a foreign corporation. A-197-98.

- The alleged terrorist attacks all took place overseas during a time of international conflict. *See* Pls. 5.

- The alleged injuries all took place on foreign soil. A-144.

- Those who inflicted these injuries were non-party foreign militants. *See*, *e.g.*, Pls. 9-11.

29

- The distribution of funds at issue occurred entirely in the Middle East. *See* Pls. 6-11.

- No transaction processed by Arab Bank, in the Middle East or through the electronic, automated clearing systems in New York, is alleged to have funded any attack at issue.

- The only U.S. connection asserted in the complaint is the use of Arab Bank-New York's automated, electronic systems to "clear dollar transactions" for transfer of funds to its "foreign bank branch offices and to affiliated banking institutions." Pls. 6. Arab Bank-New York processed approximately 500,000 such transfers each year throughout the relevant time period. *Supra* at 9.

- The complaint repeatedly challenges the activities of nations such as Saudi Arabia and other sovereign entities during the period at issue. In noting their disagreement with the conduct of foreign sovereigns, such as the "de facto ruler of the Kingdom of Saudi Arabia," "officers" of the "Palestinian Authorit[y]," and a charity "established" by "the Kingdom of Saudi Arabia in October 2000," plaintiffs underscore the absence of a universal consensus on applicable international law standards. A-228; A-232; A-235.

Plaintiffs readily admit that they deliberately bypassed available judicial remedies in Israel, in favor of what they believed to be a more lucrative proposition in the United States. In response to questions of why they did not file claims against Hamas or sue in Israel when their clients are almost entirely Israeli citizens and the torts occurred there, plaintiffs' counsel said (at A-310):

> The answer is simple: * * * We searched from the start for entities who * * * would be able to pay. * * * [Y]ou cannot compare the amounts that could be awarded in America in tort cases to anything we know here. In the U.S., contrary to Israel, in addition to the tort compensation, there are also enormous punitive awards, and I am talking millions.

*Kiobel II* put a definitive end to this kind of international forum shopping.

Given these facts, there is no need for a remand. This case, on its face, is extraterritorial, the automated dollar-clearing transactions in America cannot justify importation of this foreign controversy, and plaintiffs could never establish the existence of an international consensus needed to condemn these transactions. *See In re Terrorist Attacks*, 714 F.3d 118, 125 (2d Cir. 2013).

### A. The Case For Dismissal Is More Compelling Here Than It Was In *Kiobel II*.

In *Kiobel II* the Supreme Court required dismissal of ATS claims with a far stronger connection to the United States than those at issue here. In that litigation, the plaintiffs were Nigerian citizens who suffered torture and genocide alleged to have been planned and financed by the defendant corporations. The complaint asserted (in contrast to the present case) that the defendants had a direct role in the tortious conduct alleged, by "enlist[ing] the Nigerian Government" to implement this genocidal campaign, while affirmatively paying large amounts of their own money to equip Nigerian forces "with food, transportation, and compensation." 133 S. Ct. at 1662-63. Defendants did this after raising funds on the New York Stock Exchange through a subsidiary in New York. In a prior opinion, this Court had found that the New York subsidiary maintained "extensive operations in New York" which facilitated the raising of large amounts of money, warranting an assertion of "general jurisdiction" to permit a challenge to the defendant's

31

allegedly deliberate support of genocide. *Wiwa v. Royal Dutch Petroleum Co*., 226 F.3d 88, 93-99 (2d Cir. 2000).

The Supreme Court nonetheless ruled unanimously in *Kiobel II* that such a complaint, alleging "violations of the law of nations occurring within the territory of a sovereign other than the United States," must be dismissed. 133 S. Ct. at 1662. Expressing concern that the asserted claims might "clash" with the laws of "other nations" and produce "international discord," the Court refused to give the ATS extraterritorial reach. *Id.* at 1664. Chief Justice Roberts explained that "even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." Because corporations are "present in many countries" it "would reach too far to say that mere corporate presence suffices." *Id*. at 1669.

In concurrence, Justices Alito and Thomas added that the presumption against extraterritorial application "'would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved.'" *Id*. at 1670 (emphasis original). Justices Breyer, Ginsburg, Sotomayor, and Kagan, concurring in the order of dismissal, explained the absence of jurisdiction as follows (*id*. at 1677-78 (emphasis supplied)):

> I agree with the Court that jurisdiction does not lie. *The defendants are two foreign corporations.* Their shares, like those of many foreign corporations, are traded on the New York Stock Exchange. Their only presence in the United States consists of an office in New York City

32

* * * that helps to explain their business to potential investors. *The plaintiffs are not United States nationals but nationals of other nations. The conduct at issue took place abroad. And the plaintiffs allege not that the defendants directly engaged in the acts of torture, genocide, or the equivalent, but they helped others (who are not American nationals) to do so.*

Justice Breyer concluded that, under these circumstances, the assertion of an ATS claim was "farfetched," even if the presence of the New York office provided "general jurisdiction." *Id*. at 1678.

The assertion of an ATS claim is even more "farfetched" here, where the Bank's shares are not traded on the New York Stock Exchange, no funds were raised in the United States, and no conduct is alleged to have occurred in the United States which was related to the funding of any of the alleged acts of terrorism at issue. As in *Kiobel II*, the plaintiffs here are not United States nationals, the torts against them took place abroad, and the defendants did not "directly engage" in any acts that inflicted injury.

Here, the only link to the United States to which the plaintiffs can point is the fact the New York branch of Arab Bank engaged in automated, routine clearing operations for dollar-denominated transactions of the Bank that were directed to foreign destinations. Plaintiffs do not, and cannot, allege that these transactions were connected to the acts that injured them. The New York Court of Appeals recently explained why clearing operations of this sort, conducted in New York, are not sufficient to warrant importation of a foreign tort dispute—even where

33

jurisdiction *is* established. In dismissing *Mashreqbank PSC v. Ahmed Hamad Al Gosaibi Co.*, 2014 WL 1356220, 2014 N.Y. Slip Op. 2381 at 4-5 (2014), on forum non conveniens grounds, the Court observed:

> Our State's interest in the integrity of its banks is indeed compelling, but it is not significantly threatened every time one foreign national, effecting what is alleged to be a fraudulent transaction, moves dollars through a bank in New York. Indeed, the parties here agree that, as a practical matter, any dollar transaction comparable in size to the one now at issue must go through New York.[14]

The Court of Appeals added that "[a]ll wholesale international transactions involving the use of the dollar go through CHIPS, which is a department of the New York Clearing House Association." *Id.* at 5. Accordingly, the local interest was minimal and the "jurisdiction with the greatest interest in resolving the issues" is "clearly Saudi Arabia." *Ibid.*

---

[14]   The regulatory investigation cited by plaintiffs (Pls. 13-14) confirmed that Arab Bank- New York did not process fund transfers involving recipients that were on the OFAC list:

> At the time of the funds transfers, neither [OFAC] nor the Department of State had designated the originators or beneficiaries. Arab Bank-New York largely complied with the requirement to cease clearing funds transfers once the Office of Foreign Assets Control designated an entity as a "specially designated terrorist," "specially designated global terrorist," or "foreign terrorist organization."

A-1018. Moreover, the complaint admits that the Bank's corporate policy is to be "compliant" with foreign and U.S. antiterrorism rules, using the "strictest" blacklists. A-202-03. In the consent decree, the Government called on Arab Bank-New York, like other banks in New York, to adopt additional safeguards and controls. The Bank voluntarily agreed to do so. A-991-95.

While state and federal governments have an interest in regulating clearing transactions in New York, that does not suggest that federal courts must entertain *private suits* between *foreigners* regarding *foreign tortious injuries*. *Kiobel II* makes clear that such claims must be dismissed.

### 1. *The Cases Cited In* Kiobel II *Confirm That Dismissal Is Needed Here.*

The prior Supreme Court decisions cited by the Justices in *Kiobel II* confirm the need for dismissal here. The Court relied heavily on its recent decision in *Morrison v. National Australia Bank*, 561 U.S. 247 (2010), which ordered dismissal of securities fraud claims even though the fraudulent scheme was planned in the United States and the defendant raised funds on the New York Stock Exchange. Because the tort took place overseas where the harm was inflicted, this was an extraterritorial suit that could not be maintained in federal court. It was not enough that Florida was the place where "senior executives" engaged in the "deceptive conduct" or made "misleading public statements" in furtherance of the alleged tortious conduct at issue. *Id*. at 266. The deception claim focused not on "the place where the deception originated" but "upon purchases and sales of securities" in another nation. *Ibid*. The Court again warned of "incompatibility" between foreign and U.S. law on substantive and procedural issues. *Id*. at 269. And the Court rejected the Solicitor General's plea to apply a "significant and material conduct" standard to allow importation of this foreign tort

35

action. *Id*. at 270-73. In concurrence, Justice Stevens explained that even though the fraudulent scheme in Florida would warrant a government "enforcement proceeding," that does not support a "private action" for damages "suffered abroad." *Id*. at 285-86.

The Supreme Court explained in *Sosa*, 542 U.S. at 705-06, that the "place of wrong for torts involving bodily harm" is "*the place where the harmful force takes effect upon the body*" (emphasis original). Thus, the state of "the 'last event' is the state where the injury occurred.'" *Id*. at 705 n.3. In cases like *Morrison*, 561 U.S. at 266, and this one, the tort occurred when injury was inflicted: on foreign soil.

Likewise, in *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004), cited by Justice Breyer in *Kiobel II*, the Supreme Court unanimously required dismissal of foreign antitrust claims even under a statute which *does* have extraterritorial reach, as the ATS does not. The global price-fixing conspiracy at issue caused substantial harm in the United States and overseas. But *foreign claimants* could not bring suit in the United States. Such extraterritorial claims, Justice Breyer explained, could lead to "interference with the sovereign authority of other nations." *Id*. at 164. Entertaining such suits would be viewed abroad as "an act of legal imperialism." *Id.* at 169. That is precisely how the sovereign Kingdom of Jordan has described the present litigation. A-1041.

In its most recent decision rejecting an ATS claim at the dismissal stage, the Supreme Court held that there was no "general jurisdiction" under the Due Process Clause to entertain allegations of kidnapping, torture, and murder of workers in Argentina. *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), ordered dismissal even though the defendant corporation maintained a multibillion dollar business in California, even though "American federal courts * * * have a strong interest in adjudicating and redressing international human rights abuses," and even though the defendant maintained a local subsidiary whose records might reveal "key files" and "important strategic decisions." *Id.* at 762; *id.* at 767 (Sotomayor, J., concurring in judgment). The Supreme Court held that the "international context" of the case, including "risks to international comity," weighed decisively against entertaining the foreign dispute. The Court, speaking through Justice Ginsburg, cited "[c]onsiderations of international rapport" when it required dismissal. *Id*. at 762 n.20, 763. Here, plaintiffs are trying to put sovereign nations in the Middle East in the dock and challenge their policies before a jury in New York, all within the context of trying to hold a reputable bank liable for injuries sustained in the course of a conflict that has divided world opinion for decades. *Kiobel II* commands dismissal of claims of this stripe.

## 2. Under Sosa *There Is No Universally Accepted International Norm.*

An additional fatal defect in the complaint here, requiring dismissal for an independent reason, is that plaintiffs' aiding and abetting and terrorism financing claims do not come close to alleging "violations of international law norms that are 'specific, universal, and obligatory.'" *Kiobel II*, 133 S. Ct. at 1665; *accord Sosa*, 542 U.S. at 723, 732 (stressing that the ATS covers only a "modest number" of claims based on "universal" international norms). As their complaint shows on its face, plaintiffs are not asserting a universally recognized tort but rather are challenging the policies of other sovereign nations, many of which are allies of the United States.

Plaintiffs ask a jury in New York to disagree with the government of Saudi Arabia on what constitutes legitimate charitable activities, as well as government policies of the Palestinian Territories. More broadly, conduct that some citizens of foreign nations may perceive as a struggle for self-determination has become the subject of this tort suit. The jury would be forced to make international policy and attempt to identify a universal consensus when, in fact, none exists. A-319-45; A-416-89. This Court's precedents squarely reject such allegations under the ATS.

As this Court held unanimously in *In re Terrorist Attacks*, 714 F.3d at 125, a plaintiff alleging injury at the hands of terrorists cannot "plead a violation of the ATS because no universal norm against 'terrorism' existed under customary

international law (*i.e.*, the 'law of nations') as of September 11, 2001." In that case, like this one, the plaintiffs challenged "financial services" provided to alleged "front charities." *Id.* at 123. The Court found dismissal of the claims appropriate, even though the tort in question—the 9/11 attacks—caused massive injury *solely* within the United States and was allegedly funded by monies routed by the charities at issue to al Qaeda. *Ibid*. This is an *a fortiori* precedent.

> This Court's explanation for that ruling fits this case like a glove:
>
>> We regrettably are no closer now to an international consensus on the definition of terrorism or even its proscription; the mere existence of the phrase "state-sponsored terrorism" proves the absence of agreement on basic terms among a large number of States that terrorism violates [customary] international law. Moreover, there continues to be strenuous disagreement among States about what actions do or do not constitute terrorism, nor have we shaken ourselves free of the cliché that "one man's terrorist is another man's freedom fighter." We thus conclude that terrorism—unlike piracy, war crimes, and crimes against humanity—does not provide a basis for universal jurisdiction [under customary international law].

714 F.3d at 125. For this fundamental proposition the Court cited and quoted prior circuit law (*United States v. Yousef*, 327 F.3d 56, 106-08 (2d Cir. 2003)) and the law of other circuits (*Chiquita Brands*, 792 F. Supp. 2d at 1317). And it required dismissal of the ATS claims without any remand. *Ibid.*

To establish a "universal" international norm here, plaintiffs would have to allege, as they cannot, facts showing "universal" condemnation of the violence that characterized the Second Intifada and, beyond this, "universal" condemnation of

the banking practices of Arab Bank. But as the Comptroller of the Currency and Department of Treasury explained (*see* A-1018), Arab Bank followed OFAC regulations regarding blacklisted customers. The complaint admits that the Bank also utilized blacklists promulgated in the Middle East. A-202-03. A regulated bank that clears transfer orders in the international payments system in an effort to block transfers involving prohibited parties is obviously not acting contrary to "universal" international law standards. This is anything but the modern-day equivalent of "piracy." *Sosa*, 542 U.S. at 732.

When the Supreme Court required dismissal of the kidnapping complaint in *Sosa*, Justice Souter explained that its "general practice has been to look for legislative guidance before exercising innovative authority over substantive law." 542 U.S. at 726. That is because "a decision to create a private right of action is one better left to legislative judgment." *Id*. at 727. Here that legislative judgment shows clearly that Congress does not intend foreign claimants to bring cases of this kind in federal court.

The federal ATA statute provides "civil remedies" in terrorism cases that extend *only* to a "national of the United States." 18 U.S.C. § 2333. The statute defines the conduct condemned with precision. It specifies a strict standard of causation. It defines available damages and procedures. And it does not provide for aiding and abetting liability. *In re Terrorist Attacks*, 714 F.3d at 123. Plaintiffs here

40

seek to employ the ATS to override all these limitations prescribed by Congress for civil claims in terrorism cases brought in federal court.[15] To enlarge the ATS in this manner would obliterate the criteria prescribed by Congress in a law defining federal policy in this very field.

The United States has also stated that "there is no * * * international norm for civil aiding-and-abetting liability" and cautioned that "permitting aiding-and-abetting liability under the ATS would interfere with the U.S. Government's ability

---

[15]     These ATS claims are clearly preempted by the ATA, which was enacted to address terrorist attacks that "occur primarily outside the territorial jurisdiction of the United States." 18 U.S.C. § 2331(1). That Congress understood such attacks would involve injury to aliens, as well as U.S. citizens, is axiomatic. Yet, Congress limited the right of recovery solely to "nationals of the United States." 18 U.S.C. § 2333. *See In re Oswego Barge Corp.*, 664 F.2d 327, 335 (2d Cir. 1981) (affirming "presumption in favor of preemption of federal common law whenever * * * Congress has legislated on the subject."); *Yeun Jin v. Mukasey*, 538 F.3d 143, 159-60 (2d Cir. 2008) ("Congress may 'shut the door to the law of nations entirely' * * * at any time (explicitly, or implicitly by * * * statutes that occupy the field).").

In July 2008, Congress enacted legislation to settle claims against Libya brought only by U.S. victims of terrorism, despite the pendency of identical claims asserted by alien plaintiffs, which, in light of Congress's enactment of immunity for Libya, had effectively been barred. *See* Libyan Claims Resolution Act, Pub. L. No. 110-301, 122 Stat. 2999 (2008); *see also* A-593-601. Assistant Secretary for Near Eastern Affairs C. David Welch, who authored the agreement, explained that "only Americans can bring these kinds of suits in the United States." A-586.

Recent proposals to amend the ATA to permit alien claims have also been rejected. *Compare* S. Amdt. 2523 to S. 1197, 113th Cong., 159 Cong. Rec. S8516-20 (Daily ed. Nov. 21, 2013) (proposed amendment to remove requirement that ATA plaintiffs be nationals of the United States), *with* National Defense Authorization Act, Pub. L. No. 113-66, 127 Stat. 672 (2013) (legislation enacted without amendment).

to employ the full range of foreign policy options when interacting with various foreign governments." A-513-14; A-520; A-326-32. *Kiobel II* instructs courts to defer to foreign policy assessments by the Executive Branch, such as these, in defining the proper scope of the ATS. 133 S. Ct. at 1674 (Breyer, J., concurring). Moreover, a finding of aiding-and-abetting liability would conflict with *Kiobel II*'s rejection of ATS claims against those accused of having "helped others." *Id.* at 1677-78.

### 3. *Maintaining This Suit Would Violate Comity Principles.*

As the Supreme Court observed in *Kiobel II*, citing *Sosa*, "the danger of unwarranted judicial interference in the conduct of foreign policy is magnified in the context of the ATS, because the question is not what Congress has done but instead what courts may do." 133 S. Ct. at 1664. "These concerns, which are implicated in any case arising under the ATS, are all the more pressing when the question is whether a cause of action under the ATS reaches conduct within the territory of another sovereign." *Id*. at 1665. Here, where plaintiffs overtly challenge the actions and governmental policies of other sovereign nations, the danger of international friction, violation of international comity, and interference with foreign policy exceed those considered in any of the above-cited cases.

A principal allegation of plaintiffs' complaint is that Arab Bank "knowingly and purposefully distributed millions of dollars to terrorists and the families of

terrorists on behalf of the Saudi Committee," Pls. 3, thereby leaving to the determination of a New York jury the legitimacy of a governmental fundraising effort that plaintiffs acknowledge was established by a Royal Decree of the Kingdom of Saudi Arabia. A-235-36.[16] Documents received in response to FOIA requests, A-664-74, including dispatches from the U.S. Embassy in Riyadh to the Secretary of State, establish that the United States supported and encouraged the Saudi Committee relief effort. A-683-84 (discussing the "Committee for the Support of the Al Quds Intifada" "headed by the Saudi Minister of the Interior");

---

[16] Some of the same plaintiffs' lawyers now suing Arab Bank filed analogous claims against the U.S. Department of State, Secretary of State Kerry, and USAID, alleging that official U.S. aid to the Palestinian Authority and Palestinian charities constituted material support for terrorism. *Bernstein v. Kerry*, 962 F. Supp. 2d 122, 129 (D.D.C. 2013). That lawsuit was summarily dismissed by the district court after it found, *inter alia*, that "plaintiffs' theory would depend on proof that * * * the aid provided by the U.S. is being funneled directly to recognized terrorist organizations[;] * * * [o]f course, these allegations are far beyond the Court's jurisdiction." *Id.*

Courts have routinely dismissed lawsuits of this type due to their adverse impact on foreign relations in general, and the Israeli-Palestinian peace process specifically. *Corrie v. Caterpillar Inc.*, 503 F.3d 974, 982-84 (9th Cir. 2007) (affirming dismissal after recognizing that adjudicating the case could "undermine foreign policy decisions in the sensitive context of the Israeli-Palestinian conflict"); *Doe I v. Israel*, 400 F. Supp. 2d 86, 112 (D.D.C. 2005) (affirming dismissal after concluding that a determination of whether violence perpetrated by Israeli settlors constituted "genocide" was a "predicate policy determination" that "is plainly reserved to the political branches of government"); *Matar v. Dichter*, 500 F. Supp. 2d 284, 295 (S.D.N.Y. 2007) (dismissing claims after observing that ATS plaintiffs were injured in a "uniquely volatile region" and stating that the court could not "ignore the potential impact of this litigation on the Middle East's delicate diplomacy"), *aff'd*, 563 F.3d 9 (2d Cir. 2009).

A-699 (recommending that messages of appreciation be sent to Saudi Arabia and other members of the Arab League "for its generous assistance" and "urging members to follow Riyadh's example"). Secretary of State Powell additionally praised Saudi Arabia for being "in the forefront of donor efforts for the Palestinians [with] a genuine commitment to building and sustaining institutions for the Palestinians' future," A-690, and rejected allegations that the Saudi Committee's assistance to needy families somehow supported terrorism, A-770. *See also* A-704. And the United States has hailed the Chairman of the Saudi Committee as a "*leader[] * * * in the fight against terrorism*."[17]

Compounding such interference in the conduct of foreign policy, plaintiffs have also demanded and obtained discovery sanctions that override the law of sovereign governments in Jordan, Lebanon, and the Palestinian Territories, among other nations. *Arab Bank v. Linde*, 706 F.3d 92 (2d Cir. 2013). In response to a call from the Supreme Court for the views of the U.S. Government on the Bank's petition, 134 S. Ct. 500 (2013), the Solicitor General underscored the diplomatic strife generated by this litigation:

---

[17] The White House, Statement by the President on the Death of Crown Prince Nayif bin Abd al-Aziz Al Saud of Saudi Arabia (emphasis added), *available at* http://www.whitehouse.gov/the-press-office/2012/06/16/statement-president-death-crown-prince-nayif-bin-abd-al-aziz-al-saud-sau. *Compare ibid.* ("Under [Prince Nayif's] leadership, the United States and Saudi Arabia developed a strong and effective partnership in the fight against terrorism, one that has saved countless American and Saudi lives."), *with* A-235(¶164).

- The district court's order, sanctioning the Bank for foreign law compliance, "could undermine the United States' vital interest in maintaining close cooperative relationships with Jordan and other key regional partners in the fight against terrorism." U.S. Brief at 19.

- "The sanctions order may have an impact on * * * important [U.S.] counterterrorism relationships. Jordan views the sanctions order as a 'direct affront' to its sovereignty. [A-1051] * * * [T]he governments of Saudi Arabia and the Palestinian Authority have also expressed significant concerns about the order and its effect on their relationships with the United States." *Ibid*.

- "[T]he possibility that foreign financial entities could be penalized based on their cooperation with United States government agencies may deter foreign private entities and governments from assisting in United States investigations or enforcement actions." *Id*. at 19-20.

- "The possible effect of a judgment of liability [against the Bank] on United States foreign-relations interests and the stability of the region" should have been considered by the district court. *Id.* at 21.

The adverse consequences for international relations are also explained in a brief filed in the Supreme Court by the Kingdom of Jordan. A-1029-57. Noting its role as "a critical United States ally in the Middle East," it states that it is "compelled" to protest "the grave affront to its sovereignty and the grave threat to its stability" resulting from the sanctions imposed in this very litigation. A-1039-41. Its brief demonstrates that "Arab Bank's alleged provision of ordinary banking services cannot plausibly be considered an 'act of international terrorism'" and shows that these ATS claims are "plainly barred by this Court's decision in *Kiobel v. Royal Dutch Petroleum*." A-1053-54. It expressly warns that the "economic instability" threatened by this litigation "could in turn lead to political instability,

which would disrupt the mutual efforts of Jordan and the United States to broker peace in the Middle East." A-1056.[18]

As the Supreme Court has explained again and again in the cases cited above, novel claims under the ATS may not properly impose those risks to international relations.

### B. This Court Has Held That Dismissal Is Required In Indistinguishable Cases.

This Court's decisions applying *Kiobel II* confirm the need for dismissal. In *Balintulo v. Daimler AG*, 727 F.3d 174 (2d Cir. 2013), this Court held that *Kiobel II* "plainly bar[red]" plaintiffs' claims that U.S. corporations violated international law by selling military vehicles and computers to the security forces of the South African apartheid government, "thus facilitating * * * rape, torture, and extrajudicial killings" in South Africa. *Id.* at 180, 182. This Court found it "irrelevant" that plaintiffs had sued U.S. defendants, since "[n]othing" in *Kiobel II* "depends on a defendant's citizenship." *Id.* at 190 & n.24. The Court found it equally irrelevant that the U.S. defendants allegedly "'took affirmative steps in this

---

[18]    Whatever the ultimate resolution of the discovery issue in *Linde*, the briefs of Jordan and the United States make clear that plaintiffs' claims jeopardize relations with a vital ally. Likewise, plaintiffs' claim that Saudi Arabia's program to provide humanitarian relief to a population in crisis was intended to "encourage, incite and make possible the second *intifada*—including its campaign of systematic suicide bombings and other murderous attacks," A-302, jeopardizes relations with that vital ally.

country to circumvent the sanctions regime'" and "continued to supply the South African government with their products, notwithstanding various legal restrictions against trade with South Africa." *Id.* at 192. The Court held that plaintiffs' claims failed as a matter of law "because the asserted 'violation of the law of nations occurr[ed] outside the United States,'" by the South African apartheid regime. *Ibid.*

Similarly, in *Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 44-46 (2d Cir. 2014), this Court reversed an ATS verdict for a U.S. resident who sued another U.S. resident, claiming that the defendant caused him to be tortured in Bangladesh. The Court ruled that "the conduct giving rise to this action occurred within the territory of another sovereign" and therefore "cannot form the basis for an [ATS] action." *Id.* at 54.

Other circuits likewise have held that *Kiobel II* bars ATS claims where tortious injury occurred abroad. Prior to *Kiobel II*, the Ninth Circuit had reinstated ATS claims against a defendant with "substantial operations in this country" that allegedly committed and induced genocide and war crimes against the indigenous population in Papua New Guinea. *Sarei v. Rio Tinto, PLC*, 671 F.3d 736, 744, 758, 766 (9th Cir. 2011) (*en banc*). The Supreme Court vacated and remanded that decision in light of *Kiobel II*. 133 S. Ct. 1995 (2013). On remand, the Ninth Circuit reversed course and "affirm[ed] the district court's judgment of dismissal with prejudice" without dissent. 722 F.3d 1109, 1110 (9th Cir. 2013) (*en banc*).

The Third Circuit has affirmed the dismissal of ATS claims brought by Israeli citizens alleging torture and crimes against humanity because "the conduct that formed the basis of the ATS claims took place in Israel." *Ben-Haim v. Neeman*, 543 F. App'x 152, 153, 155 (3d Cir. 2013) (per curiam); *accord Aldana v. Del Monte Fresh Produce N.A., Inc.*, 741 F.3d 1349, 1352 n.1 (11th Cir. 2014) (*Kiobel II* "h[eld] that the ATS does not apply to violations of the law of nations occurring within territory of a sovereign other than the United States").[19]

---

[19]    In *Al Shimari v. CACI Premier Technology, Inc.*, 2014 WL 2922840 (4th Cir. June 30, 2014), the Fourth Circuit reversed dismissal of ATS claims arising from a U.S. government contractor's administration of Abu Ghraib prison in Iraq and offered an analysis of *Kiobel II* that differs in some respects from this Circuit's analysis in *Balintulo*. However, *Al Shimari* provides no basis for exercising subject matter jurisdiction over plaintiffs' claims here. The Fourth Circuit concluded that the *Al Shimari* plaintiffs' claims displaced the presumption against extraterritorial application of the ATS because of five factors that are entirely absent here:

> (1) [defendant's] status as a United States corporation; (2) the United States citizenship of [defendant's] employees, upon whose conduct the ATS claims are based; (3) the facts in the record showing that [defendant's] contract to perform interrogation services in Iraq was issued in the United States by the United States Department of the Interior, and that the contract required [defendant's] employees to obtain security clearances from the United States Department of Defense; (4) the allegations that [defendant's] managers in the United States gave tacit approval to the acts of torture committed by [defendant's] employees at the Abu Ghraib prison, attempted to "cover up" the misconduct, and "implicitly, if not expressly, encouraged" it; and (5) the expressed intent of Congress, through enactment of the TVPA and 18 U.S.C. § 2340A, to provide aliens access to United States courts and to hold citizens of the United States accountable for acts of torture committed abroad.

*Id.* at *12. By contrast, as discussed above, this is an entirely foreign cubed

District courts in this Circuit also have rejected ATS claims based on alleged violations of international law that inflicted injury abroad. *E.g.*, *Tymoshenko v. Firtash*, 2013 WL 4564646, at \*4 (S.D.N.Y. Aug. 28, 2013) (dismissing ATS claims against a foreign bank and noting that "[a]lthough the defendant in *Kiobel* maintained an office in New York, Nadra Bank's presence in the United States is even less substantial—merely the use of New York bank accounts").

Under these decisions, plaintiffs' claims fail as a matter of law.

## C.  There Is No Direct Or But-For Causation In This Case.

As Justice Breyer explained in *Kiobel II*, 133 S. Ct. at 1678, when a defendant's actions are "indirect" and merely "helped others" to inflict bodily harm overseas, that is an additional reason for denying ATS jurisdiction. This instruction is dispositive here.

In *Rothstein v. UBS*, 708 F.3d 82 (2d Cir. 2013), this Court affirmed dismissal of claims that an international bank had allegedly provided material support to Hezbollah and Hamas by performing currency exchange services for the benefit of Iran, a designated State sponsor of terrorism. This Court held that these allegations were insufficient to satisfy the requisite "but for" and "proximate cause" elements of an ATA claim. *Id*. at 95; *see also Univ. of Texas v. Nassar*, 133

---

dispute—foreign plaintiffs are suing a foreign defendant, alleging that payments into and out of foreign bank accounts assisted foreign non-parties to commit international law violations on foreign soil.

S. Ct. 2517, 2524 (2013) ("but-for" causation is "a standard requirement of any tort claim"); *Burrage v. United States*, 134 S. Ct. 881, 888, 890-92 (2014) ("strict but-for causation" is the "common understanding of cause," rejecting "substantial" or "contributing factor" tests).

The *Rothstein* complaint failed to allege but-for causation because it did not allege that "if UBS had not transferred U.S. currency to Iran, Iran, with its billions of dollars in reserves, would not have funded the attacks in which plaintiffs were injured." 708 F.3d at 97. Plaintiffs are plainly incapable of satisfying this pleading requirement here. *E.g.*, A-145(¶18) (alleging that terrorists receive funding as a result of "public and private donations deposited in numerous accounts" in various "financial institutions in the Middle East").[20]

This Court applied those principles again in *In re Terrorist Attacks*, 714 F.3d 118 (2d Cir. 2013), affirming dismissal of terrorism claims against Middle Eastern banks brought by American victims for providing banking services to charities. Those plaintiffs similarly alleged that the banks "provided funding to purported

---

[20]    Plaintiffs include a chart in their complaint that purportedly "illustrates the connexity between" Saudi aid and "terror attacks in Israel." A-240-41. This is exactly the type of chart that was rejected by the *Bernstein* court in evaluating terror-financing claims against the United States: "plaintiffs conflate the concept of correlation with causation." *Bernstein*, 962 F. Supp. 2d at 129. Plaintiffs' chart could, in fact, be easily recreated in an even more compelling fashion by substituting the United States, Great Britain, the United Nations, or numerous NGOs, among others, for Saudi Arabia, in light of the substantial aid provided by those nations and organizations to the region during the same time period.

charity organizations known to support terrorism that, in turn, provided funding to al Qaeda." *Id.* at 124. But as this Court explained, they did not allege that the "money donated" "to the purported charities actually was transferred to al Qaeda and aided in the September 11, 2001 attacks." *Ibid*.

The causation defect in this case follows *a fortiori* from these precedents and provides an additional ground for dismissal. *Kiobel II*, 133 S. Ct. at 1678. Plaintiffs have not alleged, and cannot demonstrate, "that 'the[ir] harm would not have occurred' in the absence of—that is, but for—the [Bank's]" processing of automated, electronic funds transfers. *Nassar*, 133 S. Ct. at 2525; *see also ibid.* (finding that it is "textbook tort law that an action 'is not regarded as a cause of an event if the particular event would have occurred without it'").

### D.  Dismissal Should Be Affirmed Without A Pointless Remand.

Plaintiffs' request for a remand on the *Kiobel II* issue, Pls. 14 n.18, should be rejected because the parties fully briefed this issue in the district court. *E.g.*, A-22-23 (*Jesner* ECF Nos. 983-86); A-24 (*Jesner* ECF No. 995); A-25 (*Jesner* ECF No. 1001). Plaintiffs do not allege and cannot demonstrate that the Bank violated international law in the United States. *See Balintulo*, 727 F.3d at 192 (holding that ATS claims must allege "relevant conduct within the United States giving rise to a violation of customary international law"); *Kiobel II*, 133 S. Ct. at 1670 (Alito, J., concurring) (an ATS claim will "be barred * * * unless the domestic conduct is

51

sufficient to violate" international law). Plaintiffs allege that they were injured by terrorists *in Israel, the West Bank*, *and Gaza*. On that basis alone, any alleged "violation of the law of nations" occurred on foreign soil, making plaintiffs' claims entirely extraterritorial. *Balintulo*, 727 F.3d at 192 n.28.

Lacking any claim that Arab Bank's New York branch violated international law, plaintiffs' assertion that their lawsuits advance American interests "are without merit." *Balintulo*, 727 F.3d at 194. As this Court held in *Balintulo*, "[t]hese case-specific policy arguments miss the mark." *Id*. at 191. Moreover, plaintiffs' contention conflicts with the views of the U.S. Government, which cautioned that it is an error to equate its interests with those of *these plaintiffs* and stated that *this litigation* may adversely impact "important [U.S.] counterterrorism relationships" and "threatens to undermine important United States law-enforcement and national-security interests." U.S. Br. 12, 19. Additionally, foreign policy concerns are "magnified in the context of the ATS" because ATS claims "imping[e] on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Kiobel II*, 133 S. Ct. at 1664. That this case magnifies such concerns is patent.

There also is no need for a remand on the application of *Kiobel II* because this Court is "free to affirm an appealed decision on any ground which finds support in the record, regardless of the ground upon which the trial court relied." *Yousef*, 327 F.3d at 156.

As *Kiobel II* and *Morrison* show, the presumption against extraterritoriality provides a purely legal basis for affirming a lower court's dismissal. The Supreme Court in both cases affirmed dismissal as a matter of law without remand. *Kiobel II*, 133 S. Ct. at 1664, 1669; *Morrison*, 561 U.S. at 273; *see also Nortex Petroleum v. Access Indus., Inc.*, 631 F.3d 29, 32-33 (2d Cir. 2010) (per curiam) (affirming dismissal of RICO claims based on presumption against extraterritoriality under *Morrison*); *Cedeno v. Castillo*, 457 F. App'x 35, 37-38 (2d Cir. 2012) (per curiam) (same); *Ben-Haim*, 543 F. App'x at 155 (affirming dismissal of ATS claims for lack of subject matter jurisdiction based on presumption against extraterritoriality under *Kiobel II*); *Kaplan v. Cent. Bank*, 961 F. Supp. 2d 185, 204-05 (D.D.C. 2013); *Muntslag v. Beerens*, 2013 WL 4519669, at *3 (S.D.N.Y. Aug. 26, 2013).

*Kiobel II* demonstrates that dismissal based on the presumption against extraterritoriality is appropriate where it is an alternative ground not discussed by a lower court. 133 S. Ct. at 1663, 1669. This Court in *Nortex Petroleum* similarly "affirm[ed] the district court's dismissal of plaintiff's [RICO] complaint * * * on different grounds" under *Morrison* "[r]ather than remand to the district court." 631 F.3d at 31-32. Indeed, it is "well established that [this Court] can affirm the dismissal of a complaint on any basis supported by the record." *In re Terrorist Attacks*, 714 F.3d 109, 117 (2d Cir. 2013); *see also Scott v. Fischer*, 616 F.3d 100, 105, 117 (2d Cir. 2010) (denying plaintiffs' remand request and affirming

dismissal based on alternative grounds); *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001) (affirming dismissal for lack of jurisdiction, explaining "where evidence relevant to [a] jurisdiction question is before the court" on a motion to dismiss, the Court "'may refer to [that] evidence.'").

There is no reason "simply [to] delay the inevitable" by remanding, *In re Terrorist Attacks*, 714 F.3d at 117, when *Kiobel II* and *Sosa* provide this Court with a straightforward basis for affirming.

## III. DISMISSAL OF PLAINTIFFS' "GENERAL FEDERAL COMMON LAW" CLAIMS WAS REQUIRED BY WELL-SETTLED SUPREME COURT PRECEDENT.

Plaintiffs' contention that their "general" federal common law claims were improperly dismissed is erroneous. Plaintiffs concede that they did not bother to "cit[e] the specific tort law of a particular jurisdiction." Pls. 56. Though they now say that "it is possible that different states' or countries' liability or damages laws may apply" (Pls. 55), they relied in the district court on "federal common law claims," which are barred by *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). *See* A-576. The district court properly dismissed these claims as lacking a "sound basis" under *Erie* and for failing to identify any other legal basis. SPA-1. Moreover, if plaintiffs were permitted to "repackage[e]" their extraterritorial claims as "federal common law" claims or "unidentified 'non-federal common law' theories," *see* SPA-1, there would be little—indeed no—substance to the

decisions of the Second Circuit in *Kiobel I* and the Supreme Court in *Kiobel II*. *See supra* Parts I and II.

## CONCLUSION

For the reasons stated herein, the district court's dismissal of the plaintiffs' ATS and federal common law claims should be AFFIRMED.

Respectfully submitted,

s/   Stephen M. Shapiro

| | |
|---|---|
| Kevin Walsh | Stephen M. Shapiro |
| Douglas W. Mateyaschuk, II | Timothy S. Bishop |
| Steven J. Young | Chad M. Clamage |
| DLA PIPER LLP (US) | MAYER BROWN LLP |
| 1251 Avenue of the Americas | 71 South Wacker Drive |
| New York, NY 10020-1104 | Chicago, IL 60606 |
| (212) 335-4500 | (312) 782-0600 |

*Attorneys for Defendant-Appellee Arab Bank plc*

July 7, 2014

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the foregoing brief is in <u>14-Point Times New Roman</u> proportional font and contains 13,824 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

Dated: July 7, 2014                      Respectfully submitted,


                                         s/  Douglas W. Mateyaschuk, II

                                         One of the Attorneys for defendant-
                                         appellee Arab Bank plc

56

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on July 7, 2014, the foregoing Brief of

Defendant-Appellee Arab Bank plc, together with its attachment, were served by

CM/ECF and e-mail on the following counsel of record:


Michael E. Elsner, Esq.
John M. Eubanks, Esq.
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Phone: (843) 216-9000
Fax: (843) 216-9450

Mark Werbner, Esq.
Joel Israel, Esq.
SAYLES WERBNER, PC
1201 Elm Street
44th Floor
Dallas, TX 75270
Phone: (214) 939-8700

Allan Gerson, Esq.
AG INTERNATIONAL LAW, PLLC
2131 S Street, NW
Washington, DC 20008
Phone: (202) 234-9717

Gavriel Mairone, Esq.
MM~LAW LLC
980 Michigan Avenue, Suite 1400
Chicago, IL 60611
Phone: (312) 253-7444

Jonathan David, Esq.
THE DAVID LAW FIRM, P.C.
2202 Timberloch Place, #200
The Woodlands, TX 77380
Phone: (281) 296-9090


Dated:  July 7, 2014                    Respectfully submitted,


                                        s/  Douglas W. Mateyaschuk, II

                                        One of the Attorneys for Defendant-
                                        Appellee Arab Bank plc

# ADDENDUM

No. 12-1485

# In the Supreme Court of the United States

---

ARAB BANK, PLC, PETITIONER

*v.*

COURTNEY LINDE, ET AL.

---

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT*

---

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**

---

DONALD B. VERRILLI, JR.
  *Solicitor General*
    *Counsel of Record*
STUART F. DELERY
  *Assistant Attorney General*
EDWIN S. KNEEDLER
  *Deputy Solicitor General*
GINGER D. ANDERS
  *Assistant to the Solicitor*
  *General*
DOUGLAS N. LETTER
SHARON SWINGLE
KEITH I. MCMANUS
  *Attorneys*

  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

## QUESTION PRESENTED

Respondents sued petitioner under the Antiterrorism Act of 1990, 18 U.S.C. 2331 *et seq.*, alleging that petitioner provided banking services to entities and individuals engaged in terrorist activities or affiliated with terrorist organizations. During discovery, petitioner declined to produce certain bank records located in foreign jurisdictions on the ground that doing so was prohibited by those jurisdictions' bank secrecy laws. The district court imposed sanctions in the form of permissive adverse inferences and preclusion of certain evidence. The question presented is:

Whether the court of appeals erred in declining to issue a writ of mandamus vacating the district court's order imposing sanctions for petitioner's non-production of bank records.

(I)

## TABLE OF CONTENTS

Page

Interest of the United States ........................................................ 1
Statement .................................................................................... 1
Discussion .................................................................................... 8
   I.   The lower courts' international comity analysis
       is erroneous in several respects ..................................... 9
       A.  A district court may sanction a party for
            failing to disclose materials protected by
            foreign bank secrecy laws only if doing so
            is consistent with international comity .................. 9
       B.  The lower courts' international comity
            analysis rested on several erroneous
            premises ................................................................ 12
   II.  This Court's review is not warranted at this time ...... 21
Conclusion ................................................................................ 25

## TABLE OF AUTHORITIES

Cases:

   *American Ins. Ass'n* v. *Garamendi*, 539 U.S. 396
     (2003) ................................................................................ 12
   *Cheney* v. *United States Dist. Court for the Dist. of*
     *Columbia*, 542 U.S. 367 (2004) ............................... 21
   *Cochran Consulting, Inc.* v. *Uwatec USA, Inc.*,
     102 F.3d 1224 (Fed. Cir. 1996) ............................... 22
   *Daimler AG* v. *Bauman*, 134 S. Ct. 746 (2014) .................. 18
   *F. Hoffmann-La Roche Ltd.* v. *Empagran S.A.*,
     542 U.S. 155 (2004) ................................................. 14
   *Hilton* v. *Guyot*, 159 U.S. 113 (1895) .................................... 10
   *Kiobel* v. *Royal Dutch Petroleum Co.*, 133 S. Ct. 1659
     (2013) .................................................................................. 2
   *Morrison* v. *National Australia Bank Ltd.*,
     130 S. Ct. 2869 (2010) ........................................... 10

(III)

IV

Cases—Continued:                                           Page

    *SEC* v. *Banca Della Svizzera Italiana*, 92 F.R.D. 111
      (S.D.N.Y. 1981) ................................................................12

    *Societe Internationale pour Participations Indus-*
      *trielles et Commerciales, S.A.* v. *Rogers,* 357 U.S.
      197 (1958) ..................................................................11

    *Société Nationale Industrielle Aérospatiale* v.
      *United States Dist. Court for the S. Dist. of Iowa,*
      482 U.S. 522 (1987) .........................................9, 10, 11, 16, 17

    *United States* v. *Davis*, 767 F.2d 1025 (2d Cir. 1985).........12

    *United States* v. *First Nat'l Bank*, 699 F.2d 341
      (7th Cir. 1983)...........................................................22

    *Westinghouse Elec. Corp. Uranium Contracts Litig.,*
      *In re*, 563 F.2d 992 (10th Cir. 1977)....................................22

Treaty, statutes and rule:

    United Nations International Convention for the
      Suppression of the Financing of Terrorism, Dec. 9,
      1999, 2178 U.N.T.S. 197:
        Art. 12, 2178 U.N.T.S. 235 .................................13

    Alien Tort Statute, 28 U.S.C. 1350.........................................2

    Antiterrorism Act of 1990, 18 U.S.C. 2331 *et seq.* .................2

      18 U.S.C. 2333(a) .................................................2

    8 U.S.C. 1189 ....................................................................2

    12 U.S.C. 3402-3408................................................................17

    15 U.S.C. 6802(a) ................................................................17

    15 U.S.C. 6802(e)(8).............................................................17

    31 U.S.C. 5313 ....................................................................17

    31 U.S.C. 5318(g)(2)..............................................................17

    31 U.S.C. 5326 ....................................................................17

    Fed. R. Civ. P. 37(b)(2) ...........................................................5

V

Miscellaneous:                                                          Page

International Organization of Securities Commis-
    sions, Multilateral Memorandum of Understanding
    Concerning Consultation and Cooperation and the
    Exchange of Information, May 2012, http://www.
    iosco.org/library/pubdocs/ pdf/IOSCOPD386.pdf............13

Memorandum of Understanding Between the Gov-
    ernments of the Member States of the Middle East
    and North Africa Financial Action Task Force
    Against Money Laundering and Terrorist Financ-
    ing, Nov. 30, 2014, http://www. sic.gov.lb/
    downloads/MENAFATF_MOU_EN.pdf..........................17

Restatement (Third) of the Foreign Relations Law of
    the United States (1987)...........................3, 10, 11, 14, 16, 21

U.N. Conference on Trade & Dev., *Report on
    UNCTAD assistance to the Palestinian people:
    developments in the economy of the Occupied Pal-
    estinian Territory* (2013), http://unctad.org/
    meetings/en/SessionalDocuments/tdb60d3_en.pdf .........20

U.S. & Foreign Commercial Serv. & U.S. Dep't of
    State, *Doing Business in the West Bank and Gaza*
    (updated June 12, 2013), http://export.gov/
    westbank/build/groups/public/@eg_we/documents/
    webcontent/eg_we_064047.pdf ...........................20

U.S. Dep't of State, *Bureau of Counterterrorism*,
    http://www.state.gov/j/ct/index.htm (last visited
    May 15, 2014)..........................................19

White House Office of the Press Secretary, *Remarks
    by President Obama and His Majesty King Abdul-
    lah II of Jordan in a Joint Press Conference* (Mar.
    22, 2013) .............................................19

# In the Supreme Court of the United States

———

No. 12-1485

ARAB BANK, PLC, PETITIONER

*v.*

COURTNEY LINDE, ET AL.

———

*ON PETITION FOR A WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE SECOND CIRCUIT*

———

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**

———

### INTEREST OF THE UNITED STATES

This brief is submitted in response to the Court's order inviting the Solicitor General to express the views of the United States. In the view of the United States, the petition for a writ of certiorari should be denied.

### STATEMENT

1. Petitioner is a multinational bank headquartered in the Kingdom of Jordan, with branches throughout the Middle East and elsewhere in the world. Pet. App. 2a, 5a-6a. As Jordan has explained, petitioner is Jordan's "leading financial institution" and plays a "significant role in the Jordanian and surrounding regional economies." *Id.* at 232a.

Respondents are United States citizens who are the victims, or the family members of victims, of terrorist attacks committed in Israel, Gaza, and the West

(1)

2

Bank.[1] Pet. App. 5a-6a, 138a-140a; Br. in Opp. App. 13a-14a. In 2004, respondents brought suit against petitioner under the Antiterrorism Act of 1990 (ATA), 18 U.S.C. 2331 *et seq.*, which provides that "[a]ny national of the United States injured * * * by reason of an act of international terrorism" may sue for treble damages. 18 U.S.C. 2333(a).

Respondents allege that petitioner "knowingly and purposefully supported foreign terrorist organizations between 1995 and 2004 by providing financial services to those organizations." Pet. App. 1a-2a; see *id.* at 6a. Specifically, respondents allege that petitioner helped administer a "death and dismemberment benefit plan" in which the Saudi Committee for the Support of the Intifada Al Quds (Saudi Committee) made payments to terrorist "martyr[s]" and their families. *Id.* at 6a-7a, 118a. Respondents further allege that petitioner performed financial services for other persons affiliated with Hamas and other designated foreign terrorist organizations. *Id.* at 7a, 119a.

2. a. In 2005, respondents requested that petitioner produce records of specified accounts maintained at petitioner's branches, primarily concerning organizations designated by the United States as foreign terrorist organizations, see 8 U.S.C. 1189, and their alleged affiliates. Pet. App. 8a. Most of the records were located in Jordan, Lebanon, and the West Bank and Gaza. Br. in Opp. App. 16a. Petitioner objected

---

[1] The plaintiffs initially included foreign nationals who asserted claims under the Alien Tort Statute (ATS), 28 U.S.C. 1350. The district court subsequently dismissed the ATS claims in light of *Kiobel* v. *Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013). Br. in Opp. 1-2. This brief uses "respondents" to refer to the remaining plaintiffs.

3

that producing the requested documents would violate bank secrecy laws, and expose petitioner to criminal or other penalties, in the jurisdictions in which the records were located. *Id.* at 16a-17a. In July 2005, a magistrate judge directed petitioner to seek permission to disclose certain records from the appropriate foreign regulatory authorities. Pet. App. 8a; Br. in Opp. App. 15a. Authorities in Jordan and the West Bank and Gaza denied permission. Br. in Opp. App. 15a.

b. Respondents ultimately moved for an order "overruling all objections" based on foreign bank secrecy laws in order to "remove * * * [petitioner's] assertion of foreign bank secrecy laws as a bar to disclosure." Br. in Opp. App. 13a.

In November 2006, the magistrate judge held that petitioner's "objections to providing discovery in this action based on foreign bank secrecy laws are overruled." Br. in Opp. App. 24a. The judge observed that the documents were primarily located in Jordan, Lebanon, and the West Bank and Gaza, but that some documents were in Great Britain, France, and other countries. *Id.* at 16a & n.2. To determine whether compelling production was consistent with international comity, the magistrate judge weighed the United States and foreign-jurisdiction interests at stake, as well as the importance of the documents to respondents' claims and the availability of alternative sources of information. *Id.* at 18a-19a (citing Restatement (Third) of the Foreign Relations Law of the United States § 442(1)(c) (1987) (Restatement)). The judge acknowledged that "maintaining bank secrecy is an important interest" of the relevant foreign jurisdictions. *Id.* at 21a-22a. He reasoned, however, that

4

Jordan and Lebanon had subordinated that interest to their interest in fighting terrorism by entering into a multilateral agreement in which they "renounc[ed] bank secrecy as a basis for refusing requests for mutual legal assistance" from other governments in terrorist financing investigations. *Id*. at 22a & n.5. The judge further reasoned that the United States' interest in fighting terrorism through private ATA actions and the importance of the withheld documents to the litigation supported compelling production. *Id*. at 20a, 21a-23a. In March 2007, the district court affirmed the magistrate judge's ruling. *Id*. at 26a-28a.

Rather than require immediate production, the magistrate judge permitted petitioner to seek foreign authorities' permission through "letters rogatory or other devices." Br. in Opp. App. 24a. In September 2007, Jordan, Lebanon, and the Palestinian Authority denied those requests. Pet. App. 11a, 63a. Petitioner accordingly declined to produce materials covered by the relevant foreign laws. Those documents include "records regarding ten specific accounts" allegedly maintained by petitioner for certain terrorist organizations, "general account records for other named organizations" allegedly linked to terrorism, and "account records for the beneficiaries of Saudi Committee transfers." *Id*. at 14a; see *id*. at 63a.

c. Over the course of discovery, respondents did obtain certain documents. In 2006, petitioner received the Saudi Committee's permission to disclose records relating to transactions handled on its behalf, which enabled petitioner to produce the records consistent with applicable bank secrecy laws. Pet. App. 13a & n.22, 114a; Br. in Opp. App. 16a. Petitioner also complied with the district court's order to produce certain

5

documents that were held in New York at the time of the suit and that previously had been disclosed to the Department of the Treasury in connection with a regulatory investigation of petitioner's New York branch. Pet. App. 11a-12a, 61a. Respondents also obtained through unidentified sources documents that petitioner had disclosed to the Department of Justice in connection with the criminal prosecution in Texas of the Holy Land Foundation for Relief and Development. *Id*. at 12a-13a, 61a. Those documents included ones that originally were located in the West Bank, Gaza, and London. *Id*. at 12a-13a.

3. In December 2007, respondents moved for sanctions under Federal Rule of Civil Procedure 37(b)(2). Pet. App. 15a. In 2009, the magistrate judge found that sanctions were warranted and recommended that the jury be instructed that it could infer that petitioner had provided financial services to terrorists. *Id*. at 107a-137a.

In 2010, the district court imposed broader sanctions than those recommended by the magistrate judge. Pet. App. 55a-91a. The court explained that determining whether to impose sanctions for non-production involved consideration of international comity, petitioner's good faith, and the hardship imposed by the production orders. *Id*. at 68a-69a. The court observed that it had already determined that compelling production was consistent with international comity principles. *Id*. at 68a. The court next found that petitioner had not acted with the "utmost good faith," because it had initially refused to produce documents previously disclosed to the United States government, and its "refusals to produce" documents had caused "years of delay." *Id*. at 75a, 77a. The

6

court also concluded that petitioner was unlikely to face prosecution in foreign jurisdictions because petitioner had not been prosecuted for its disclosures to government agencies. *Ibid*. The court accordingly held that "[e]ven absent bad faith, adverse inference sanctions are appropriate here." *Id*. at 78a.

With respect to the scope of the sanctions, the district court found that the withheld documents would be crucial to respondents' ability to establish petitioner's knowing provision of financial services to terrorists, and that, based on respondents' threshold showing, the documents would "likely substantiate [respondents'] claims." Pet. App. 80a; see *id*. at 78a-84a. Accordingly, the court ruled that, among other things, the jury would be instructed that it could infer that petitioner had provided financial services to terrorist organizations and that petitioner did so "knowingly and purposefully." *Id*. at 90a-91a. The court also precluded petitioner from "making any argument or offering any evidence regarding its state of mind or any other issue that would find proof or refutation in withheld documents." *Id*. at 91a. The court subsequently ruled, in an order that was not before the court of appeals in these mandamus proceedings, that petitioner would not be permitted to offer evidence of its adherence to foreign bank secrecy laws. Pet. Supp. Br. 2.

4. Petitioner sought a writ of mandamus directing vacatur of the district court's sanctions order.[2] The

---

[2] Petitioner also filed an interlocutory appeal of the district court's order. Pet. App. 3a. The court of appeals concluded that it did not have jurisdiction to hear the appeal under the collateral order doctrine. *Id*. at 19a-27a. Petitioner does not challenge that holding. See Pet. 13-14.

7

court of appeals denied the writ of mandamus. Pet.
App. 1a-54a.

The court of appeals first held that petitioner had
not established the requisite "clear and indisputable"
entitlement to a writ of mandamus. Pet. App. 30a; see
*id*. at 29a-47a. The court explained that the district
court had not clearly abused its discretion in conclud-
ing that the sanctions were consistent with comity
principles because the "interests of other sovereigns
in enforcing bank secrecy laws are outweighed by the
need to impede terrorism financing as embodied in"
the ATA. *Id*. at 38a. The court of appeals also upheld
the district court's finding that petitioner had not
acted with the "utmost good faith * * * based in
large part on the uncontested observation that the
discovery dispute had resulted in years of delay," *id*.
at 40a (internal quotation marks and citation omitted),
as well as the district court's finding that petitioner
was unlikely to be prosecuted for any disclosures, *id*.
at 41a. Finally, the court of appeals concluded that
the sanctions order did not violate due process. The
court reasoned that it was proper to consider "the
extent to which the sanctions are necessary to restore
the evidentiary balance upset by incomplete produc-
tion." *Id*. at 45a. The court also determined that the
sanctions order was reasonably related to petitioner's
non-production and its "degree of fault," and the order
would "not preclude * * * [petitioner] from de-
fending itself at trial." *Id*. at 47a; see *id*. at 44a-47a.

The court of appeals further held that petitioner
could obtain adequate review of the sanctions order by
appealing any adverse final judgment. Pet. App. 47a-
51a. The court rejected as speculative petitioner's
assertions that the sanctions effectively precluded it

8

from mounting a defense, and that a judgment against petitioner could cause significant "reputational harm" and destabilize foreign states' banking systems. *Id.* at 48a.

Finally, the court of appeals held that mandamus would not be appropriate in any event because petitioner's arguments "involve the application of a well-elaborated legal scheme and a fact-intensive inquiry in the midst of ongoing, lengthy litigation." Pet. App. 53a-54a.

## DISCUSSION

Petitioner contends (Pet. 13-35) that the court of appeals erred in denying a writ of mandamus vacating the discovery sanctions imposed by the district court. In analyzing whether the sanctions were consistent with principles of international comity, the lower courts erred in several significant respects, including by assuming that petitioner's previous production of documents to United States government agencies reflected the sort of selective compliance with foreign bank secrecy laws that would support sanctions in this private litigation; failing adequately to consider the broad range of United States foreign-relations and anti-terrorism interests implicated by the sanctions order; and failing to accord sufficient weight to the foreign jurisdictions' interests in enforcing their bank secrecy laws.

Despite those errors, this Court's review is unwarranted at this time. Mandamus is an extraordinary remedy that is appropriate only when a party is clearly and indisputably entitled to relief and review on appeal from a final judgment would be inadequate. The court of appeals' conclusion that mandamus was unwarranted is not obviously incorrect. And the inter-

9

locutory posture of the case makes it difficult to assess the scope, severity, and consequences of the sanctions, which remain to be implemented in the district court through evidentiary rulings and as-yet-unwritten jury instructions.

## I. THE LOWER COURTS' INTERNATIONAL COMITY ANALYSIS IS ERRONEOUS IN SEVERAL RESPECTS

In ordering petitioner to produce documents protected by foreign jurisdictions' bank secrecy laws, and in sanctioning petitioner for failing to comply, the district court was required to, and did, consider whether its orders were consistent with international comity. See *Société Nationale Industrielle Aérospatiale* v. *United States Dist. Court for the S. Dist. of Iowa*, 482 U.S. 522, 543-544 & n.27 (1987) (*Aérospatiale*). The district court's comity analysis, however, was erroneous in important respects. In particular, the court failed to give adequate weight to United States and foreign sovereign interests that weighed in favor of a lesser sanction than the one the court imposed in this private litigation.

### A. A District Court May Sanction A Party For Failing To Disclose Materials Protected By Foreign Bank Secrecy Laws Only If Doing So Is Consistent With International Comity

When a litigant in a United States court seeks discovery of materials that are located abroad and assertedly protected from disclosure by foreign bank secrecy laws, the district court must determine whether compelling production is consistent with "the demands of comity." *Aérospatiale*, 482 U.S. at 546. International comity is "the recognition which one nation allows within its territory to the legislative,

10

executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Hilton* v. *Guyot*, 159 U.S. 113, 164 (1895). Although the existence of a foreign statute barring disclosure "do[es] not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute," *Aérospatiale*, 482 U.S. at 544 n.29, courts should carefully weigh comity considerations when, as here, the exercise of United States jurisdiction implicates a foreign government's interest in a generally applicable law regulating activity occurring within its own jurisdiction. Cf. *Morrison* v. *National Australia Bank Ltd.*, 130 S. Ct. 2869, 2885-2886 (2010).

The Court has explained that the factors "relevant to any comity analysis" concerning such discovery include:

> (1) the importance to the . . . litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

*Aérospatiale*, 482 U.S. at 544 n.28 (internal quotation marks and citation omitted); see Restatement § 442(1)(c) (setting forth factors listed in *Aérospatiale* as considerations that courts should take into account).

11

In analyzing the respective interests of the United States and foreign jurisdictions, it is appropriate for a court to examine not only the specific interests at issue in the particular case, but also the more general foreign-relations interests that are implicated by the determination of the weight to be given to foreign law. See *Aérospatiale,* 482 U.S. at 544 n.29. In particular, a court should consider the United States' "long-term interests * * * in international cooperation in law enforcement and judicial assistance, * * * in giving effect to formal or informal international agreements, and in orderly international relations." Restatement § 442 cmt. c.

The district court also should take comity concerns into account in considering potential remedies for non-production. Although sanctions may be appropriate even when the party's non-production is the result of its compliance with foreign law, the court should recognize that a party's "inability to comply [with a production order] because of foreign law" can be a "weighty excuse for nonproduction." *Societe Internationale pour Participations Industrielles et Commerciales, S.A.* v. *Rogers*, 357 U.S. 197, 211-212 (1958) (emphasis omitted). A party's good faith in attempting to produce the documents consistent with foreign law is also relevant, as is the impact on United States foreign-relations interests that may result from sanctioning a party when foreign law prohibits production of the documents. See Restatement § 442(2) & cmt. h; see also *Aérospatiale*, 482 U.S. at 546; *Rogers*, 357 U.S. at 201-202.

12

### B. The Lower Courts' International Comity Analysis Rested On Several Erroneous Premises

The lower courts' comity analysis was flawed in several respects.

1. The lower courts erred in suggesting that petitioner's reliance on foreign bank secrecy laws in this private action did not reflect good faith simply because petitioner previously produced some of the documents to the Departments of the Treasury and Justice. Pet. App. 40a-42a, 72a, 77a, 78a. That reasoning fails to account for the distinct United States and foreign interests implicated when the government, as opposed to a private party, seeks disclosure. It also threatens to undermine important United States law-enforcement and national-security interests by deterring private entities and foreign jurisdictions from cooperating with government requests.

The United States has a compelling sovereign interest in obtaining documents located abroad for use in criminal prosecutions, civil enforcement actions, and other proceedings through which the government investigates and addresses violations of United States law and protects the Nation. See, *e.g.*, *United States* v. *Davis*, 767 F.2d 1025, 1035 (2d Cir. 1985); *SEC* v. *Banca Della Svizzera Italiana*, 92 F.R.D. 111, 117-118 (S.D.N.Y. 1981). When it decides whether to seek documents assertedly covered by foreign bank secrecy laws, the government balances the need for the information sought and the public interest in the investigation against the interests of the foreign jurisdictions where the information is located and any potential consequences for our foreign relations. See *American Ins. Ass'n* v. *Garamendi*, 539 U.S. 396, 413-415 (2003). A government request for production therefore re-

13

flects the Executive Branch's conclusion, in the exercise of its responsibility for both foreign affairs and the enforcement of laws requiring production, that disclosure would be consistent with both the domestic public interest and international comity concerns.

Although the United States government may seek to compel disclosure of foreign bank records in court when necessary, the United States also relies heavily on cooperative methods for obtaining documents. Government agencies often negotiate voluntary disclosures or agreements that allow examination of documents consistent with both United States and foreign law. The United States may also make state-to-state requests for information pursuant to mutual legal assistance treaties (which apply in criminal matters) and other bilateral and multilateral agreements that govern official requests for information. See, *e.g.*, United Nations International Convention for the Suppression of the Financing of Terrorism, art. 12, Dec. 9, 1999, 2178 U.N.T.S. 235 (providing for mutual legal assistance in connection with criminal investigations, which may not be refused on bank-secrecy grounds); International Organization of Securities Commissions, Multilateral Memorandum of Understanding Concerning Consultation and Cooperation and the Exchange of Information, paras. 6(b), 7(b), May 2012, http://www.iosco.org/library/pubdocs/pdf/IOSCOPD386.pdf (providing for mutual state-to-state assistance in securities matters notwithstanding domestic secrecy laws). As such treaties and agreements reflect, many sovereigns recognize that government document requests reflect important sovereign interests and should be dealt with cooperatively when possible. That cooperation, by both foreign sovereigns and

14

private entities under their auspices, directly advances the United States government's ability to investigate violations of United States law.

The balance of relevant interests is materially different when a private party seeks documents located in foreign jurisdictions. Private requests may intrude more deeply on foreign sovereign interests because private parties often do not "exercise the degree of self-restraint and consideration of foreign governmental sensibilities generally exercised by the U.S. Government." *F. Hoffmann-La Roche Ltd.* v. *Empagran S.A.*, 542 U.S. 155, 171 (2004) (internal quotation marks and citation omitted); see Restatement § 442 rep. note 9. And although private litigants may be asserting a federal statutory claim that embodies important United States interests, their document requests do not reflect a specific determination by the government that the request is sufficiently in the public interest to warrant the adverse consequences that could ensue. In addition, banks may be able to produce documents to government agencies—but not private parties—consistent with foreign bank secrecy laws because of exceptions in the laws, applicable treaty provisions, or approval by governmental authorities. And a foreign state considering whether to permit or facilitate a bank's cooperation with a disclosure request—or whether to prosecute a bank for its disclosures—may view the matter differently based on whether the party requesting the information is a government entity or a private one. See Pet. App. 41a.

The lower courts therefore erred in concluding that petitioner had engaged in "selective compliance" with foreign bank secrecy laws by producing documents to

15

United States agencies but not to respondents. Pet. App. 78a. The district court appears to have relied solely on the fact of petitioner's production to government agencies, rather than on any conclusion that petitioner actually violated applicable foreign laws when it produced documents to the United States. See *id.* at 11a-12a, 40a-42a, 72a, 77a; Resp. C.A. Br. 9-10 (noting that magistrate judge found that petitioner produced documents to the Department of the Treasury "*without obtaining the prior formal consent of the applicable governmental authorities* in Jordan, Lebanon, or the Palestinian Authority," a finding that does not in itself establish that the disclosures violated applicable laws); see also Cert. Reply Br. 1-2 (representing that petitioner furnished information to United States government with consent of petitioner's regulators, and that respondents are aware of that fact). The courts below also erred in assuming that petitioner would not be subjected to penalties for producing documents in this private action solely because it apparently was not prosecuted for providing documents to the United States. Pet. App. 41a, 77a; see *id.* at 243a-245a; Hashemite Kingdom of Jordan Amicus Br. 10-11 (Jordan Amicus Br.).

By equating the status of government and private-party document requests, the lower courts' reasoning may undermine the United States' ability to obtain documents located in foreign jurisdictions through cooperation by the entity in question or the foreign jurisdiction. If a foreign financial institution's previous cooperation with governmental authorities may be used against it when it resists production in private litigation, those institutions may restrict their cooperation with governmental authorities in the first place.

16

And the United States' foreign-government partners
may similarly be deterred from facilitating coopera-
tion with government requests if their financial insti-
tutions may later have that cooperation weighed
against them in private litigation.

2. The district court also gave insufficient weight
to the interests of foreign governments in enforcing
their own laws within their own territories. Although
it is "well settled" that foreign laws "do not deprive an
American court of the power to order a party subject
to its jurisdiction to produce evidence even though the
act of production may violate" those laws, *Aérospa-
tiale*, 482 U.S. at 544 n.29, the extent to which "com-
pliance with the request would undermine important
interests of the state where the information is located"
is an important component of the comity analysis.[3]
Restatement § 442(1)(c).

Here, criminal statutes governing bank secrecy in a
number of foreign jurisdictions prohibit disclosing the
records sought by respondents. Pet. App. 111a-112a;
Br. in Opp. App. 16a-17a & n.3. The lower courts
identified no reason to conclude that those statutes
were enacted to shield wrongdoers from foreign legal
process, like the blocking statute at issue in *Aérospa-
tiale*, or that they are anything other than laws of
general applicability that reflect legitimate sovereign
interests in protecting foreign citizens' privacy and
confidence in the nations' financial institutions.[4] See,

---

[3] As discussed above, less deference to foreign law would be
appropriate when the government has determined that it has a
need for the information notwithstanding the foreign-relations
concerns at issue. But that situation is not present here.

[4] United States law does not impose any comparably broad pro-
hibition on disclosure of banking records that would necessarily

17

*e.g.*, C.A. App. A1075-A1079; cf. *Aérospatiale*, 482 U.S. at 545 n.29 (blocking statutes "need not be given the same deference by courts of the United States as substantive rules of law").

Although the district court acknowledged that "maintaining bank secrecy is an important interest of the foreign jurisdictions where the discovery sought here resides," Br. in Opp. App. 21a-22a, the court gave that interest scant weight because it believed that "[b]oth Jordan and Lebanon[] have recognized the supremacy of [the] interest[]" in combating terrorism "over bank secrecy," *id.* at 22a. In so concluding, the court relied on those governments' adoption of a memorandum of understanding in which the signatory governments pledged not to rely on bank secrecy "as a basis for refusing requests for mutual legal assistance" in terrorist financing investigations. *Id.* at 22a n.5; Memorandum of Understanding Between the Governments of the Member States of the Middle East and North Africa Financial Action Task Force Against Money Laundering and Terrorist Financing, Nov. 30, 2004, http://www.sic.gov.lb/

---

preclude disclosure of such records to private parties involved in litigation. See, *e.g.*, 15 U.S.C. 6802(a) and (e)(8) (prohibiting disclosure of nonpublic account information except on notice to the customer, but exempting disclosures made in response to subpoenas or other judicial processes); 31 U.S.C. 5313, 5318(g)(2), 5326 (requiring banks to report and record certain transactions, and mandating confidentiality only for suspicious activity reports and geographic targeting orders); 12 U.S.C. 3402-3408 (prohibiting disclosure of banking records to governmental entities, except pursuant to consumer consent, administrative and judicial subpoenas, or certain formal requests). That does not demonstrate, however, that foreign bank secrecy laws do not reflect legitimate sovereign interests.

downloads/MENAFATF_MOU_EN.pdf. But that memorandum of understanding pertains only to official state-to-state requests for mutual legal assistance.[5] It does not suggest that member states have agreed to subordinate their interest in protecting certain banking information from public disclosure when private litigants seek documents.[6] See Pet. App. 238a, 245a, 251a-252a; C.A. App. A1064.

3. Finally, in considering whether the United States' interests would be furthered by sanctioning petitioner for non-production, the lower courts did not consider the broad range of interests implicated by this case, including those that could favor a lesser sanction.[7] See *Daimler AG* v. *Bauman*, 134 S. Ct. 746, 763 (2014). The lower courts viewed the government's interest in combatting terrorism by means of the ATA's private right of action as the sole United States interest at stake. Pet. App. 37a, 97a. While private actions under the ATA can be one important means of disrupting terrorism financing and compensating victims of terrorism, *id.* at 37a-38a, Br. in Opp. App. 29a-30a, other important interests are at stake as well.

---

[5] The court also disregarded statements by the Palestine Monetary Authority that it views both bank secrecy laws and anti-terrorism banking regulations in the West Bank and Gaza as serving important interests. See C.A. App. A1060-A1061; Pet. App. 246a-248a; cf. *id.* at 98a.

[6] The lower courts also failed to separately analyze the interests of several jurisdictions whose bank secrecy laws were implicated, including Great Britain and France. See Pet. App. 36a-37a; Br. in Opp. App. 16a n.2.

[7] Although the United States was aware of this litigation (see Pet. App. 250a-252a), it did not participate before the district court or the court of appeals, and those courts did not invite its views.

19

a. The sanctions order could undermine the United States' vital interest in maintaining close cooperative relationships with Jordan and other key regional partners in the fight against terrorism. A primary means by which the United States government protects American citizens from international terrorism is by ensuring that foreign governments and entities continue to cooperate in United States-led counterterrorism efforts. See, *e.g.*, U.S. Dep't of State, *Bureau of Counterterrorism*, http://www.state.gov/j/ct/index.htm (last visited May 15, 2014). Jordan in particular is an invaluable partner in the region. The United States relies on Jordan in accomplishing a host of critical security and foreign-policy interests, including combatting terrorism. See White House Office of the Press Secretary, *Remarks by President Obama and His Majesty King Abdullah II of Jordan in a Joint Press Conference* (Mar. 22, 2013).

The sanctions order may have an impact on these important counterterrorism relationships. Jordan views the sanctions order as a "direct affront" to its sovereignty. Jordan Amicus Br. 14. The State Department has informed this Office that the governments of Saudi Arabia and the Palestinian Authority have also expressed significant concerns about the order and its effect on their relationships with the United States.

The sanctions order's potential to harm counterterrorism efforts is exacerbated by the lower courts' reasoning. See pp. 12-16, *supra*. As discussed above, the possibility that foreign financial entities could be penalized based on their cooperation with United States government agencies may deter foreign private

20

entities and governments from assisting in United States investigations or enforcement actions.

b. The United States has a significant interest in the stability of Jordan's financial and political system. Petitioner is the single largest financial entity in Jordan. Pet. App. 232a-233a. This Office is informed by the Departments of State and the Treasury that petitioner is responsible for processing financial assistance to Jordan through various United States foreign aid programs. Those Departments also report that petitioner is a constructive partner with the United States in working to prevent terrorist financing, including by reporting suspicious financial activities to the government of Jordan, which in turn exchanges information with the United States through international sharing arrangements. For example, petitioner is a leading participant in a number of regional forums on anti-money laundering and combatting the financing of terrorism.

Petitioner is also by market share the largest bank in the West Bank and Gaza, and it plays an important role in financing public debt there. See U.S. & Foreign Commercial Serv. & U.S. Dep't of State, *Doing Business in the West Bank & Gaza* 54-55 (updated June 12, 2013), http://export.gov/westbank/build/ groups/public/@eg_we/documents/webcontent/eg_we_ 064047.pdf. In addition, petitioner processes the customs clearance revenues from Israel that represent the overwhelming majority of Palestinian Authority revenue. See U.N. Conference on Trade & Dev., *Report on UNCTAD assistance to the Palestinian people: developments in the economy of the Occupied Palestinian Territory* 8 (2013), http://unctad.org/ meetings/en/SessionalDocuments/tdb60d3_en.pdf.

21

The district court's sanctions order, by (among other things) permitting the jury to draw an adverse inference with respect to petitioner's mental state, increases the likelihood that petitioner will be found liable at trial. See Pet. App. 240a-241a; Jordan Amicus Br. 17-19. Beyond the obvious financial stakes for petitioner's shareholders, petitioner asserts (Pet. 31-32) that correspondent banks and other counterparties could cease doing business with petitioner, and depositors might withdraw their accounts out of concern for petitioner's solvency. See Jordan Amicus Br. 18.

To be sure, petitioner would face the risk of losing at trial even in the absence of the sanctions imposed by the district court. But the sanctions order makes a finding of liability more likely by permitting the jury to draw inferences adverse to petitioner and by barring petitioner from presenting certain evidence. The possible effect of a judgment of liability on United States foreign-relations interests and the stability of the region was therefore a relevant consideration in determining the appropriate form and severity of the sanctions. See Restatement § 442 cmt. c.

## II. THIS COURT'S REVIEW IS NOT WARRANTED AT THIS TIME

Notwithstanding the errors discussed above, this case's procedural posture renders this Court's review inappropriate at this time. Mandamus "is a drastic and extraordinary remedy reserved for really extraordinary causes." *Cheney* v. *United States Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 380 (2004) (internal quotation marks and citation omitted). In order to demonstrate entitlement to mandamus relief, petitioner must establish that "[its] right to

issuance of the writ is clear and indisputable," that it has "no other adequate means to attain the relief [it] desires," and that issuance of the writ is "appropriate under the circumstances." *Id.* at 380-381 (internal quotation marks and citations omitted).

The court of appeals applied that standard, and its ultimate denial of mandamus is not clearly wrong. The district court's erroneous assessment of petitioner's previous production to government agencies, and the United States and foreign interests implicated by the sanctions order, do raise substantial questions and concerns about the analysis underlying the sanctions order.[8] If petitioner is found liable, those issues will warrant close scrutiny on appeal of a final judgment, taking into account any further assessment of the issues addressed by the district court and the manner in which the sanctions are implemented through jury instructions and evidentiary rulings. But it is a different question whether petitioner has demonstrated a "clear and indisputable" right to relief here, by way of mandamus.

---

[8] Nevertheless, the court of appeals' decision upholding the sanctions order does not, as petitioner contends (Pet. 23-24), conflict with the decisions of other courts of appeals. The decisions on which petitioner relies state that courts may in appropriate cases compel production, or impose sanctions for non-production, even when the documents in question are protected from disclosure by foreign law. See *Cochran Consulting, Inc.* v. *Uwatec USA, Inc.*, 102 F.3d 1224, 1226-1228 (Fed. Cir. 1996); *United States* v. *First Nat'l Bank*, 699 F.2d 341, 345-346 (7th Cir. 1983); *In re Westinghouse Elec. Corp. Uranium Contracts Litig.*, 563 F.2d 992, 997 (10th Cir. 1977). In each case, the court conducted a comity analysis and concluded that sanctions or compelled production were not appropriate in the specific circumstances presented.

23

Moreover, the ordinary way to challenge a sanctions order like that at issue here is by appealing from a final judgment. Petitioner's primary contention with respect to the adequacy of relief on appeal is that the sanctions order makes an adverse judgment virtually inevitable, and in the event of a liability finding, petitioner "might not survive long enough to take an appeal." Pet. C.A. Br. 19; see Pet. 31-32. The court of appeals concluded that petitioner's forecast was "speculation," Pet. App. 48a, and that an appeal would provide a meaningful opportunity to avoid the harm to petitioner and the region that could result from a finding of liability. Although petitioner's concerns found some support in an amicus brief filed in the Second Circuit by Jordan, see *id.* at 240a-241a, there necessarily is a considerable degree of speculation in such a forecast. That is especially so given that the period covered by the suit ended a decade ago and a finding of liability would not address petitioner's current practices. In these circumstances, the court of appeals permissibly concluded that the increased possibility of an adverse judgment did not warrant a departure from the ordinary processes of appellate review. *Id.* at 49a.

With respect to the appropriateness of mandamus, the court of appeals correctly observed that the dispute involves "a fact-intensive inquiry in the midst of ongoing, lengthy litigation." Pet. App. 53a-54a. The court was within its discretion to decline to grant the extraordinary remedy of mandamus in the circumstances of this case.

The interlocutory posture of the case also renders the effect of the sanctions difficult to assess. Until the sanctions are implemented at trial, they remain sub-

24

ject to reconsideration or modification by the district court. See Pet. App. 23a. Although the sanctions appear broad on their face, because they take the form of permissive jury inferences and preclusion of evidence, their precise scope will be determined by their implementation in jury instructions that have not yet been drafted, as well as evidentiary rulings made prior to and during the trial. See Br. in Opp. 37. Indeed, petitioner contends that subsequent district court rulings, including a July 2013 order that precludes petitioner from presenting evidence of foreign bank secrecy laws to the jury, have exacerbated the sanctions' effect. Pet. Supp. Br. 1-2. Without knowing what evidence petitioner will present and the precise content of the jury instructions, however, it is difficult to evaluate whether petitioner is likely to prevail at trial despite the sanctions, a result that would obviate the need for further review of the sanctions order. If a final judgment is entered against petitioner, the cumulative effect of the district court's orders implementing the sanctions can be evaluated on appeal, on the basis of the record as a whole.

25

**CONCLUSION**

The petition for a writ of certiorari should be denied.

Respectfully submitted.

> DONALD B. VERRILLI, JR.
>     *Solicitor General*
> STUART F. DELERY
>     *Assistant Attorney General*
> EDWIN S. KNEEDLER
>     *Deputy Solicitor General*
> GINGER D. ANDERS
>     *Assistant to the Solicitor*
>     *General*
> DOUGLAS N. LETTER
> SHARON SWINGLE
> KEITH I. MCMANUS
>     *Attorneys*

MAY 2014